**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WILLIAM DURLING, CHRIS BELLASPICA, TOM WOLFF, MICHAEL MORRIS, and RICHARD SOBOL,** for themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>                v.<br><br>**PAPA JOHN'S INTERNATIONAL, INC.,**<br>                    Defendant. | Case No. 7:16-cv-03592-CS<br><br>Class / Collective Action |

<u>**AMENDED CLASS / COLLECTIVE ACTION COMPLAINT**</u>

William Durling, Chris Bellaspica, Tom Wolff, Michael Morris and Richard Sobol ("Plaintiffs"), by and through their undersigned attorneys, hereby submit the following class action and collective action complaint against Papa John's International, Inc. ("PJI" or "Defendant").  The allegations concerning Plaintiffs' acts and status are based upon their actual knowledge, and their allegations concerning all other matters are based upon information, belief and the investigation of counsel:

<u>**NATURE OF THE ACTION**</u>

1.      This action seeks to redress Defendant's systematic policy and practice of paying its delivery drivers hourly wages that are well below the minimum wage mandated by the Fair Labor Standards Act of 1938, 29 U.S.C. §§201 *et seq*. ("FLSA"), the New York Labor Law, N.Y. Lab. Law, Art. 19 § 650 *et seq.*, ("NYLL"), the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, *et seq.* ("PMWA"), the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, *et seq.* (NJWHL) and the Delaware Minimum Wage Act, 19 Del. C. § 901 *et seq.* ("DMWA").

2.      The FLSA, NYLL, PMWA, NJWHL and DMWA, like virtually all minimum wage laws, require employers to provide their employees with sufficient reimbursements for employment-related expenses ("kickbacks") to ensure that employees' hourly wages equal or exceed the required minimum wage after such expenses are counted against the hourly wages. However, Defendant systematically under-reimbursed its delivery drivers for vehicular wear and tear, gas and other driving-related expenses, thereby ensuring that all of Defendant's delivery drivers are effectively paid well below the minimum wage.

3.      PJI has tried to shield itself from liability for its blatant minimum wage violations by operating through franchisees.  But PJI, which operates numerous corporate-owned Papa John's stores, is also a joint employer of all of the delivery drivers at the franchised Papa John's stores and devised and disseminates the policies and practices that cause drivers at both corporate and franchise stores to be uniformly under-reimbursed.  Indeed, PJI directly profits by unlawfully driving down costs associated with paying drivers because doing so increases net income at the corporate stores and increases the fees it obtains from franchises, because those fees are tied to overall franchisee profits.

4.      Moreover, PJI has created an apparent agency relationship with its franchisees by requiring all of the delivery drivers who are jointly employed by franchisees to, *inter alia*, wear Papa John's uniforms, affix Papa John's signage on their cars, apply for jobs with Papa John's, watch Papa John's training videos on a monthly basis, and tell customers they work for Papa John's.

5.      Plaintiffs bring this claim as a collective action pursuant to 29 U.S.C. §216(b) for all delivery drivers Defendant employed during the maximum limitations period.

6.      Plaintiff Durling brings his NYLL claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed at a Papa John's store in New York as delivery drivers during the maximum allowable limitations period.

7.      Plaintiff Bellaspica brings his PMWA claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed at a Papa John's store in Pennsylvania as delivery drivers during the maximum allowable limitations period.

8.      Plaintiff Wolff brings his NJWHL claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed at a Papa John's store in New Jersey as delivery drivers during the maximum allowable limitations period.

9.      Plaintiff Morris brings his DMWA claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed at a Papa John's store in Delaware as delivery drivers during the maximum allowable limitations period.

<u>JURISDICTION AND VENUE</u>

10.      This court has jurisdiction of this action under the FLSA, 29 U.S.C. § 216(b), and under 28 U.S.C. § 1331 (federal question jurisdiction).

11.      Jurisdiction is also authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy exceeds $5,000,000.00.

12.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2), because Mr. Durling resides in this District, worked for Defendant in this District and suffered the losses at issue in this District.  Defendant also is a joint employer and operator who is liable for operations at multiple Papa John's pizza stores in this District; Defendant maintains significant business

contacts within this District; and Defendant engaged in the unlawful conduct alleged in this Complaint within this District.

## THE PARTIES

13.     Mr. Durling is an adult resident of Poughkeepsie, New York, in Dutchess County, who worked as a part-time delivery driver for a Papa John's Pizza store at 187 Church Street in Poughkeepsie, New York from January 2015 to June 2015.

14.     Mr. Bellaspica is an adult resident of Levittown, Pennsylvania, in Bucks County, who worked as a full-time delivery driver for a Papa John's Pizza store on Street Road in Bensalem, Pennsylvania from December 2011 to September 2012.

15.     Mr. Wolff is an adult resident of Medford, New Jersey, in Burlington County, who worked as a part-time delivery driver for a Papa John's Pizza store at 617 Sokes Road in Medford, New Jersey from September 2012 through October, 2014.

16.     Mr. Morris is an adult resident of Middletown, Delaware, in New Castle County, who worked as a full-time delivery driver for a Papa John's Pizza store at 386 Main Street in Middletown, Delaware from approximately December 2011 through January 2013.

17.     Mr. Sobol is an adult resident of Louisville, Kentucky, in Jefferson County, who has worked as a full-time delivery driver for a corporate-owned Papa John's Pizza store at 5363 Dixie Highway in Louisville, Kentucky from 2011 to present.

18.     PJI employs more than 21,500 employees, as either a direct or joint employer, and operates more than 4,600 pizza stores worldwide.  PJI directly operates the store where Plaintiff Sobol works, and jointly operates the stores where Plaintiffs Durling, Bellaspica, Wolff and Morris have worked.  PJI is a Delaware corporation and maintains its corporate headquarters and

principal place of business in Jeffersontown, Kentucky.  Throughout the relevant period, PJI

devised, implemented and accomplished the improper acts and practices described herein.

## BACKGROUND FACTS

### JOINT EMPLOYMENT AND VICARIOUS LIABILITY ALLEGATIONS

19.     In a callous attempt to reap profits from Papa John's stores by under-reimbursing

delivery drivers while, at the same time, attempting to shield itself from liability from wage and

hour lawsuits brought by those drivers, PJI has adopted a policy and practice of selling certain of

its stores to local owners as a franchise.  This franchise relationship is little more than a façade,

the purpose of which is to help PJI avoid liability for its unlawful wage practices.

20.     Indeed, PJI obtains significant profits from all Papa John's restaurants, including the

franchise stores.  PJI receives fees and royalties that are directly tied to the profits its franchises

make, so the less its franchisees pay to their delivery drivers, the more money PJI's makes (to the

direct detriment of the drivers).  Therefore, PJI has a direct interest in its franchisees adopting its

unlawful driver reimbursement policies.

21.     Moreover, all Papa John's franchise stores hold themselves out to the public and to

their delivery drivers as being "Papa Johns."  Deliveries and orders are all performed through

PJI's website and/or its uniform order and delivery system and there is no functional difference,

either to the public or to delivery drivers, between a franchise store and a corporate store.

Franchises are also required to purchase dough and tomato sauce directly from PJI, and they

must purchase all of the other ingredients either from PJI or from an approved source.

22.     Throughout the Class Period, PJI was actively and directly engaged in the day-to-day

operation and management of all Papa John's restaurants, including those where Plaintiffs

worked.  PJI supervises, controls, manages and/or assists all individuals and business entities

who own, operate, supervise, control and/or manage Papa John's restaurants, both corporate and franchise.

23.     PJI establishes standardized procedures for hiring delivery drivers.  Franchisees receive a "Papa John's Franchise Team Member Handbook" ("Handbook") drafted and provided by PJI, and franchisees are instructed to operate in accordance with the rules and to follow directions provided in the Handbook with respect to the hiring, training and supervising their delivery drivers.  When employees, including Plaintiffs, are hired by Papa John's franchisees, their employers tell them they work for Papa John's.  Plaintiffs all understood themselves to be Papa John's employees.

24.     Defendant also advertises itself as the employer in job postings for delivery driver positions at franchisee-owned restaurants.  When delivery drivers apply for job postings online with PJI, they are often directed to interviews with Papa John's franchisees.

25.     Defendant's delivery drivers also perform their jobs in accordance with standard policies, systems, procedures and requirements that PJI promulgated.  PJI's Handbook directed franchisees on how to classify their various workers, including delivery drivers, and provided the tasks and responsibilities for each of those various classifications.

26.     Moreover, PJI promulgates the policy by which delivery drivers are under-reimbursed.  PJI instructs its franchises to pay its drivers at or near the tipped minimum wage applicable in each state or local area, and it instructs its franchises as to the amount to reimburse drivers for each delivery.

27.     That PJI controls the manner in which franchisees reimburse delivery drivers is demonstrated by the fact that all of the Papa John's franchises at which Plaintiffs were employed follow the same policy as Papa John's corporate stores.  This is no mere coincidence.

28.     Thus, at the end of each pay period, Defendant's delivery drivers receive wages that were determined by PJI policies, systems, and procedures.  Defendant specifically directed franchisees to reimburse delivery drivers at the rates at issue in this action.

29.     Defendant's delivery drivers also interface with PJI-provided computerized systems, programs and databases to perform their jobs.  This includes PJI's proprietary point-of-sale technology, which PJI required restaurants throughout North America to use and which allow PJI to directly oversee its franchisees' operations.[1]  PJI's system was used in the stores where Plaintiffs worked at as the timekeeping system that identifies the deficient wages at the heart of this action, and was instrumental in integrating franchisees into PJI's nationwide business.

30.     Defendant's delivery drivers performed their jobs using materials and technology that PJI selected and supplied, including PJI's proprietary point-of-sale technology, which tracked individual delivery orders and tasks.

31.     Defendant's delivery drivers were supervised in the performance of their work according to criteria set by PJI.  PJI established the roles and responsibilities of various supervisors, managers and shift leaders in its Handbook.  Defendant's delivery drivers were required to follow and abide by common work, time and compensation policies, systems, procedures and requirements that PJI promulgated.

---

[1] *See* Papa John's International, Inc. Form 10-K filing for the Fiscal Year ended December 29, 2013, available at http://ir.papajohns.com/secfiling.cfm?filingid=1104659-14-13226&cik= ("Our proprietary PROFIT System, point-of-sale technology ("POS"), is in place in all North America traditional Papa John's restaurants. … We believe the PROFIT System also enhances restaurant-level marketing capabilities. Polling capabilities allow us to obtain restaurant operating information, providing us with timely access to sales and customer information. The PROFIT System is also closely integrated with our digital ordering solutions in all domestic traditional Papa John's restaurants, enabling Papa John's to offer nationwide digital ordering to our customers.") (accessed April 8, 2016).

32.     PJI is a joint employer of its franchisees' delivery drivers because, *inter alia*,  it has the right to: hire and fire them, set their wages, control the work they perform, direct the manner in which they perform their work, inspect and supervise their work, promulgate policies and procedures governing their employment (including the work, time, compensation and overtime policies and procedures at issue here), enforce these policies and procedures, and calculate the compensation they received.

33.     Defendant has hidden behind its franchise model -- which allows it to reap annual revenues of over $1.2 billion -- to disclaim any responsibility for the policies and practices it allows, encourages at its franchisees' restaurants, despite being aware that those policies violate state and federal law.

34.     The wage theft at issue in this action is neither an isolated incident, nor is it due to the actions of "rogue" franchisees.  Rather, the serial underpayment of delivery drivers is an integrated part of Defendant's business model intended to maximize profits while using franchisees as a shield to mitigate liability.

35.     Multiple civil and criminal actions against PJI and its franchisees have identified widespread, systemic violations throughout Defendant's franchise network.[2]  This ongoing

---

[2] *See* Jessica Mason Pieklo, *Papa John's Ordered to Pay Almost $800,000 in Wage Theft Case*, REWIRE, Feb. 9, 2015, https://rewire.news/article/2015/02/09/papa-johns-ordered-pay-almost-800000-wage-theft-case/ (reporting on wage theft case against New York Franchisee Emstar Pizza, Inc.); Laila Kearney, *Papa John's To Pay $2 Million After Short-Changing New York Delivery Workers*, HUFFINGTON POST, Mar. 5, 2015, http://www.huffingtonpost.com/2015/03/05/papa-johns-franchise-ord_n_6811852.html (reporting on wage violations case against New York franchisee New Majority Holdings, LLC);  James McNair, *Papa John's to Settle Claims it Underpaid Delivery Drivers*, KENTUCKY CENTER FOR INVESTIGATIVE REPORTING, Aug. 7, 2015, http://kycir.org/2015/08/07/papa-johns-to-settle-claims-it-underpaid-delivery-drivers-in-six-states/ (reporting on under-reimbursement case against PJI on behalf of drivers in Missouri, Florida, Illinois, North Carolina, Arizona, and Maryland); Dave Jamieson, *Papa John's Stores To Dish Up Half A Million Dollars In Wage Theft Case*, HUFFINGTON POST, Oct. 15, 2015,

pattern of frequent violations led New York Attorney General Eric Schneiderman to *repeatedly* call on PJI "to step up and stop the widespread lawlessness plaguing [its] businesses and harming the workers who make and deliver [its] food."[3]

36.     PJPA, LLC ("PJPA"), the franchisee that employed Plaintiffs Bellaspica, Wolff and Morris (the "PJPA Plaintiffs") provides a typical example of PJI's abuse of the franchise system to profit at delivery drivers' expense while, at the same time, attempting to use legal trickery to evade liability.

37.     PJPA was a profitable company and PJI profited from having PJPA as a franchisee. PJI and its franchisees have benefitted from an intensely intertwined financial relationship.  In November 2008, PJI loaned PJPA approximately $9 million in startup money.  PJPA has paid down that loan to approximately $2,200,000, and also paid PJI millions of dollars in royalties and other fees.  Yet, shortly after the PJPA Plaintiffs sued PJPA for the unlawful wage practices at issue, PJI indicated that it would require full payment of the balance due (in addition to other moneys PJPA regularly paid PJI) and refused to negotiate any further payment plan or any accommodation to allow PJPA to pay the drivers for the minimum wage violations that occurred when PJPA followed PJI's policy.

38.     In the action against PJPA for under-reimbursing its drivers in violation of minimum wage law, the PJPA Plaintiffs obtained conditional class certification, and won numerous

---

http://www.huffingtonpost.com/entry/papa-johns-wage-theft-case_us_ 561fc478e4b050c6c4a4854b (reporting on wage theft case against four New York franchisees); Dave Jamieson, *Papa John's Franchisee Gets Jail Time For Failing To Pay Full Wages*, HUFFINGTON POST, Nov. 16, 2015, http://www.huffingtonpost.com/entry/papa-johns-wage-theft_us_ 564a16e9e4b045bf3df02826 (reporting on wage theft case against a New York franchisee BMY Foods).

[3] *Papa John's To Pay $2 Million After Short-Changing New York Delivery Workers*, *supra* note 2; *Papa John's Stores To Dish Up Half A Million Dollars In Wage Theft Case*, *supr*a note 2.

discovery motions as well as a temporary restraining order.  Nonetheless, solely because of PJI's actions, the PJPA Plaintiffs were severely limited in their recovery from PJPA.  After the PJPA Plaintiffs filed suit, PJI abruptly and deliberately placed PJPA under significant financial hardship by requiring PJPA to immediately pay off the remainder of its outstanding loan balance and indicating it would not provide PJPA with any funds to resolve the legal claims against it. As part of the PJPA litigation, U.S. Magistrate Judge Timothy R. Rice (E.D. Pa.) appointed an independent economic expert to review PJI's finances.  After an extensive review of PJPA's finances, this expert concluded that -- due to PJI's decision to recall its loan to PJPA and withhold further financial assistance until PJPA settled the lawsuit against it -- PJPA could only afford to pay its aggrieved delivery drivers a fraction of the value of their claims.[4]  PJI was thus able, through its financial control over PJPA, to effectively prevent PJPA from adequately reimbursing its drivers for the wage and hour violations that were due to PJI's policies and that, ultimately, padded PJI's profits.

39.     By using its franchisees as a liability shield, Defendant is able to limit delivery drivers' recoveries in suits against its franchisees.  For example, by calling due a loan to PJPA in response to the litigation against the franchisee, Defendant siphoned off the funds that would have been otherwise available to compensate the drivers it harmed through its unlawful policies. At the same time, PJI was guaranteed to make money because -- in addition to repaying the loan -- PJPA and other franchisees also paid PJI substantial additional sums for PJI's guidance in running the business.

40.     Because Defendant has deliberately used its franchisees as a liability shield and, through its economic control over those franchisees, sought to limit delivery drivers' ability to

---

[4] *See* Settlement Agreement at 4-5, *Bellaspica v. PJPA*, No. 13-3014 (E.D. Pa. Mar. 25, 2016) (Dkt. No. 139 – Attachment 3).

recover for blatant minimum wage violations, Plaintiffs are entitled to tolling on their claims against Defendant for the maximum allowable limitations period.

## DEFENDANT'S FRANCHISEES ARE APPARENT AGENTS OF DEFENDANT

41.    At all material times, Defendant's franchisees acted as agents of Papa John's. Franchisees such as PJPA employed Plaintiffs and other delivery drivers for the mutual benefit of Papa John's and those franchisees.

42.    Defendant's actions gave clear indication to franchisee employees that those employees, including Plaintiffs and Class members, were Papa John's employees.

43.    While working, Plaintiffs and other delivery drivers were required to affix Papa John's signs to their vehicles, to wear uniforms (shirts and hats) prominently featuring the Papa John's logo and to use delivery bags featuring the Papa John's logo.

44.    Prospective employees at franchisee stores fill out applications for employment that prominently feature the Papa John's logo and reference working for Papa John's.  While being interviewed, applicants are told by franchisees that they will be working for Papa John's.

45.    Defendant required the use of Papa John's uniforms, bags and signs at their restaurants, and required or permitted the use of the Papa John's logo on job applications for franchisee stores, fully aware that doing so gave rise to the reasonable belief that the delivery drivers were Papa John's employees and part of the Papa John's team.  Delivery drivers, including Plaintiffs, relied on the apparent authority of franchisees to hire them as Papa John's employees.

46.    Throughout their employment, Plaintiffs and delivery drivers were required to view monthly training videos produced and provided by Defendant.  These videos repeatedly stated

that the employees were members of the Papa John's team, and instructed the employees to perform job functions according to Papa John's standards.

47.    In reasonable reliance upon the representations made by the franchisees (representations consistently reinforced and allowed by Defendant), and by Defendant directly through their training videos, delivery drivers including Plaintiffs believed they were Papa John's team members and employees.  In relying on these representations, Plaintiffs and other delivery drivers performed the work required of them by Papa John's franchisees and received the sub-minimum wages at issue in this action.

48.    The control Papa John's has asserted and continues to assert over its franchisees exceeds any control necessary to protect Papa John's trademark or good will.

49.    Defendant authorized and condoned the violations alleged herein, and franchisees acted within the course and scope of their agency as agents of Papa John's.

## DEFENDANT'S FAILURE TO PAY MINIMUM WAGES TO DELIVERY DRIVERS

50.    The majority of food and drink orders placed at Defendant's restaurants are for home delivery.

51.    During a typical ten-hour shift, delivery drivers spend about seven hours "on the road" making deliveries.

52.    Throughout the relevant period, Defendant required its delivery drivers to maintain and provide a safe, functioning, insured and legally-operable automobile to make deliveries. These vehicles, typically two- and four-door passenger cars, weigh less than 10,000 pounds.

53.    Throughout the relevant period, Defendant required its delivery drivers to bear the "out-of-pocket" costs associated with their vehicles, including costs for gasoline, vehicle depreciation, insurance, maintenance and repairs.

54.     For decades, the Internal Revenue Service ("IRS") has calculated and published a standard mileage reimbursement rate ("IRS rate") for businesses and employees to use in computing the minimum deductible costs of operating an automobile for business purposes.

55.     In 2010, the IRS rate was $0.50 per mile.  From January through June 2011, the IRS rate was $0.51 per mile.  From July 2011 through December 2012, the IRS rate was $0.555 per mile; in 2013, the IRS rate was $0.565 per mile; in 2014, the IRS rate is $0.56 per mile; in 2015, the IRS rate was $0.575 per mile; in 2016 the IRS rate was $0.54 per mile.

56.     Since 2010, many reputable companies that study the cost of owning and operating a motor vehicle and/or estimating reasonable reimbursement rates for vehicular travel, including the American Automobile Association, have set the average cost of operating a vehicle at more than $0.50 per mile.

57.     Defendant's delivery drivers typically experienced lower gas mileage, more rapid vehicle depreciation, higher insurance rates and greater vehicular expenses than the average business driver because they typically drove in urban areas, in "start-and-stop" traffic, on a tight schedule, at night, and in inclement weather.

58.     Thus, during the relevant period, the actual "out-of-pocket" costs that Defendant's delivery drivers paid to provide a safe, functioning, insured and legally-operable automobile for their deliveries was at least $0.54 per mile.

59.     During the relevant period, Defendant's delivery drivers made an average of five deliveries per hour which required them to drive an average of 25 miles each hour (five miles per delivery), meaning they paid "out-of-pocket" about $13.50 per hour to provide, operate and maintain their vehicles.

60.     When Defendant's delivery drivers worked "on the road," they were paid an hourly wage at or above the tipped minimum, plus a set amount per delivery to ostensibly offset their "out-of-pocket" costs.  However, this set amount always provided delivery drivers with less than the tipped minimum wage plus the amount of their actual "out-of-pocket" costs incurred by Defendant's drivers.

61.     For example, PJPA paid its delivery drivers $6.00 per hour plus $1.00 per delivery to offset their "out-of-pocket" vehicle costs, an average total wage of $11.00 per hour, which is well under the actual "out of pocket" cost of $13.50 its delivery drivers incurred each hour.  As a result, instead of receiving at least the tipped minimum wage of $2.83 per hour, Defendant's delivery drivers had to pay $2.50 per hour to cover their "out-of-pocket" vehicle costs, a difference of $5.33 per hour – and a clear minimum wage violation.

## FLSA COLLECTIVE ACTION ALLEGATIONS

62.     Plaintiffs bring a collective action pursuant to 29 U.S.C. §216(b) on behalf of a proposed collective defined to include:

> All persons Defendant employed (either directly or through its franchisees) as a delivery driver during any workweek in the maximum limitations period.  Excluded from the class are any delivery drivers who worked for franchisees other than PJPA that are currently involved in class or collective litigation relating to delivery driver under-reimbursement.  Any delivery drivers who participated in the settlement with PJI in *Perrin v. Papa John's Int'l, Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for recovery for the time period specifically covered in the *Perrin* settlement.  Defendant shall be entitled to an offset as to delivery drivers who participated in settlements of claims for under-reimbursements with franchisees.

63.     Plaintiffs reserve the right to modify the proposed collective definition at a later stage of litigation.

64.    Plaintiffs are members of the proposed collective they seek to represent because they worked for Defendant as delivery drivers during the relevant period and suffered the minimum wage violation alleged above relating to work "on the road."

65.    This action may be properly maintained as a collective action on behalf of the putative Class because, during the relevant period:

a.   Plaintiffs and the Class members had the same employers;

b.   Plaintiffs and the Class members performed the same type of work;

c.   Plaintiffs and the Class members were governed by the same compensation policies, practices and systems;

d.   Plaintiffs and the Class members were subjected to the same policies relating to the payment of supplemental wages to offset vehicle maintenance costs;

e.   Plaintiffs and the Class members were governed by the same payroll policies, practices and systems;

f.   Defendant's labor relations and human resources systems were centrally-organized and controlled, and controlled the policies and practices at issue in this case.

66.    Plaintiffs estimate that the collective group, including both current and former employees over the relevant period, will include thousands of members.  The precise number of members should be readily available from Defendant's personnel, scheduling, time and payroll records, and from input received from the Class members as part of the notice and "opt-in" process provided by 29  U.S.C. §216(b).   Given the composition and size of the Class, its members may be informed of the pendency of this action directly via U.S. mail, e-mail and/or the posting of written notices at Defendant's work sites.

## STATE LAW CLASS ACTION ALLEGATIONS

67.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff William

Durling brings this class action on behalf of himself and the following Class of similarly-situated

individuals:

> All persons Defendant employed (either directly or through its franchisees) in New York as a delivery driver during any workweek in the maximum limitations period (the "New York Class"). Excluded from the class are any delivery drivers who worked for franchisees other than PJPA that are currently involved in class or collective litigation relating to delivery driver under-reimbursement. Any delivery drivers who participated in the settlement with PJI in *Perrin v. Papa John's Int'l, Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for recovery for the time period specifically covered in the *Perrin* settlement. Defendant shall be entitled to an offset as to delivery drivers who participated in settlements of claims for under-reimbursements with franchisees.

68.     The New York Class specifically excludes Defendant; any parent, subsidiary, or

affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which

Defendant otherwise controls or controlled; any officer, director, employee, legal representative,

predecessor, successor, or assignee of Defendant; and the Court and Court personnel.

69.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Chris Bellaspica

brings this class action on behalf of himself and the following Class of similarly situated

individuals:

> All persons Defendant employed (either directly or through its franchisees) in Pennsylvania as a delivery driver during any workweek in the maximum limitations period (the "Pennsylvania Class"). Excluded from the class are any delivery drivers who worked for franchisees other than PJPA that are currently involved in class or collective litigation relating to delivery driver under-reimbursement. Any delivery drivers who participated in the settlement with PJI in *Perrin v. Papa John's Int'l, Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for recovery for the time period specifically covered in the *Perrin* settlement. Defendant shall be entitled to an offset as to delivery drivers who

participated in settlements of claims for under-reimbursements with franchisees.

70.    The Pennsylvania Class specifically excludes Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant; and the Court and Court personnel.

71.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tom Wolff brings this class action on behalf of himself and the following Class of similarly situated individuals:

> All persons Defendant employed (either directly or through its franchisees) in New Jersey as a delivery driver during any workweek in the maximum limitations period (the "New Jersey Class"). Excluded from the class are any delivery drivers who worked for franchisees other than PJPA that are currently involved in class or collective litigation relating to delivery driver under-reimbursement. Any delivery drivers who participated in the settlement with PJI in *Perrin v. Papa John's Int'l, Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for recovery for the time period specifically covered in the *Perrin* settlement. Defendant shall be entitled to an offset as to delivery drivers who participated in settlements of claims for under-reimbursements with franchisees.

72.    The New Jersey Class specifically excludes Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant; and the Court and Court personnel.

73.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Michael Morris brings this class action on behalf of himself and the following Class of similarly situated individuals:

> All persons Defendant employed (either directly or through its franchisees) in Delaware as a delivery driver during any workweek

in the maximum limitations period (the "Delaware Class"). Excluded from the class are any delivery drivers who worked for franchisees other than PJPA that are currently involved in class or collective litigation relating to delivery driver under-reimbursement. Any delivery drivers who participated in the settlement with PJI in *Perrin v. Papa John's Int'l, Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for recovery for the time period specifically covered in the *Perrin* settlement. Defendant shall be entitled to an offset as to delivery drivers who participated in settlements of claims for under-reimbursements with franchisees.

74.     The Delaware Class specifically excludes Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant; and the Court and Court personnel.

## CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (On Behalf Of The FLSA Collective)

75.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

76.     Defendant is an "employer" as defined by 29 U.S.C. § 203(d).

77.     Plaintiffs and the collective group members are "employees" as defined by 29 U.S.C. § 203(e)(1) and "tipped employees" as defined by 29 U.S.C. § 203(t).

78.     The direct and supplemental wages Defendant paid to Plaintiff and the collective group members are "wages" as defined by 29 U.S.C. § 203(m).

79.     Defendant is an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A).

80.    Plaintiffs and the putative Class members are similarly situated individuals within the meaning of 29 U.S.C. §216(b). with the FLSA's requirements, and Plaintiffs and the putative Class members were covered employees entitled to the FLSA's protections.

81.    This Count arises from Defendant's violation of the FLSA, 29 U.S.C. § 206(a)(1), for failing to pay Plaintiffs and the putative Class members the required minimum wage for each hour they worked.

82.    Throughout the relevant period, the federal minimum wage rate for non-tipped employees was $7.25 per hour and the federal minimum wage rate for tipped employees was $2.83 per hour.

83.    Defendant failed to pay Plaintiffs and the putative Class members the required minimum wage for their work "on the road."

84.    Defendant paid its delivery drivers $6.00 per hour plus $1.00 per delivery, an average total wage of $11.00 per hour.  However, based on nationally-accepted minimum reimbursement calculations for business travel, Plaintiffs and the Class members wound up having to pay "out-of-pocket" about $13.50 per hour to provide, operate and maintain their vehicles.  Since Plaintiffs and the Class members experiences a net loss of $2.50 each hour they worked "on-the-road", Defendant's wage system for this work presents a clear FLSA violation.

85.    In failing to ensure that Plaintiffs and the collective group members received at least the tipped minimum wage rate for each hour they worked "on-the-road," Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

86.    Defendant has no good faith justification or defense for failing to pay Plaintiffs and the collective group members all wages mandated by the FLSA.

## COUNT II - VIOLATION OF THE NEW YORK LABOR LAW
### (On Behalf Of The New York Class)

87.     Plaintiff William Durling repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

88.     Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiff Durling and the other members of the New York Class.

89.     The unpaid wages at issue in this litigation are "Wages" as defined by NYLL § 190(1).

90.     Plaintiffs and the Class members are "Employees" as defined by NYLL § 190(2).

91.     Defendant is an "Employer" as defined by NYLL § 190(3).

92.     Throughout the relevant period, Defendant was an employer obligated to comply with the NYLL's requirements, and Plaintiff Durling and the New York Class members were covered employees entitled to the NYLL's protections.

93.     NYLL § 193 prohibits employers, among other things, from requiring an employee to make payments by separate transaction, unless such charge or payment is permitted as a deduction from wages under the NYLL.

94.     NYLL § 193 prohibits deductions from wages that are not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency and are not expressly authorized in writing by the employees and are not for the benefit of the employee.

95.     NYLL § 198-B(2) prohibits persons, among other things, from requesting, demanding, or receiving, either before or after such employee is engaged, a return, donation, or contribution of any part or all of said employee's wages, salary, supplements, or other thing of

value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such employee from procuring or retaining employment.

96.     As alleged herein, Defendant, pursuant to its policy and practice, has reimbursed Delivery Drivers less than the reasonably approximate amount of their automobile expenses to such an extent that it diminishes the Delivery Drivers' net wages below New York's minimum wage.

97.     Prior to December 31, 2015, the New York minimum wage for tipped restaurant workers was $5.00 per hour.  As of December 31, 2015, the New York minimum wage for tipped restaurant workers is $7.65 per hour for workers who earn at least $1.35 per hour in tips, and $6.80 per hour for workers who earn at least $2.20 per hour in tips.

98.     Defendant, pursuant to its policy and practice, violated the NYLL by requiring *de facto* deductions for vehicle expenses that are not authorized under the NYLL and/or that reduce Delivery Drivers' net wages below the minimum.

99.     Plaintiff and all other Delivery Drivers are victims of uniform compensation and vehicle cost reimbursement policies; and these uniform policies, in violation of the NYLL, have been applied, and continue to be applied, to all Defendant's Delivery Drivers.

100.     As a result of the aforesaid violations of the NYLL's minimum wage provisions, Defendant has unlawfully caused *de facto* deductions from the wages of Plaintiff and all other Delivery Drivers that resulted in minimum wages being unlawfully withheld by Defendant from Plaintiff and all other Delivery Drivers.

101.     NYLL § 633(1) provides that Plaintiff and all other Delivery Drivers are entitled to damages equal to the amount of the unpaid minimum wages during the relevant period, plus periods of equitable tolling.

102.    NYLL § 633(1) further provides that Plaintiff and all other Delivery Drivers are entitled to an award of their costs incurred in pursuing this claim, an award of reasonable attorneys' fees incurred in pursuing this claim and an award of prejudgment interest at the applicable rate.

103.    Under NYLL § 633(1) Defendant is liable for a penalty in the amount of 100% of the total of the amount due during the relevant period as Defendant cannot prove a good faith basis to believe that its underpayment was in compliance with the law.

### COUNT III - VIOLATION OF THE PENNSYLVANIA MINIMUM WAGE ACT
### (On Behalf Of The Pennsylvania Class)

104.    Plaintiff Chris Bellaspica repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

105.    Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiff Bellaspica and the other members of the Pennsylvania Class.

106.    The unpaid wages at issue in this litigation are "Wages" as defined by PMWA § 3(d).

107.    Defendant is an "Employer" as defined in PMWA §3(g).

108.    Plaintiffs and the Class members are "Employees" as defined by PMWA § 3(h) and "Tipped Employees" as defined by PMWA §3(d).

109.    Throughout the relevant period, Defendant was an employer obligated to comply with the PMWA's requirements, and Plaintiff Bellaspica and the Pennsylvania Class members were covered employees entitled to the PMWA's protections.

110.    This Count arises from Defendant's failure to pay Plaintiff Bellaspica and the Pennsylvania Class members the required minimum wage for each hour they worked in violation of PMWA § 4(a).

111.    Throughout the relevant period, the minimum wage rate in Pennsylvania for tipped employees who do not pool their tips has been set at $2.83 per hour.

112.    When Plaintiff Bellaspica and the Pennsylvania Class members were out on the road making deliveries, performing work for which they received tips that were not pooled, Defendant paid them a direct wage of $6.00 per hour plus a supplemental wage of $1.00 per delivery, which resulted in an average wage of $11.00 per hour.

113.    However, Defendant required Plaintiffs and the Class members to bear "out-of-pocket" vehicle maintenance costs of between $12.50 and $15.00 per hour, meaning that they were actually under-reimbursed between $1.50 and $4.00 per hour for each hour they worked making deliveries.

114.    Since Defendant under-reimbursed Plaintiffs and the Class members for their "out-of-pocket" expenses, it also necessarily failed to pay them the required minimum wage of $2.83 per hour for tipped employees who do not pool their tips.

115.    Defendant knew, or should have known, that its employment practices and policies resulted in the minimum wage violations pled here.

116.    In failing to ensure that Plaintiff Bellaspica and the Pennsylvania Class members actually received the applicable minimum wage rate for each hour they worked, Defendant acted willfully, or with reckless disregard for clearly applicable PMWA provisions.

117.    Defendant has no good faith justification or defense for failing to play Plaintiff Bellaspica and the Pennsylvania Class members the minimum wage required by the PMWA for each hour they worked.

118.    PMWA § 13 expressly allows private plaintiffs to bring civil actions to enforce an employers' failure to comply with the PMWA's requirements.

119.     PMWA § 13 expressly provides that an agreement between the employer and employee to work for less than the required minimum wage is not a defense to an action seeking to recover unpaid minimum wages.

### COUNT IV - VIOLATION OF THE NEW JERSEY WAGE AND HOUR LAW
### (On Behalf Of The New Jersey Class)

120.     Plaintiff Tom Wolff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

121.     Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiff Wolff and the other members of the New Jersey Class.

122.     The unpaid wages at issue in this litigation are "Wages" as defined by N.J.S.A. 34:11-56a1(d).

123.     Defendant is an "Employer" as defined in N.J.S.A. 34:11-56a1(g).

124.     Plaintiffs and the Class members are "Employees" as defined by N.J.S.A. 34:11-56a1(h).

125.     Throughout the relevant period, Defendant was an employer obligated to comply with the NJWHL's requirements, and Plaintiff Wolff and the New Jersey Class members were covered employees entitled to the NJWHL's protections.

126.     This Count arises from Defendant's failure to pay Plaintiff Wolff and the New Jersey Class members the required minimum wage for each hour they worked in violation of N.J.S.A. 34:11-56a.

127.     Throughout the relevant period, the minimum wage rate in New Jersey for tipped employees has been set at $2.13 per hour.

128.    When Plaintiff Wolff and the New Jersey Class members were out on the road making deliveries, performing work for which they received tips that were not pooled, Defendant paid them a direct wage of $6.00 per hour plus a supplemental wage of $1.00 per delivery, which resulted in an average wage of $11.00 per hour.

129.    However, Defendant required Plaintiffs and the Class members to bear "out-of-pocket" vehicle maintenance costs of between $12.50 and $15.00 per hour, meaning that they were actually under-reimbursed between $1.50 and $4.00 per hour for each hour they worked making deliveries.

130.    Because Defendant under-reimbursed Plaintiffs and the Class members for their "out-of-pocket" expenses, it also necessarily failed to pay them the required minimum wage of $2.13 per hour for tipped employees who do not pool their tips.

131.    Defendant knew, or should have known, that its employment practices and policies resulted in the minimum wage violations pled here.

132.    In failing to ensure that Plaintiff Wolff and the New Jersey Class members actually received the applicable minimum wage rate for each hour they worked, Defendant acted willfully, or with reckless disregard for clearly applicable NJWHL provisions.

133.    Defendant has no good faith justification or defense for failing to play Plaintiff Wolff and the New Jersey Class members the minimum wage required by the NJWHL for each hour they worked.

134.    N.J.S.A. 34:11-56a25 expressly allows private plaintiffs to bring civil actions to enforce an employers' failure to comply with the NJWHL's requirements by recovering the full amount of such minimum wage less any amount actually paid together with costs and reasonable attorney's fees as determined by the Court.

135.     N.J.S.A. 34:11-56a25 expressly provides that an agreement between the employer and employee to work for less than the required minimum wage is not a defense to an action seeking to recover unpaid minimum wages.

136.     Furthermore N.J.S.A. 34:11-56a25 expressly permits an employee or employees to maintain an action for, and on behalf of, themselves and all others similarly situated.

## COUNT V - VIOLATION OF THE DELAWARE WAGE AND HOUR LAW
### (On Behalf Of The New Jersey Class)

137.     Plaintiff Michael Morris repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

138.     Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiff Morris and the other members of the Delaware Class.

139.     The unpaid wages at issue in this litigation are "Wages" as defined by 19 Del. C. § 901(7).

140.     Defendant is an "Employer" as defined in 19 Del. C. § 901(4).

141.     Plaintiffs and the Class members are "Employees" as defined by 19 Del. C. § 901(3).

142.     Throughout the relevant period, Defendant was an employer obligated to comply with the DMWA's requirements, and Plaintiff Morris and the Delaware Class members were covered employees entitled to the DMWA's protections.

143.     This Count arises from Defendant's failure to pay Plaintiff Morris and the Delaware Class members the required minimum wage for each hour they worked in violation of 19 Del. C. § 902.

144.     Throughout the relevant period, the minimum wage rate in Delaware for tipped employees has been set at $2.23 per hour.

145.    When Plaintiff Morris and the Delaware Class members were out on the road making deliveries, performing work for which they received tips that were not pooled, Defendant paid them a direct wage of $6.00 per hour plus a supplemental wage of $1.00 per delivery, which resulted in an average wage of $11.00 per hour.

146.    However, Defendant required Plaintiffs and the Class members to bear "out-of-pocket" vehicle maintenance costs of between $12.50 and $15.00 per hour, meaning that they were actually under-reimbursed between $1.50 and $4.00 per hour for each hour they worked making deliveries.

147.    Since Defendant under-reimbursed Plaintiffs and the Class members for their "out-of-pocket" expenses, it also necessarily failed to pay them the required minimum wage of $2.23 per hour for tipped employees who do not pool their tips.

148.    Defendant knew, or should have known, that its employment practices and policies resulted in the minimum wage violations pled here.

149.    In failing to ensure that Plaintiff Moriss and the Delaware Class members actually received the applicable minimum wage rate for each hour they worked, Defendant acted willfully, or with reckless disregard for clearly applicable DMWA provisions.

150.    Defendant has no good faith justification or defense for failing to play Plaintiff Morris and the Delaware Class members the minimum wage required by the DMWA for each hour they worked.

151.    19 Del. C. § 911(a) expressly allows private plaintiffs to bring civil actions to enforce an employers' failure to comply with the NJWHL's requirements by recovering the full amount of such minimum wage less any amount actually paid together with costs and reasonable attorney's fees as determined by the Court.

152.    19 Del. C. § 911(a) expressly provides that an agreement between the employer and employee to work for less than the required minimum wage is not a defense to an action seeking to recover unpaid minimum wages.

WHEREFORE, Plaintiffs respectfully pray for an Order:

   a.   certifying this matter to proceed as a class action;

   b.   approving Plaintiffs as adequate Class representatives of their respective Classes;

   c.   appointing Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Stephan Zouras, LLP to serve as Class Counsel;

   d.   requiring Defendant to provide the names and current (or best known) addresses of all members of the identified Collective and Classes;

   e.   authorizing Class Counsel to issue a notice informing the Class members that this action has been filed, of the nature of the action, and of their right to opt out of this lawsuit;

   f.   finding that Defendant willfully violated the applicable provisions of the FLSA by failing to pay all required wages to Plaintiffs and the collective group members;

   g.   finding that Defendant willfully violated the applicable provisions of the NYLL by failing to pay all required wages to Plaintiffs and the New York Class members;

   h.   finding that Defendant willfully violated the applicable provisions of the PMWA by failing to pay all required wages to Plaintiffs and the Pennsylvania Class members;

i.  finding that Defendant willfully violated the applicable provisions of the NJWHL by failing to pay all required wages to Plaintiffs and the New Jersey Class members;

j.  finding that Defendant willfully violated the applicable provisions of the DMWA by failing to pay all required wages to Plaintiffs and the Delaware Class members;

k.  granting judgment in favor of Plaintiffs and the members of the collective group and each class on all Counts;

l.  awarding all available compensatory damages in an amount to be determined;

m.  awarding an equal amount of liquidated damages as provided by the FLSA;

n.  awarding reasonable attorneys' fees and reimbursement of all costs and expenses incurred in litigating this action;

o.  awarding all available equitable and injunctive relief precluding the continuation of the policies and practices pled in this Complaint;

p.  awarding any further relief the Court deems just, necessary and proper;

q.  granting leave to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; and

r.  maintaining jurisdiction over this action to ensure Defendant's compliance with the foregoing.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned counsel, hereby demand a jury trial in the above-captioned matter.

July 12, 2016                          Respectfully submitted,

                                       By:      /s/ Jeremiah Frei-Pearson
                                                Jeremiah Frei-Pearson
                                                D. Greg Blankinship
                                                Difie Osborne
                                                **FINKELSTEIN, BLANKINSHIP,**
                                                **FREI-PEARSON & GARBER, LLP**
                                                445 Hamilton Avenue, Suite 605
                                                White Plains, New York 10601
                                                Tel: (914) 298-3281
                                                jfrei-pearson@FBFGLaw.com


                                                **STEPHAN ZOURAS, LLP**

                                                David J. Cohen
                                                604 Spruce Street
                                                Philadelphia, PA 19106
                                                Tel: (215) 873-4836
                                                dcohen@stephanzouras.com
                                                *Pro Hac Vice forthcoming*

                                                James B. Zouras
                                                Ryan F. Stephan
                                                205 N. Michigan Avenue, Suite 2560
                                                Chicago, Illinois 60601
                                                312-233-1550
                                                312-233-1560 f
                                                jzouras@stephanzouras.com
                                                rstephan@stephanzouras.com
                                                *Pro Hac Vice*


                                                *Attorneys for Plaintiffs*
                                                *and the Putative Class*