UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM DURLING, et al.,

        Plaintiffs,

    -against-                    **Civil Action No: 16-cv-03592 (CS)**

PAPA JOHN'S INTERNATIONAL, INC..,

        Defendant.

---

## *AMICUS* BRIEF OF THE
## INTERNATIONAL FRANCHISE ASSOCIATION
## CONCERNING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

---

                                      David M. Wirtz
                                      LITTLER MENDELSON, P.C.
                                      900 Third Avenue
                                      New York, New York 10022
                                      Telephone: (212) 583-9600

The International Franchise Associate ("IFA") respectfully submits this *amicus* brief to provide its perspective on the issues raised in Plaintiffs' Motion for Conditional Certification (the "Motion"; Doc. No. 66).

## I.  SUMMARY STATEMENT OF INTEREST

The IFA is the largest trade association in the world devoted to representing the interests of franchising. Its members consist of franchisees, franchisors, and companies that support the franchising industry.

If this Court were to grant Plaintiffs' Motion, it would have a significant, negative impact on thousands of IFA member franchisees. Despite operating under nationwide brands, most local franchise employers are small businesses that survive on narrow profit margins. Subjecting these businesses to unwarranted costs in legal fees and business disruptions—all without any showing of wrongdoing by them— would jeopardize their solvency and the entire franchise model.

The IFA has reviewed and fully supports the memorandum submitted by Papa John's International, Inc. ("PJI") (Doc. No. 88) and will not repeat PJI's arguments. Instead, the IFA files this memorandum to make four points: (a) the Motion unfairly targets and penalizes non-party franchisees; (b) the proposed relief violates franchisees' constitutionally-guaranteed Due Process rights; (c) the proposed Notice would significantly, and without justification, disrupt hundreds of small, independent businesses; and (d) the relief requested would irreparably damage the franchise model and harm the future of small businesses in the United States.

## II.  BACKGROUND OF THE FRANCHISE MODEL

Franchising is a method of marketing goods and services in which one entity, the franchisee, pays another entity, the brand name company/franchisor, for the right to do business

under the franchisor's trademark or trade name.[1] The Federal Trade Commission—the agency with jurisdiction over disclosure requirements for franchisors—defines a franchise as a commercial relationship in which the franchisor "will exert or has the authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation."[2] Many states maintain similar definitions.[3]

Commercial franchising can be traced back to the distribution of the Singer sewing machine in the mid-1800s.[4] However, the modern franchise model began in the 1950s and 1960s.[5] Franchising grew because of an increasingly mobile consumer public and because it provided a less capital-intensive way for a business to operate on a national or even international scale.[6] The franchise system allows the brand name company to create a network of suppliers or providers under its name, through which it can obtain new capital and self-motivated vendors of its products and services, without the substantial expense of developing company owned outlets.[7]

Under this system, the brand name company is not the only beneficiary; the system also favors the franchisee. It provides an entrepreneur or small business owner with the expertise, stability, and marketing usually reserved for larger enterprises.[8] In other words, the business

---

[1] Joseph H. King., Jr., *Limiting the Vicarious Liability of Franchisors for the Torts of Their Franchisees*, 62 Wash & Lee L. Rev. 417, 420-21 (2005) (citation omitted); Francine LaFontaine & Roger D. Blair, *The Evolution of Franchising and Franchise Contracts: Evidence from the United States,* 3 Entrepreneurial Bus. L.J. 381, 387 (2009).
[2] 16 C.F.R. § 436.1(h)(2).
[3] *See, e.g.,* N.Y. Gen. Bus. Law § 681(3)(a); Ind. Code §23-2-2.5-1(a)*;* Mich. Comp. Laws §§ 445.1501, *et seq*.
[4] Steven A. Carvell & David Sherwyn, *It Is Time for Something New: A 21st Century Joint-Employer Doctrine for 21st Century Franchising*, 5 Am. U. Bus. L. Rev. 5 (2015).
[5] Kevin M. Shelley & Susan H. Morton, *"Control" in Franchising and the Common Law*, 19 Franchise L.J. 119, 119 (2000).
[6] Sean Obermeyer, *Resolving the Catch 22: Franchisor Vicarious Liability for Employee Sexual Harassment Claims Against Franchisees*, 40 Ind. L. Rev. 611, 611-20 (2007).
[7] *Id*.
[8] *Id*.; Shelley & Morton, *supra,* note 5 at 121.

2

model was premised upon the idea that there could be a symbiotic relationship between the brand name company, as it seeks to expand into markets it otherwise might not pursue, and the franchisees, which own their own business and benefit from their own individual efforts.

There are two basic forms of franchise arrangements—the product distribution and the business-format systems.[9] Pertinent to this matter is the business-format system, where the franchisor sells the brand name company's product or service. In the typical business-format franchise, the franchisee agrees to meet certain minimum standards set by the franchisor to protect its brand, trade name, and trademarks.[10] Such standards may serve to indirectly affect some of the less important terms and conditions of employment experienced by employees of the franchisees; for example, wearing uniforms or interacting with customers in a particular way.[11]

In the past few decades, the business-format franchise model has experienced great growth. The most well-known business-format franchise examples include "chain" restaurants such as McDonald's and Burger King.[12] However, this model is far more widespread than most realize and can be found in a wide variety of business sectors, including automotive (Meineke Car Care Center), business services (The UPS Store), beauty (Massage Envy and Great Clips), financial services (Allstate), and health (AFC Urgent Care).[13]

One common and "core concept" in both basic franchising models is the uniformity of products and services.[14] Customers expect to receive the same product or service from every franchisee regardless of location, but the desire for uniformity of customer experience does not

---

[9] King, *supra,* note 1 at 422.
[10] Obermeyer, *supra*, note 6 at 616.
[11] *Id*.
[12] *Id*. at 615.
[13] Franchise Opportunities, http://www.franchiseopportunities.com/industry (last visited Jan. 5, 2017).
[14] Shelley and Morton, *supra,* note 5 at 121.

dictate uniformity of all (or even most) of the significant terms and conditions of employment for a franchisee's employees. The IFA is unaware of any franchise relationship in which the franchisor dictates how (or how much) franchisees pay their employees, when their employees are scheduled to work, or which employees should be hired, disciplined, or fired.

### III. LEGAL ANALYSIS/ARGUMENT

#### A. The relief requested in the Plaintiffs' Motion unfairly targets and penalizes franchisees.

In premising their Motion on the unsubstantiated notion that all franchised corporations constitute a single, unified enterprise, Plaintiffs ignore the fact that a franchisor and franchisee are separate and distinct companies. The U.S. Small Business Administration recognizes that a franchisee and its franchisor are separate and independent corporate entities, absent common ownership or management.[15] To the IFA's knowledge, Plaintiffs in this case have submitted no evidence that the franchisees of PJI are subject to common ownership or management, and this is no wonder, because there is no such evidence.

Put another way, for purposes of control of employees, franchisees are just like other small business owners. The owners and managers oversee all the day-to-day operations of their business, pay the rent, taxes and financing costs, and most importantly here, make all their own labor and employment decisions, including those related to pay practices. The sole distinction between a franchisee and other small businesses is that the franchisee licenses the franchisor's brand and business model, enabling them to rely on built-in goodwill and name recognition.

---

[15] "The restraints imposed on a franchisee or licensee by its franchise or license agreement relating to standardized quality, advertising, accounting format and other similar provisions, generally will not be considered in determining whether the franchisor or licensor is affiliated with the franchisee or licensee provided the franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. Affiliation may arise, however, through other means, such as common ownership, common management or excessive restrictions upon the sale of the franchise interest." 13 C.F.R. § 121.103.

Franchisees operate on razor-thin margins. According to a survey of New York quick service restaurant owners released in 2015 by the Employment Policies Institute, 81 percent of such restaurants earn profits of four percent or less per annum.[16] Increasing the franchisees' overhead in the form of litigation costs and business disruptions–through the certification of a nationwide class of franchisee employees–could easily drive some of the smaller franchisees out of business. Those that survive will be placed at an unfair competitive disadvantage and forced to raise prices, reduce headcount, or lower the quality of their goods and services. Such effects are not among the reasonably foreseeable consequences of entering into an arm's length franchise relationship with a franchisor. PJI franchisees should not be indirectly targeted in this lawsuit merely by virtue of having entered into franchise agreements that have nothing to do with the alleged pay practices at issue. And the precedent created, if this Court were to grant Plaintiffs' Motion and it were to be followed by other courts, could have nationwide consequences, given the pervasiveness of the franchise model.

**B.    Certifying a nationwide class of employees of non-party defendants would violate the franchisees' Due Process rights.**

The proposed certification would also deprive franchisees of their protected property and liberty interests without constitutionally-required procedural protections. The Due Process Clause provides that life, liberty, and property cannot be deprived except pursuant to constitutionally adequate procedures. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). In determining whether the process afforded was constitutionally adequate, courts examine the procedural safeguards built into the statutory or administrative procedure effecting the deprivation. *Payne v. D.C.,* 808 F. Supp. 2d 164, 174 (D.D.C. 2011). The impairment of the

---

[16] Employment Policies Institute, *Measuring the Cost of a Higher Minimum Wage for New York's Fast Food Restaurants*, June 2015, at 3-4, https://www.epionline.org/wp-content/uploads/2015/06/NY_MINWAGE21.pdf (last visited Jan. 5, 2017).

right to use or dispose of property is a constitutionally recognized deprivation. *Connecticut v. Doehr,* 501 U.S. 1 (1991).

Granting the Plaintiffs' Motion would have a significant impact on the non-party franchisees, dragging them into a nationwide lawsuit involving employment practices of hundreds of different franchisees. In addition, as non-parties, the franchisees would have no practical ability to contest the proposed collective action or Notice and no voice—save this eight-page brief— in a proceeding seeking to certify a class of thousands of their employees.

If Plaintiffs' Motion were to be granted, it would expose the franchisees to significant third-party discovery, with its attendant costs and legal fees. Non-parties do not have the same procedural tools that are available to parties to object to discovery, leaving the franchisees with little ability to narrow or object. Given that each franchisee is a corporation, it will have to retain legal counsel to make objections, a cost that many franchisees cannot afford. Additionally, since most of the PJI franchisees are not located in New York, they will need to seek and retain separate counsel admitted in this District to appear and participate on their behalf. Should this matter proceed, Plaintiffs will almost certainly seek to depose franchisee owners and managers from throughout the country, demanding the expenditure of yet more on fees, all predicated upon nothing more than the barebones allegations Plaintiffs have offered in support of the Motion.[17]

Effectively, granting the Motion will result in holding non-party franchisees hostage to this unwieldy action, consisting of diverse claims pertaining to employees at hundreds of unconnected locations nationwide. A franchisee operating exclusively in Oregon will be

---

[17] Franchisees will almost certainly be unable to recoup any legal fees they incur. *See e.g. In re Am. Hous. Found.,* No. 09-20232-RLJ-11, 2013 WL 2422706, at *3 (Bankr. N.D. Tex. June 4, 2013) (holding that a non-party cannot shift fees incurred for attendance at deposition or review of items produced.)

materially affected by a dispute across the country with no ability to effectively defend itself or object to the very proceeding that purports to attack its employment practices (whatever those might be). Such a result would offend the Due Process Clause.

      **C.**    **Plaintiffs' proposed Notice would cause significant disruption to hundreds of businesses nationwide and interfere in employer relationships.**

The proposed Notice would significantly disrupt each of the more than 700 franchisees nationwide and create mass confusion. The Notice to franchisee employees that Plaintiffs have proposed [Doc. No. 68-21] is misleading and based on a joint-employer theory that this Court has not adopted, putting the cart before the horse. Specifically, the Notice states "Records show that you currently or previously worked as a Papa John's delivery driver," and defines Papa John's International, Inc. as "Papa John's." Sending a notice—with the imprimatur of this Court—to thousands of individuals employed by hundreds of different franchisees, whose paychecks come from the franchisees, not PJI, indicating that their employer is PJI, would cause pointless confusion and disruption in the workplace.

      **D.**    **Granting Plaintiffs' Motion would eviscerate the franchise model and undermine small business.**

A franchisor is not a joint employer in any legal context unless it has significant control over the employment relationship. *Raines v. Shoney's, Inc.,* 909 F. Supp. 1070, 1078 (E.D. Tenn. 1995) (generally, "a franchisor is not the employer of employees of the franchisee"). Courts evaluating franchise relationships for joint employment have routinely concluded that a franchisor's expansive control over certain elements of a franchisee's business creates no joint employment relationship.[18]

---

[18] *See, e.g., Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003) (no joint employer relationship where franchisor's employees monitored franchisee's employees but franchisor did not schedule or control shifts, or assign duties); *Jacobson v. Comcast Corp.*, 740

Franchising is an essential business model that creates opportunities for small business ownership and job creation. However, this essential model would be significantly threatened if franchisees and franchisors were to be treated as joint employers for the purposes of conditional certification of collective action claims. This is true *a fortiori,* when, as here, certification is sought without any concrete showing of common ownership or meaningful control. Making franchisors liable for the employee practices of its independent franchisees, or allowing a collective action to proceed against a franchisor to pinch every one of its franchisees, would destroy jobs and prevent small business growth.[19]

## IV. CONCLUSION

For the foregoing reasons, the IFA submits that the relief requested in the Plaintiffs' Motion would be damaging to franchisees of PJI and deny them Due Process, and if the Motion were to be granted, it could be, as precedent, damaging to all franchisors and franchisees of all types and kinds throughout the country. As such, the Motion should be denied.

---

F. Supp. 2d 683, 688 (D. Md. 2010) (no joint employment although franchisor had power to hire and fire technicians, and set schedules and performance standards, because it was for quality control); *Lockard v. Pizza Hut,* 162 F.3d 1062, 1071 (10th Cir. 1998) (franchisee's use of franchisor's policies did not establish that the franchisor had centralized control of labor relations sufficient to create a joint employer relationship, where no evidence indicated what role, if any, the franchisor played in implementing or effecting the policies).

[19] On point, the CEO of a major franchise brand, and incoming Secretary of Labor, has forecast "the upheaval in the fast-food industry if tens of thousands of restaurants accustomed to operating independently suddenly were forced to work hand in hand with franchisers on every employment-related decision." Andrew Puzder, Op-Ed., *Why Do the Feds Want to Dismantle the Golden Arches?*, Wall St. J. (Jul. 31, 2014), at http://www.wsj.com/articles/andrew-puzder-why-do-the-feds-want-to-dismantle-the-golden-arches-1406850364 (last accessed on Jan. 5, 2017). *See also* Raymond G. McGuire, *The Labor Law Aspects of Franchising*, 13 B.C. L. Rev. 215, 268 (1971) ("The characterization of the franchisor as an employer or joint employer partially vitiates several of the primary purposes of most franchising programs...").

Respectfully submitted this 6th Day of January, 2016,

                                        LITTLER MENDELSON, P.C.
                                      *Attorneys for International Franchise Association*

By:      */s/David M. Wirtz*
       David M. Wirtz
       900 Third Avenue
       New York, NY 10022
       Telephone: 212.583.2699
       Facsimile: 646.291.5834
       dwirtz@littler.com

Case 7:16-cv-03592-CS-JCM   Document 102   Filed 01/06/17   Page 10 of 10