UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WILLIAM DURLING, JAMES MORTON, JR.,
TOM WOLFF, MICHAEL MORRIS and
RICHARD SOBOL, for themselves and all
others similarly situated,

                         Plaintiffs,

            -against-

PAPA JOHN'S INTERNATIONAL, INC.,

                         Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 3592 (CS)(JCM)

      Plaintiffs William Durling, James Morton, Jr., Tom Wolff, Michael Morris and Richard Sobol ("Plaintiffs") commenced this putative class action against Defendant Papa John's International, Inc. ("PJI"), alleging that PJI pays its pizza delivery drivers wages below the minimum wage mandated by federal and state law. Presently before the Court is Plaintiffs' motion to compel production of documents. (Docket No. 242). Plaintiffs' motion challenges PJI's decision to withhold, on privilege grounds, certain documents involving communications between PJI and third-party Motus, LLC ("Motus"). The motion also raises other general document discovery issues. For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

**I. BACKGROUND**

      The Court assumes familiarity with the history of this case, and recites only the facts necessary to this Opinion and Order. Plaintiffs allege that PJI "systematically under-reimbursed its delivery drivers for vehicular wear and tear, gas and other driving-related expenses, thereby ensuring that all of [PJI's] delivery drivers are effectively paid well below the minimum wage." (Docket No. 35 ¶ 2). Plaintiffs assert claims under the Fair Labor Standards Act of 1938

1

("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the New York Labor Law, N.Y. Lab. Law, Art. 19 §§ 650 *et seq.*; the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, *et seq.*; the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, *et seq.*; and the Delaware Minimum Wage Act, 19 Del. C. §§ 901 *et seq.* (*Id.* ¶ 1).

On July 6, 2016, Plaintiffs issued their first set of document requests, seeking, among other things, all "studies or analyses relating to [PJI's] determination as to how much to reimburse Delivery Drivers." (Docket No. 244-4 ¶ 7). On or about August 8, 2017, PJI provided Plaintiffs with a privilege log listing documents it had withheld from production. (Docket No. 244 ¶ 6). PJI subsequently updated its privilege log as the parties conferred on discovery issues, providing a revised privilege log (the "Privilege Log"), (Docket No. 244-12), on August 21, 2017, (Docket No. 244 ¶ 6). PJI later provided Plaintiffs with a supplemental log containing thirteen entries, reflecting documents that PJI inadvertently produced and sought to claw back on privilege grounds (the "Claw-Back Privilege Log"). (Docket No. 244-11).

PJI has withheld multiple documents related to Motus, a third-party consultant that provided services to PJI. At a status conference on October 4, 2017, the Court ordered the parties to submit briefing on the present discovery issues and ordered PJI to submit, for *in camera* review, all Motus-related documents that PJI was withholding on privilege grounds. PJI has represented that its Privilege Log contains eighty entries that involve communications with Motus or attachments concerning Motus data. (*See* Docket No. 254). PJI submitted the documents reflected in those eighty entries to the Court for *in camera* review.[1] In addition, PJI

---

[1] The eighty entries bear Privilege Log numbers 9–16, 19–25, 38–43, 56, 74, 76–80, 82–85, 87–89, 91–94, 103, 104, 107, 109, 110, 112–123, 125–131, 135–137, 278, 280, 292, 321, 338, 400, 453, 459, 461, 660, 695, 697, 821, and 943.

2

submitted documents reflected in the thirteen entries on PJI's Claw-Back Privilege Log.[2] In total, PJI submitted documents reflected in ninety-three log entries to the Court for *in camera* review.

PJI also submitted declarations signed by Billy Higdon (Docket No. 253-1), Caroline Oyler (Docket No. 253-2) and Rodney Harrison (Docket No. 253-3) addressing, among other things, the role performed by Motus. On August 19, 2009, PJI was sued in a nationwide class action captioned *Perrin v. Papa John's Int'l, Inc.*, No. 09 Civ. 01335 (E.D. Mo. 2015) (the "*Perrin* Litigation"). PJI's outside counsel in the *Perrin* Litigation, Ogletree Deakins, retained Motus to act as an expert. In January 2016, the court granted final settlement approval in the *Perrin* Litigation. Separate from Motus's role as an expert in the *Perrin* Litigation, PJI retained Motus to assist it in connection with an analysis of alternative approaches to reimbursement of delivery driver vehicle expenses. Motus continued to provide services to PJI after conclusion of the *Perrin* Litigation.

On October 30, 2017, the Court heard oral argument regarding Plaintiffs' motion.

## II. LEGAL STANDARDS

The following is a summary of the applicable legal standards regarding relevance, the attorney-client privilege and the work-product doctrine.

### A. Relevance

In general, the Federal Rules of Civil Procedure permit parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Information within this scope of discovery need not be admissible in evidence to be discoverable. *Id.* "Although not unlimited,

---

[2] The thirteen entries bear Claw-Back Privilege Log numbers CB-01 through CB-13.

relevance, for the purpose of discovery, is an extremely broad concept." *Greater New York Taxi Ass'n v. City of New York*, No. 13 Civ. 3089 (VSB) (JCF), 2017 WL 4012051, at *2 (S.D.N.Y. Sept. 11, 2017) (quoting *Am. Fed'n of Musicians of the United States & Canada v. Sony Music Entm't, Inc.*, No. 15-CV-05249 (GBD) (BCM), 2016 WL 2609307, at *3 (S.D.N.Y. Apr. 29, 2016)). "'Relevance' under Rule 26 'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case.'" *Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp. 3d 607, 618 (S.D.N.Y. 2014) (quoting *Crosby v. City of New York*, 269 F.R.D. 267, 282 (S.D.N.Y. 2010)).

### B. Attorney-Client Privilege

"Where, as here, a case includes federal and state law claims and the evidence sought is relevant to both, 'the asserted privileges are governed by the principles of federal law.'" *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, No. 13 Civ. 8997(JPO)(GWG), 2015 WL 3450045, at *2 (S.D.N.Y. May 28, 2015) (quoting *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987)). Accordingly, the Court applies federal law to decide the issues raised by this motion.

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re Cty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419. "The party asserting the privilege . . . bears the burden of establishing its essential elements." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).

"The privilege's underlying purpose has long been 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests

4

in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In order to balance the protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege "only where necessary to achieve its purpose" and "construe the privilege narrowly because it renders relevant information undiscoverable." *Mejia*, 655 F.3d at 132 (quoting *In re Cty. of Erie*, 473 F.3d at 418).

"The attorney-client privilege protects only legal advice, not economic, business, or policy advice." *Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012); *see also Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) ("Communications that are made for purposes of evaluating the commercial wisdom of various options as well as in getting or giving legal advice are not protected."). The test for deciding whether a communication that contains both legal and non-legal advice is privileged is "whether the predominant purpose of the communication is to render or solicit legal advice." *In re Cty. of Erie*, 473 F.3d at 420. "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. It requires a lawyer to rely on legal education and experience to inform judgment." *Id.* at 419 (citation omitted); *see also Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962) ("Attorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from their essentially professional legal services, gives rise to no privilege whatever.").

"Application of the attorney-client privilege to the corporate context poses 'special problems.'" *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 279 F.R.D. 140, 150 (S.D.N.Y. 2011) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). "In-house counsel often fulfill the dual role of legal advisor and business consultant." *MSF Holding,*

5

*Ltd. v. Fiduciary Tr. Co. Int'l*, No. 03 Civ. 1818PKLJCF, 2005 WL 3338510, at *1 (S.D.N.Y. Dec. 7, 2005) (holding that e-mails from in-house counsel constituted business advice because counsel "never alluded to a legal principle in the documents nor engaged in legal analysis"). "The court therefore must proceed cautiously, recognizing that the application of the privilege 'risks creating an intolerably large zone of sanctuary since many corporations continuously consult attorneys.'" *Ovesen v. Mitsubishi Heavy Indus. of Am. Inc.*, No. 04 Civ. 2849(JGK)(FM), 2009 WL 195853, at *3 (S.D.N.Y. Jan. 23, 2009) (quoting *First Chicago Int'l v. United Exch. Co.*, 125 F.R.D. 55, 57 (S.D.N.Y. 1989)). "In cases involving corporations and in-house counsel, courts have maintained a stricter standard for determining whether to protect confidential information through the attorney-client privilege." *Bank Brussells Lambert v. Credit Lyonnais (Suisse), S.A.*, 220 F. Supp. 2d 283, 286 (S.D.N.Y. 2002); *see also Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 1579(HB)(JCF), 2013 WL 1195545, at *9 (S.D.N.Y. Mar. 25, 2013) ("[C]ommunications between businesspeople and in-house counsel are not automatically shielded from discovery."). "Communications that principally involve the performance of non-legal functions by an attorney are not protected." *Complex Sys.*, 279 F.R.D. at 150. "Moreover, even if a business decision can be viewed as both business and legal evaluations, the business aspects of the decision are not protected simply because legal considerations are also involved." *Id.* (internal quotation marks omitted).

  While as a general matter the attorney-client privilege applies only to communications between lawyers and their clients, the Second Circuit has held that under certain circumstances "the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *Mejia*, 655 F.3d at 132 (quoting *United States v. Adlman* ("*Adlman I*"), 68 F.3d 1495,

6

1499 (2d Cir. 1995)). For example, the Second Circuit has extended the application of the privilege to communications by an attorney's client to an accountant hired by the attorney to assist the attorney in understanding the client's financial information. *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). "Nevertheless, the extension has always been a cabined one, and '[t]o that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.'" *Mejia*, 655 F.3d at 132 (quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)).

The Second Circuit has clarified that the *Kovel* decision "recognized that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." *Ackert*, 169 F.3d at 139–40. "On the other hand, where an attorney seeks out a third party in order to obtain information that his client does not have, the third party's role is 'not as a translator or interpreter of client communications, [and] the principle of *Kovel* does not shield his discussions with [the attorney].'" *Montesa v. Schwartz*, No. 12 Civ. 6057 (CS)(JCM), 2016 WL 3476431, at *5 (S.D.N.Y. June 20, 2016) (alterations in original) (quoting *Ackert*, 169 F.3d at 139–40); *see also Merck Eprova AG v. Gnosis S.p.A.*, No. 07 Civ. 5898(RJS)(JCF), 2010 WL 3835149, at *2 (S.D.N.Y. Sept. 24, 2010) ("[W]hen an attorney seeks out a third party to provide information rather than to act as a translator for client communications, the communications between the attorney and the third party are not privileged.").

## C. Work-Product Doctrine

Federal law governs the applicability of the work-product doctrine in all actions in federal court. *Fresh Del Monte*, 2015 WL 3450045, at *2. The work-product doctrine is based on "strong public policy" and is codified in part by Federal Rule of Civil Procedure 26(b)(3),

7

which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party shows substantial need and an inability to obtain the substantial equivalent of the documents without undue hardship. *United States v. Adlman* ("*Adlman II*"), 134 F.3d 1194, 1197 (2d Cir. 1998). In contrast to the attorney-client privilege, which is intended to encourage full disclosure by the client, the work-product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *Id.* at 1196 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Adlman II* established a test to determine whether documents should be deemed prepared "in anticipation of litigation" and therefore subject to work-product protection. "A document will be protected if, 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'" *Schaeffler*, 806 F.3d at 43 (quoting *Adlman II*, 134 F.3d at 1202). "Conversely, protection will be withheld from 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" *Schaeffler*, 806 F.3d at 43 (quoting *Adlman II*, 134 F.3d at 1202).

"While legal risks may ripen into litigation, not all risk management qualifies as anticipation of litigation. Generalized steps to avoid non-specific litigation are not accorded work product protection." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 553 (S.D.N.Y. 2013); *see also De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, No. 04 Civ. 4099(DLC), 2006 WL 357825, at *1 (S.D.N.Y. Feb. 15, 2006) (documents created by management consultant not work product where consultant "would have created" them in similar

form "even if the potential for litigation had been remote"). As with the attorney-client privilege, the party asserting the protection of the work-product doctrine bears the burden of establishing its applicability to the case at hand. *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 393 (S.D.N.Y. 2015).

## III. DISCUSSION

### A. Relevance

PJI argues that documents related to Motus are categorically not relevant to this case. (Docket No. 252 at 4). However, having conducting an *in camera* review, the Court finds that, in general, the Motus-related documents in question are potentially relevant to, among other issues, PJI's willfulness or good faith. Plaintiffs allege that PJI acted with willfulness or reckless disregard for the relevant minimum wage laws. (*See* Am. Compl. ¶¶ 85, 116, 132, 149). Those allegations affect the applicable limitations period. *See Acosta v. Manna 2nd Ave. LLC*, No. 15 Civ. 4655 (JCF), 2017 WL 4574809, at *2 (S.D.N.Y. Oct. 12, 2017) ("[T]he statute of limitations for FLSA claims is two years unless any violation is willful, in which case the limitations period is three years."); 29 U.S.C. § 255(a). Additionally, PJI expressly premises its third, thirteenth, fourteenth and fifteenth affirmative defenses on the assertion that it acted in good faith. (*See* Docket No. 47). Information regarding PJI's consideration of different reimbursement methodologies is relevant to Plaintiffs' allegations of willfulness and PJI's good faith defenses. *See Scott*, 67 F. Supp. 3d at 618 (ordering employer to produce documents relevant to its good faith defenses to FLSA claims); *Xuedan Wang v. Hearst Corp.*, No. 12 CV 793(HB), 2012 WL 6621717, at *1 (S.D.N.Y. Dec. 19, 2012) (same).

### B. Attorney-Client Privilege

As set forth below, some, but not all, of the documents submitted for *in camera* review are protected by the attorney-client privilege.

9

### 1. Communications with Motus

On their face, communications between PJI or PJI's counsel and Motus (a third party) appear to fall outside the scope of the attorney-client privilege because sharing otherwise-privileged communications with third parties generally waives the privilege. PJI argues, however, that its communications with Motus are protected by the attorney-client privilege both (1) because the purpose of Motus was to "improve the comprehension of the communications between attorney and client," and (2) because Motus employees were the functional equivalent of PJI employees. (Docket No. 252 at 12–13). Based on its *in camera* review of the documents, the Court disagrees and finds that PJI has failed to demonstrate a basis for asserting the attorney-client privilege over communications between PJI (or its counsel) and Motus.

First, the principle of *Kovel* does not shield communications between PJI and Motus because Motus's role was not as a translator or interpreter of client communications. *See Ackert*, 169 F.3d at 140. PJI retained Motus not to improve the comprehension of the communications between attorney and client, but rather to obtain information that PJI did not already have. *See Montesa*, 2016 WL 3476431, at *5; *Merck*, 2010 WL 3835149, at *2.

Second, PJI has failed to establish that Motus employees were the "functional equivalent" of PJI employees.[3] It appears that Motus employees had neither independent authority to make decisions on PJI's behalf, nor primary responsibility for PJI's reimbursement program. Although Motus employees collaborated with and provided input to PJI's employees for over a year, Motus—a third-party consultant with multiple employees and numerous customers other than

---

[3] "[F]ederal common law is not settled as to the existence of the functional equivalency exception." *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12CV5067JFKJLC, 2017 WL 4676806, at *14 n.21 (S.D.N.Y. Oct. 17, 2017). The Second Circuit, in particular, has not recognized the exception's existence. *Id.* Without reaching the question of whether or not the functional equivalent exception is valid, the Court finds that PJI has failed to satisfy its burden under the functional equivalent analysis.

PJI—was not so fully integrated into the PJI hierarchy that its employees were *de facto* employees of PJI. *See CAC Atl. LLC v. Hartford Fire Ins. Co.*, No. 16 Civ. 5454 (GHW) (JCF), 2017 WL 448957, at *1 (S.D.N.Y. Jan. 19, 2017); *Steinfeld v. IMS Health Inc.*, No. 10 Civ. 3301(CS)(PED), 2011 WL 6179505, at *3 (S.D.N.Y. Dec. 9, 2011); *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113–14 (S.D.N.Y. 2005). Moreover, even if Motus employees were the functional equivalent of PJI employees, the communications at issue between Motus and PJI would not fall within the scope of the attorney-client privilege because the predominant purpose of the communications was not to render or solicit legal advice, but rather to help evaluate the commercial wisdom of various options. *See Schaeffler*, 806 F.3d at 40.

**2. Internal PJI Communications**

Many of the documents submitted for *in camera* review are not communications with Motus, but rather internal PJI communications or communications between PJI and its outside counsel. (*See, e.g.*, Privilege Log No. 107). Those communications are protected by the attorney-client privilege, in whole or in part, to the extent they were made in confidence between client and counsel for the purpose of obtaining or providing legal advice. Application of the attorney-client privilege to these documents is complicated because it is clear that PJI's in-house attorneys, John Matter and Caroline Oyler, performed "the dual role of legal advisor and business consultant." *MSF Holding*, 2005 WL 3338510, at *1. Nevertheless, in general, the internal PJI e-mails contained in PJI's *in camera* submission reflect a predominantly legal function performed by PJI's in-house counsel. Therefore, PJI may continue to withhold the internal PJI communications (or communications between PJI and its outside counsel) contained within the *in camera* submission, to the extent those communications were made in connection with obtaining or providing legal advice and were kept confidential (for example, not shared with Motus employees). The attorney-client privilege does not extend to e-mail attachments that

11

originated from Motus or communications with Motus that were merely forwarded by PJI's counsel. *See ECDC Envtl., L.C. v. New York Marine & Gen. Ins. Co.*, No. 96CIV.6033(BSJ)(HBP), 1998 WL 614478, at *9 (S.D.N.Y. June 4, 1998) ("An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client.").

### C. Work-Product Doctrine

Having found that some of the documents submitted for *in camera* review are protected by the attorney-client privilege, the Court now evaluates whether any privilege applies to the documents that are *not* protected by the attorney-client privilege, such as the communications and data transmitted between PJI and Motus. PJI argues that all of the Motus-related documents at issue are protected by the work-product doctrine because PJI retained Motus to assist it in connection with an analysis of alternative approaches to reimbursement of delivery driver vehicle expenses.[4] (Docket No. 252 at 8). The scope of the work-product doctrine under *Adlman II* and *Schaeffler* is broad, but not unlimited, and PJI's interpretation would extend the doctrine too far. Accordingly, the Court finds that the work-product doctrine does not protect the communications between PJI and Motus submitted for *in camera* review.[5]

---

[4] The Court notes that PJI's Privilege Log identifies only a single privilege basis for all-but-one of the eighty Privilege Log entries at issue: "Attorney-Client Communication." (*See* Docket No. 242-12). Therefore, PJI arguably waived any claim that those documents are protected by the work-product doctrine. *See Obeid v. Mack*, No. 14 Civ. 6498 (LTS) (HBP), 2016 WL 7176653, at *6 (S.D.N.Y. Dec. 9, 2016). The Court need not reach the issue of waiver because it finds that, regardless, the work-product doctrine does not protect the communications at issue.

[5] The documents submitted for *in camera* review do not appear to relate to PJI's retention of Motus as an expert in the *Perrin* Litigation. Indeed, most of the submitted communications occurred after the *Perrin* Litigation concluded. Accordingly, this Opinion and Order does not address the extent to which the work-product doctrine protects documents related to PJI's retention of Motus as an expert in the *Perrin* Litigation. Moreover, Plaintiffs acknowledge that communications between PJI and Motus related to the *Perrin* Litigation "may be privileged." (Docket No. 243 at 12 n.4).

### 1. Applicability

In light of the *Perrin* Litigation and the many lawsuits filed around the country regarding the reimbursement of pizza delivery drivers, there is little doubt that PJI's counsel anticipated the possibility of future litigation when PJI retained Motus to assist with PJI's evaluation of alternative reimbursement programs. "The question under *Adlman*, however, is not merely whether [the party asserting privilege] contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'" *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting *Adlman II*, 134 F.3d at 1204); *see also Wultz*, 304 F.R.D. at 395 (finding that work-product protection did not apply even after accepting the contention that defendant anticipated litigation); *Fresh Del Monte*, 2015 WL 3450045, at *6 (same).

"If, regardless of the prospect of litigation, the document would have been prepared anyway, in the ordinary course of business or in 'essentially similar form,' it is not entitled to work product protection." *Clarke v. J.P. Morgan Chase & Co.*, No. 08 Civ. 02400(CM)(DF), 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009). "This inquiry requires the Court to 'consider what would have happened had there been no litigation threat.'" *Fresh Del Monte*, 2015 WL 3450045, at *7 (quoting *Wultz*, 304 F.R.D. at 395). The burden to show what "would have" happened in these circumstances is on PJI, not Plaintiffs. *Wultz*, 304 F.R.D. at 395. PJI has not satisfied its burden of demonstrating that, but for the prospect of litigation, the Motus communications in question would not have been prepared in the ordinary course of business or in substantially the same form.

Businesses constantly reevaluate available options within the constraint of needing to comply with legal obligations. For purposes of the work-product doctrine, there is a difference between documents that were created in a particular form because of a company's legal

obligations and documents that were created in a particular form because of actual or anticipated litigation. "Indeed, to find that avoidance of litigation without more constitutes in anticipation of litigation would represent an insurmountable barrier to normal discovery and could subsume all compliance activities by a company as protected from discovery." *In re Grand Jury Proceedings*, No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) (internal quotation marks omitted). Taken to its logical conclusion, PJI's argument would require PJI to concede that, but for the threat of litigation, PJI would not have considered whether its reimbursement policies complied with the applicable wage laws. PJI has not made such a concession. As a matter of prudent business practice, even if PJI did not anticipate future litigation after *Perrin*, it would have still tried to evaluate the best way to reimburse its drivers.

The Court carefully inspected the documents submitted for *in camera* review to determine whether they were prepared because of anticipated litigation or would have been prepared in substantially similar form regardless. The communications between PJI and Motus do not contain legal analyses or litigation strategies; they are generally business strategy documents addressing, for example, cost calculations and data, not anticipated litigation. *See De Beers*, 2006 WL 357825, at *1 ("Although Centenary and Bain suggest that DBG contemplated the possibility that litigation would arise out of the decisions it was preparing to make, the documents at issue here are *business strategy* documents that Bain would have created for DBG in similar form even if the potential for litigation had been remote.").[6] The Court finds that the communications at issue would have occurred in essentially similar form even if PJI had not

---

[6] The reports provided by Motus to PJI share clear similarities with non-privileged reports PJI received prior to the *Perrin* Litigation from another third-party vendor, Runzheimer International, Inc. (*Compare* Docket No. 244 Ex. 14, *with* Docket No. 244 Ex. 26). That fact supports the conclusion that the documents Motus prepared for PJI would have been created in essentially similar form irrespective of the prospect of litigation.

14

anticipated litigation. Accordingly, PJI has not met its burden to establish that the communications are entitled to protection under the work-product doctrine.

## 2. Substantial Need

Even if PJI had satisfied its burden of showing that the withheld documents are eligible for work-product privilege, Plaintiffs would nevertheless be entitled to the Motus communications at issue because Plaintiffs have demonstrated a substantial need for them. The protections afforded by the work-product doctrine are not absolute. Instead, a party may obtain fact work product if it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). A substantial need exists "where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (footnotes omitted) (finding that plaintiffs had demonstrated substantial need where data compiled by defendants was "directly probative on many of the issues in this case").

Based on its *in camera* review, the Court finds that the communications between PJI and Motus at issue are not opinion work product because they contain factual material, not attorney mental impressions or legal theories. As noted above, PJI's willfulness or good faith are contested issues in this case. Accordingly, Plaintiffs have a substantial need for access to the relevant information that PJI employees had at their disposal when considering and implementing PJI's driver reimbursement policies. Therefore, with respect to the documents submitted for *in camera* review, PJI is directed to produce all communications or documents transmitted between PJI, or PJI's outside counsel, and Motus (*see, e.g.*, Privilege Log Nos. 21–24, 42, 43, 93, 94, 113–118, 120–123, 130, 131, 135–137).

### D. Withheld Attachments to Privileged E-mails

PJI has taken the position that "[i]f a privileged email includes an attachment, the attachment is part of the email communication and was accordingly withheld." (Docket No. 252 at 14). Plaintiffs argue that PJI "should not be allowed to withhold non-privileged documents merely because they are attached to a privileged document." (Docket No. 243 at 21). To the extent PJI maintains that any attachment to a privileged e-mail is *automatically* privileged, PJI's argument fails. As Plaintiffs state, such an approach would allow PJI "to justify withholding vendor documents that are not independently privileged merely because [PJI's] internal counsel strategically attached the documents to communications that are privileged."[7] (*Id.*).

Whether an attachment to a privileged e-mail is itself privileged will depend on the circumstances. The general standard for the attorney-client privilege applies. To be subject to a claim of attorney-client privilege, an attachment must have been communicated in confidence between counsel and client for the purpose of obtaining or providing legal advice. *See In re Cty. of Erie*, 473 F.3d at 419. PJI must produce any attachments withheld on grounds of attorney-client privilege that do not meet that standard. When assessing whether an attachment is privileged, PJI's counsel can consider the contents of the parent e-mail and need not view the attachment as an entirely distinct and independent document. A document that a client sends a lawyer "might be subject to a claim of privilege if disclosure would reveal that it was communicated in confidence to an attorney in connection with the seeking or receipt of legal advice." *Gen. Elec. Co. v. United States*, No. 3:14-cv-00190 (JAM), 2015 WL 5443479, at *2 (D. Conn. Sept. 15, 2015).

---

[7] PJI objects that "Plaintiffs' argument is based entirely on unsupported speculation" because "Plaintiffs cannot point to any evidence that PJI's in-house counsel engaged in such conduct." (Docket No. 252 at 15). However, it is clear from the Court's *in camera* review of the submitted documents that PJI deliberately routed some communications through counsel in an attempt to expand privilege protections. (*See, e.g.*, Privilege Log No. 12).

16

E.  E-mail Strings Withheld for Privilege

Plaintiffs also object to PJI's claims of privilege over entire e-mail strings. (Docket No. 243 at 21–22).  Plaintiffs argue that, where an email string contains individual non-privileged e-mails, PJI should have redacted the discrete privileged portions, as opposed to withholding the string entirely. (*Id.* at 22).  PJI asserts that it "reviewed the most inclusive e-mail strings that it collected and claimed privilege if the string included confidential communications with an attorney." (Docket No. 252 at 16).  PJI further asserts that the review and redaction suggested by Plaintiffs would be unduly burdensome, "as it would require PJI to review and potentially redact 1,630 individual email messages currently included in 1,064 logged email threads." (*Id.*)

The Court acknowledges PJI's argument that some non-privileged, responsive e-mails that were incorporated into privileged strings were already produced to the extent the "string existed in a non-privileged form (i.e., before an attorney was involved)." (*Id.*).  However, the strength of that argument depends on, among other things, the breadth and completeness of PJI's initial document collection.  There is a risk that categorically withholding all privileged strings in their entirety will deprive Plaintiffs of information to which they are entitled, especially where, as here, PJI's in-house attorneys were closely involved in the relevant decision-making and the relevant discussions involved both legal and business components.  PJI has not adequately demonstrated that, under the circumstances, reviewing and redacting the strings at issue would be unduly burdensome.  Therefore, PJI "may not withhold the entirety of a conversation merely because one portion of such communication is subject to privilege." *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-03411 (GHW)(SN), 2016 WL 6820383, at *8 (S.D.N.Y. Nov. 18, 2016).

Instead, PJI must "selectively redact the document in question" and produce any non-privileged portions, unless those portions are all plainly non-responsive and irrelevant.[8] *Id.*

## F. Redaction of Non-Privileged Information

Plaintiffs assert that PJI "has produced numerous documents that have pertinent, non-privileged information redacted" and argue that "PJI should be ordered to produce clean copies of all documents that it redacted on grounds other than privilege." (Docket No. 243 at 23–24). Plaintiffs also argue that PJI's privilege redactions are overbroad. (*Id.* at 24). In response, PJI asserts that "if PJI redacted information and did not include that document on its privilege log PJI only would have done so to redact irrelevant personal information of non-parties" and that it is "prepared to explain these redactions in a conferral process." (Docket No. 252 at 16). Plaintiffs acknowledge that "the parties have not yet conferred on these issues on a document-by-document basis" and "it may be possible to narrow this issue through the conferral process." (Docket No. 243 at 23 n.9). The parties are directed to meet and confer to try to resolve this issue amongst themselves.

As guidance, the Court notes that redactions on grounds of non-responsiveness or irrelevance are generally impermissible, especially where, as here, a confidentiality stipulation and order, (Docket No. 40), is in place. *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("[R]edactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege."); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, No. 08 Civ. 0333(RJH)(DFE), 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009) (directing parties not to "redact any portion of a document on the

---

[8] Accordingly, where a privileged string contains earlier non-privileged communications with Motus, PJI must generally redact the privileged portions, as opposed to withholding the string entirely.

ground that the portion is non-responsive and irrelevant" because such redactions "breed suspicions" and "may deprive the reader of context").

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel is granted in part and denied in part. PJI is directed to produce documents in accordance with the rulings set forth above. The Clerk is respectfully requested to terminate the pending motion (Docket No. 242).

Dated: January 24, 2018
        White Plains, New York

                                       **SO ORDERED:**

                                       _____
                                       JUDITH C. McCARTHY
                                       United States Magistrate Judge