1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  WILLIAM DURLING, et al.,

4            Plaintiffs,

5       v.                              16 Civ. 3592(CS)

6  PAPA JOHN'S INT'L INC.,              Decision

7            Defendant.

8  ------------------------------x

9                                  United States Courthouse
                                   White Plains, N.Y.
10                                 March 29, 2017
                                   11:40 a.m.
11 Before:

12            THE HONORABLE CATHY SEIBEL,

13                                       District Judge

14                  APPEARANCES

15

16 FINKELSTEIN BLANKINSHIP FREI-PEARSON & GARBER, LLP
        Attorneys for Plaintiffs William Durling, et al.
17 JEREMIAH FREI-PEARSON

18 SEYFARTH SHAW, LLP
        Attorneys for Defendant Papa John's Int'l, Inc.
19 GERALD MAATMAN, JR.
   BRENDAN SWEENEY
20 GINA RENEE MERRILL

21 ALSO PRESENT:  Andrew White, Esq.

22

23

24

25

           SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
                        (914)390-4053

170329durlingD                Decision

1            (In open court)

2            THE COURT:  Have a seat, everyone.  Let me make sure I

3    know who is who.

4            Mr. Frei-Pearson; am I saying it right?

5            MR. FREI-PEARSON:  You absolutely are.

6            THE COURT:  And Mr. White.

7            MR. WHITE:  Yes, your Honor.

8            MR. FREI-PEARSON:  Mr. White is not yet admitted, but

9    with your Honor's indulgence, we respectfully request that he be

10   allowed to sit at the table.

11           THE COURT:  No problem.

12           MR. FREI-PEARSON:  Thank you.

13           THE COURT:  But we would be happy to relieve you of

14   your $200 whenever you are ready to get admitted.

15           And Mr. Maatman.

16           MR. MAATMAN:  Yes, your Honor.

17           THE COURT:  And Mr. Sweeney.

18           MS. SWEENEY:  Yes, your Honor.

19           THE COURT:  And Ms. Merrill, good morning.

20           MS. MERRILL:  Good morning, your Honor.

21           THE COURT:  We've got a few motions.  There's a motion

22   to transfer, there's a motion for conditional class

23   certification, there's a motion for leave to file a sur-reply,

24   and a potential motion to strike.

25           I think the latter two, I don't need to address

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

170329durlingD               Decision

1   because -- at least not yet.

2           Is there anything anybody wants to add on the transfer

3   motion that's not been covered by the papers?

4           MR. FREI-PEARSON:  Your Honor, we're happy to rest on

5   the papers, unless your Honor has questions.

6           MR. MAATMAN:  The same would be true for the defense,

7   your Honor.

8           THE COURT:  Apart from the open questions regarding the

9   supplemental declarations and all of that, is there anything

10  anybody wants to add on the motion for conditional

11  certification?

12          MR. FREI-PEARSON:  No, your Honor.  Thank you.

13          THE COURT:  All right.

14          MR. MAATMAN:  The same would be true for the defense,

15  your Honor.  We'll rest on our papers.

16          THE COURT:  Let me start with the motion to transfer.

17  The defendant Papa John's International, which I'm going to call

18  PJI, would like to transfer venue to Kentucky.

19          Just by way of background, the named plaintiffs are

20  William Durling, who is a resident of New York, Chris

21  Bellaspica, who is a resident of Pennsylvania, Tom Wolff, who is

22  a resident of New Jersey, Michael Morris, a resident of

23  Delaware, and Richard Sobol, a resident of Kentucky all were

24  delivery drivers in Papa John's pizza stores.

25          The defendant, PJI, is a Delaware corporation with its

170329durlingD          Decision

1   principal place of business in Jeffersontown, Kentucky.  The

2   plaintiffs allege that defendant directly or jointly employs

3   21,500 individuals and operates more than 4600 stores worldwide.

4   There are approximately 3,324 Papa John's pizza locations in the

5   U.S, about 700 of which are owned and operated by PJI or PJI and

6   its partners.  The remaining locations are franchised.  There's

7   about 2,623 franchise locations, which are run by 786 different

8   franchisors; the number of franchisors being smaller than the

9   number of franchisees because some franchisors run multiple

10  stores.

11          There are 145 Papa John's locations in New York, New

12  Jersey, Pennsylvania, and Delaware, all of which are owned and

13  operated by franchisees.  There are 97 stores in New York, and

14  of those, 30 are within the Southern District of New York.

15  There are approximately 44 locations in Kentucky, all owned by

16  the defendant or, quote/unquote, "corporate stores," that

17  includes the store that employed Plaintiff Sobol in Kentucky,

18  which defendant directly operates.  According to plaintiffs'

19  theory, defendant jointly operates the franchises where the

20  other four plaintiffs worked.

21          Plaintiffs filed the original complaint in this case on

22  May 13 of last year.  We had a pre-motion conference on -- let's

23  see.  I had a request for a pre-motion conference at the end of

24  June.  On July 6, the defendant answered.  On July 12,

25  plaintiffs filed an amended complaint.  They alleged that they

170329durlingD            Decision

1   were paid well below the minimum wage in violation of the Fair

2   Labor Standards Act or FLSA, 29 U.S. Code, Section 201; New York

3   Labor Law, Article 19, Section 650; and the corresponding

4   minimum wage laws of Pennsylvania, New Jersey, and Delaware.

5   Kentucky apparently does not have a minimum wage law.

6          Plaintiffs allege that all of these statutes require

7   employers to provide employees with sufficient reimbursement for

8   employment-related expenses, so that the employees get the

9   required minimum wage after such expenses are subtracted from

10  the hourly wage.

11         The plaintiffs, who all delivered pizzas in their own

12  vehicles, allege that defendant systematically under-reimbursed

13  its delivery drivers for vehicular wear and tear, gas, and other

14  driving-related expenses, resulting in the drivers all being

15  paid effectively well below the minimum wage.  Plaintiffs

16  further allege that the defendant not only operates its

17  cooperate-owned stores, but is also a joint employer of all of

18  the delivery drivers at the franchised stores, and according to

19  plaintiffs, defendant devised and disseminated the policies and

20  practices that caused drivers at both corporate and franchise

21  stores to be uniformly under-reimbursed.  And this is in

22  paragraphs two and three of the amended complaint.

23         In paragraph 41 of the amended complaint, plaintiffs

24  allege in the alternative that the franchisees acted as agents

25  for the defendant, PJI.  They base their claims regarding either

170329durlingD                Decision

1    a joint employer or agency, at least in part, on the fact that

2    all Papa John's restaurants, whether owned by defendant or

3    franchised, use PJI's proprietary point-of-sale technology,

4    which I'll call POS technology, to record deliveries made and

5    calculate the number of flat-rate per-delivery reimbursements

6    made to drivers.

7            Plaintiffs allege, by way of example, that the

8    franchisor that employs three of the five named plaintiffs,

9    which was PJPA, they allege that that franchisor paid its

10   delivery drivers $6 an hour, plus $1 per delivery.  Using an

11   average of five deliveries per hour, that comes out to $11 an

12   hour, which is what plaintiffs allege is the average hourly

13   wage.

14           Using the IRS standard mileage reimbursement rate and

15   applying it to an average of 5 miles per delivery, plaintiffs

16   assert that they paid $13.50 each hour in out-of-pocket expenses

17   to work as a delivery driver for defendant, resulting in a net

18   loss of $2.50 an hour.  They allege that they should have either

19   been paid the IRS rate or that their employer should have kept

20   records justifying what they were paid, neither of which

21   occurred.  And they argue that the $1 per delivery was

22   insufficient to offset their expenses, and as a result, they got

23   paid below minimum wage.

24           They seek to represent a nationwide putative class of

25   Papa John's pizza delivery drivers.  In their reply papers on

170329durlingD              Decision

1  the motion for a conditional collective action and

2  certification, they proposed to modify the class in response to

3  arguments made by defendant to include only drivers who were

4  reimbursed on a per-delivery basis who are not part of a pending

5  class or conditional action relating to reimbursement, there

6  being a couple of other cases raising similar issues, at least a

7  couple.

8         We had a pre-motion conference on July 13.  On July 20,

9  defendant filed the motion to transfer venue to the Western

10 District of Kentucky under 28 U.S. Code 1404(a).  On July 21 of

11 last year, a case discovery plan and scheduling order was

12 entered, which called for fact discovery to be complete by July

13 31 of this year and expert discovery by September 25 of this

14 year.  On October 14 of last year, plaintiffs filed a motion for

15 conditional certification of an FLSA collective action.

16        Turning first to the motion to transfer venue, under

17 1404(a), I can transfer any civil action to any other district

18 or division where it may have been brought, and whether to do so

19 requires a balancing of conveniences, which is left to my sound

20 discretion.  *Forjone v. California*, 425 F. App'x 73, 74.  The

21 inquiry involves two steps:  First, I must establish whether the

22 case could have been filed in the transferee district, and then

23 whether the convenience of the parties and the interest of

24 justice favor transfer.  *See Fuji Photo v. Lexar Media*, 415

25 F.Supp.2d 370, 373 (S.D.N.Y. 2006).  "[T]he parties seeking

170329durlingD          Decision

1  transfer carries the burden of making out a strong case for

2  transfer." *New York Marine v. Lafarge*, 599 F.3d 102, 114; and

3  must point to clear and convincing evidence on which the court

4  can base its decision. *Lewis-Gursky v. Citigroup*, 2015 WL

5  8675449, *2 (S.D.N.Y. Dec. 11, 2015).

6          I may consider a number of factors to assess whether a

7  transfer of venue is appropriate, including (1) the plaintiff's

8  choice of forum; (2) the convenience plaintiff witnesses; (3)

9  the location of relevant documents and relative ease of access

10  to sources of proof; (4) the convenience of the parties; (5) the

11  locus of the operative facts; (6) the availability of process to

12  compel the attendance of unwilling witnesses; and (7) the

13  relative means of parties.  That's *New York Marine*, 599 F.3d at

14  112.  While the moving party "bears the burden of clearly

15  establishing that these factors favor transfer," *Citigroup v.*

16  *City Holding,* 97 F.Supp.2d 549, 561 (S.D.N.Y. 2000), "[d]istrict

17  courts have broad discretion in making determinations of

18  convenience under Section 1404(a), *D.H. Blair v. Gottdiener,* 462

19  F.3d 95, 106, and "[t]here is no rigid formula for balancing

20  these factors and no single one is determinative," *Indian Harbor*

21  *Insurance v. NL Environmental*, 2013 WL 1144800, *5 (S.D.N.Y.

22  Mar. 19, 2013).  Trial efficiency and the interest of justice

23  are also important factors in a 1404(a) transfer analysis and

24  may be determinative in a given case.  *Liberty Mutual v.*

25  *Fairbanks*, 17 F.Supp.3d 385, 397 (S.D.N.Y. 2014).

170329durlingD          Decision

1      Here, there's no dispute that the action could have

2  been brought in the Western District of Kentucky in the first

3  instance, so I will address only the factors regarding whether

4  transfer would be appropriate.

5      First is plaintiffs' choice of forum.  That choice is

6  presumptively entitled to substantial deference.  *Gross v.*

7  *British Broadcasting Corp.*, 386 F.3d 224, 230, but in "class

8  actions, less weight is given to the plaintiff's choice," *Pace*

9  *v. Quintanilla*, 2013 WL 5405563, at *2 (S.D.N.Y. Sept. 23,

10  2013).  Affording less deference to representative plaintiffs,

11  however, "does not mean that they are deprived of all difference

12  in their choice of forum," *DiRienzo v. Philip Services*, 294 F.3d

13  21, 28.  In addition, Courts have held that a plaintiff's

14  "choice of forum in an FLSA collective action is entitled to

15  more deference than the choice of forum in Rule 23 national

16  class actions."  *Koslofsky v. Santaturs*, 2011 WL 10894856, at *2

17  (S.D.N.Y. Aug. 18, 2011), which collects cases; *see also Flood*

18  *v. Carson Restaurants*, 94 F.Supp.3d 572, 577 (S.D.N.Y. 2015)

19  where the court said, quote, "[T]he opt-in structure of FLSA

20  collective actions strongly suggests that Congress intended to

21  give plaintiffs considerable control over the bringing of an

22  FLSA action.  Thus, a plaintiff's choice of forum in an FLSA

23  collective action is entitled to more deference than the choice

24  of forum in Rule 23 national class actions;" *but see Earley v.*

25  *BJ's*, 2007 WL 1624757, at *2 (S.D.N.Y. June 4, 2007), a case

170329durlingD            Decision

1   involving alleged FLSA and Pennsylvania minimum wage law

2   violations where the court said that the plaintiff's choice of

3   forum is a less significant consideration in a putative class

4   action than in an individual action, although it did not address

5   whether in FLSA collective plaintiff's choice should get more

6   weight than a Rule 23 class of plaintiff action should.

7         Here, defendant argues in a conclusory fashion that

8   plaintiffs' choice of forum is entitled to little deference

9   because plaintiffs have engaged in forum shopping.  Defendant

10  has not pointed to any specific indicia of forum shopping, such

11  as: "attempts to win a tactical advantage resulting from local

12  laws that favor the plaintiff's case, the habitual generosity of

13  juries in the United States or in the forum district, [or] the

14  plaintiff's popularity or the defendant's unpopularity in the

15  region."  That's from *Iragorri v. United Technologies*, 274 F.3d

16  65, 72.

17        Courts do give less weight to a plaintiff's choice of

18  forum where it's not the plaintiff's home forum.  *Dickerson v.*

19  *Novartis*, 315 F.R.D. 18, 32 (S.D.N.Y. 2016).  Here, however,

20  plaintiff Durling is a resident of New York and worked for

21  defendant in this district, and therefore, I find no evidence of

22  forum shopping.  And accordingly, the factor of the plaintiffs'

23  choice of forum weighs in favor of keeping the case here.

24        The next factor is the convenience of witnesses and the

25  availability of process to compel the attendance of unwilling

170329durlingD          Decision

1   witnesses.

2          Courts typically regard the convenience of witnesses to

3   be the most important factor, with the convenience of nonparty

4   witnesses given more weight than that of party witnesses.  *See*

5   *Mohsen v. Morgan Stanley*, 2013 WL 5312525, at *6 (S.D.N.Y.

6   Sept. 23, 2013); and *Schauder v. International Knife & Saw*, 2003

7   WL 1961611, at *3 (S.D.N.Y. Apr. 28, 2003).  "When weighing this

8   factor the courts must consider the materiality, nature, and

9   quality of each witness, in addition to the mere number of

10  witnesses in each district*." Martignagno v. Merrill Lynch*, 2012

11  WL 112246, at *5 (S.D.N.Y. Jan. 12, 2012).  The transfer

12  analysis also involves consideration of the Court's power to

13  compel attendance of unwilling witnesses, as a district court

14  can only subpoena witnesses in the district, or within 100 miles

15  of it.  *Mohsen* at page 6*; see* Fed. R. Civ. P. 45.

16          "When a party seeks the transfer on account of the

17  convenience of witnesses under Section 1404(a), he must clearly

18  specify the key witnesses to be called and must make a general

19  statement of what their testimony will cover." *ESPN v.*

20  *Quicksilver*, 581 F.Supp.2d 542, 550 (S.D.N.Y. 2008).  Defendant

21  has not provided the names of specific witnesses who would be

22  inconvenienced or who the Court would be unable to compel to

23  testify in this district if the case is not transferred.

24  Therefore, defendant has failed to establish that this factor

25  weighs in its favor.  *See American Eagle Outfitters v. Tala*

170329durlingD          Decision

1   *Brothers*, 457 F.Supp.2d 474, 478–479 (S.D.N.Y. 2006).

2          Plaintiffs say they intend to call more witnesses from

3   New York than Kentucky, although they do not provide specifics

4   either.  They note that their likely expert is based in White

5   Plains.  Plaintiffs argue there will be "more non-party

6   witnesses in New York than Kentucky because, to the extent

7   testimony from third parties may be relevant to defendant's

8   liability for franchisee-operated stores, those third parties

9   are more numerous in New York and surrounding states than in

10   Kentucky, (which has fewer franchisee-operated stores.)"

11          The defendant notes the vast majority of individuals

12   responsible for maintaining the relevant records and who have

13   knowledge regarding how to capture data and documents from

14   defendant's systems are located in the Western District of

15   Kentucky.  In addition, defendants stress that most Papa John's

16   executives currently reside within 100 miles of the Western

17   District of Kentucky, while none reside within 100 miles of the

18   Southern District of New York.

19          While testimony from witnesses at defendant's corporate

20   headquarters in Kentucky will undoubtedly be important, *see*

21   *Martignago v. Merrill Lynch*, 2012 WL 112246, at *2 (S.D.N.Y.

22   Jan. 12, 2012), the convenience of such witnesses is not

23   dispositive because the employee of an employer that is involved

24   in litigation is considered available in any venue due to the

25   employer-employee relationship, *see SBAV v. Porter Bancorp*, 2013

170329durlingD                Decision

1    WL 3467030, at *8 (S.D.N.Y. July 10, 2013); *Medien Patent v.*

2    *Warner Bros.*, 749 F.Supp.2d 188, 191 (S.D.N.Y. 2010).

3          While policies developed in Kentucky may well be

4    critical to plaintiffs' case, how those policies are implemented

5    in the field also seems relevant.  Further, because the putative

6    class includes drivers from at least four states, whether the

7    case proceeds here or in Kentucky, some witnesses will likely be

8    inconvenienced.  *See Delgado v. Villanueva*, 2013 WL 3009649, at

9    *5 (S.D.N.Y. June 18, 2013).  In the absence of evidence, the

10   particular witnesses not employed by defendant will be

11   inconvenienced by litigation in the Southern District of New

12   York.  This factor is neutral.

13         Next is the location of relevant documents and the

14   relative ease of access to sources of proof.

15         The defendant asserts that the majority of the

16   documents, including defendant's system-wide standards and

17   requirements for franchisees, are created and disseminated out

18   of its corporate headquarters in Kentucky.  "[T]he location of

19   documents and records is not a compelling consideration when

20   records are easily portable."  *Mohsen*, 2013 WL 5312525, at *6;

21   *see also Morris v. Ernst & Young*, 2012 WL 3964744, at *4

22   (S.D.N.Y. Sept. 11, 2012) where the Court noted that the

23   location of relevant documents is largely a neutral factor in

24   today's world of faxing, scanning, and e-mailing documents.

25   Even the Court's reference to faxing seems quaint, only five

170329durlingD          Decision

1   years later.

2          The defendant has, quote, "failed to cite specific

3   evidence located [in the potential transferee district] that

4   will be difficult to transfer to New York." *Lewis v. C.R.I.*,

5   2003 WL 1900859, at *3 (S.D.N.Y. Apr. 17, 2003).  And as

6   plaintiffs point out, defendant's counsel has not expressed any

7   geography-related concerns about producing discovery to

8   plaintiffs' counsel in New York.  Because defendant hasn't shown

9   a burden on document production absent a transfer, "its

10  assertion that documents are located in the transferee forum is

11  entitled to little weight." *Flood*, 94 F.Supp.3d at 578.

12  Therefore, I conclude this factor is also neutral.

13          Next is the convenience of the parties.

14          The starting point in assessing this factor is the

15  residence of the parties or their principal place of business

16  and office locations.  *See Royal & Sun v. Nippon Express*, 2016

17  WL 4523885, at *4 (S.D.N.Y. Aug. 8, 2016); and *Freeman v.*

18  *Hoffman-LaRoche*, 2007 WL 895282 (S.D.N.Y. Mar. 21, 2007).

19  "[T]he convenience of the parties does not favor transfer when

20  it would merely shift any inconvenience from defendant to

21  plaintiff." *Kiss My Face Corp. v. Bunting*, 2003 WL 22244587, at

22  *3 (S.D.N.Y. Sept. 30, 2003.)

23          Plaintiff Durling lives in New York, and Bellaspica,

24  Wolff, and Morris respectively live in nearby Pennsylvania, New

25  Jersey, and Delaware.  Only Sobol lives in Kentucky on

170329durlingD           Decision

1   plaintiffs' side.  Defendant has its principal place of business

2   there.  "The convenience of the parties is often connected to

3   the convenience of their respective witnesses," *CYI v. Ja-Ru*,

4   913 F.Supp.2d 16, 25 (S.D.N.Y. 2012), and as noted above, there

5   is no indication that this district would be particularly

6   inconvenient for the parties' witnesses based on the information

7   I have to date.

8           As plaintiffs note, New York is a major transportation

9   hub and is more easily accessible than Kentucky.  Based on the

10  residence of the majority of the named parties, the

11  accessibility of New York, and the lack of information I have

12  regarding potential witnesses as discussed earlier, this factor

13  slightly favors plaintiffs.

14          Next is the locus of operative facts, which is a

15  primary factor in evaluating a motion to transfer because it

16  helps the Court identify a center of gravity and where it should

17  properly proceed.  *Spiciarich,* 2015 WL 4191532, at *6.

18  "[O]perative facts may be found at the locations where employees

19  worked, notwithstanding allegations that a uniform corporate

20  policy caused the FLSA violations."  That's *Flood*, 94 F.Supp.3d

21  at 579*; see Bukhari v. Deloitte & Touche*, 2012 WL 5904815, at *5

22  (S.D.N.Y. Nov. 26, 2012).

23          Defendant argues that this factor weighs in favor

24  transfer because less than 3 percent of the domestic PJI stores

25  are in New York and less than 1 percent of them are in the

170329durlingD            Decision

1   Southern District.   These statistics don't persuade me because

2   the defendant has more stores in New York (97) than in Kentucky

3   (44).

4            While the policies underlying the claims may have been

5   formulated in the Western District of Kentucky, although

6   defendants deny this to be the case, plaintiff Durling resides

7   in and was employed by defendant in New York, where at least one

8   of the claims occurred.   The practices of franchise locations in

9   Pennsylvania, New Jersey, and Delaware will also be at issue in

10  whatever court the case is in front of; therefore, this factor

11  is neutral.

12           Next is the relative means of the parties.

13           "This factor will not weigh in plaintiffs' favor unless

14  they can show that transfer would impose an undue hardship."

15  That's *Morris* at page 5.   "A party arguing for or against

16  transfer because of inadequate means must offer documentation to

17  show the transfer (or lack thereof) would be unduly burdensome

18  to his finances."   *Federman Associates v. Paradigm Medical*, 1997

19  WL 811539, at *4, (S.D.N.Y. Apr. 8, 1997).   *See Rosen v.*

20  *Ritz-Carlton*, 2015 WL 64736, at *4, (S.D.N.Y. Jan. 5, 2015).

21           Plaintiffs note that defendant is a "publicly-traded

22  company with $1.64 billion in annual sales in 2015" and

23  therefore argues that defendant has vastly more resources than

24  plaintiffs.   That is surely true, but that is not the same as

25  plaintiffs being unable to afford to litigate in Kentucky and

170329durlingD          Decision

1   they have not provided any individual financial information.

2   Given, however, that they recently worked delivering pizzas, it

3   is a fairly safe bet that most of them are still relatively

4   low-income earners.  Thus, this factor somewhat favors

5   plaintiffs, although not as strongly as it would have if

6   plaintiffs had supplied financial documentation.

7           The next factor is familiarity with governing law.

8   That factor is generally given little weight in federal courts.

9   *Flood* at 580.  Both this Court and courts in the Western

10  District of Kentucky are equally familiar with the FLSA.  *See*

11  *Flood* at 580; and *Rindfleisch v. Gentiva*, 752 F.Supp.2d 246, 261

12  (E.D.N.Y. 2010).  Kentucky has no minimum wage laws and the

13  claims of at least some plaintiffs will involve the application

14  of New York law, with which this Court is more familiar than

15  courts in Kentucky.  *See Flood* at 580.  At the same time, I

16  don't doubt that a Kentucky judge can figure out New York law.

17          While defendant notes that the franchise agreements it

18  enters into are governed by Kentucky law, there are no claims

19  arising under Kentucky law or any reason to believe that the

20  Court will need to interpret Kentucky franchise law; therefore,

21  I conclude on balance this factor weighs slightly against

22  transfer.

23          The last factor is trial efficiency and the interest of

24  justice, which is based on the totality of the circumstances and

25  relates primarily to issues of judicial economy.  *Dickerson*, 315

170329durlingD          Decision

1   F.R.D. at 32.  When discovery is at a relatively early stage, it

2   would not be inefficient to transfer.  *See Freeplay Music v.*

3   *Gibson Brands*, 2016 WL 4097804, at *5 (S.D.N.Y. July 18, 2016).

4   Here, depositions have apparently begun, but there are still

5   several more months of fact discovery, so I would characterize

6   it as a midpoint, but even so, I don't think it would be

7   inefficient to transfer midstream.

8           "Although certainly not decisive, docket conditions or

9   calendar congestion of both transferee and transferor districts

10  is a proper factor."  *Indian Harbor Insurance v. Factory Mutual*

11  *Insurance*, 419 F.Supp.2d 395, 407 (S.D.N.Y. 2005).  Defendant

12  notes that this district has a higher caseload than the Western

13  District of Kentucky and argues that that favors transfer.

14  Judicial economy, although relevant, is insufficient on its own

15  to support a transfer motion.  *In re Nematron*, 30 F.Supp.2d 397,

16  407 (S.D.N.Y. 1998), which collects cases.  More fundamentally,

17  while this district has many more cases than the Western

18  District of Kentucky, it also has many more judges, and when

19  defendant's counsel examined the 2015 caseload statistics that

20  they cited in their papers, they might well have noticed that

21  the median disposition time for a Southern District of New York

22  case in 2015 was actually shorter than it was in the Western

23  District of Kentucky.

24          Another factor traditionally considered in deciding

25  whether a transfer is warranted in the interest of justice is

170329durlingD          Decision

1   whether related litigation can be consolidated by transfer.

2   *Liberty Mutual v. Fairbanks*, 17 F.Supp.3d at 397; *see also*

3   *Everlast v. Ringside*, 928 F.Supp.2d 735, 747.  Here, while there

4   are similar actions here and there, there doesn't appear to be

5   anything already pending in the Western District of Kentucky

6   that would make it more efficient to have this case proceed

7   there as opposed to here.  So, I don't find this factor weighs

8   in favor of transfer.

9           After analyzing all of the relevant factors and the

10  totality of the circumstances, I find that most either weigh

11  against transfer or are neutral; accordingly, the defendant has

12  not met its burden.  And for the reasons stated above, the

13  motion to transfer venue is denied, as I predicted it would be.

14          I do note that the defendant, as part of the transfer

15  motion, makes much of the fact that if the plaintiffs were to

16  prevail in this case, this would upend the entire basis of

17  franchising.  It may be right the plaintiffs' theory does not

18  hold water with respect to franchises and that the defendant's

19  liability, if any, would be limited to its corporate-owned

20  stores, none of which are in New York.  If that's where we end

21  up, a renewed motion to transfer might well be appropriate, but

22  for now, it is denied.  And the clerk of court needs to

23  terminate the transfer motion, which is number 42.

24          In connection with whether we have a case that relates

25  only to the corporate stores or to the franchises, I now turn to

170329durlingD                Decision

1   the motion for conditional certification of a collective action.

2          Section 216(b) of the FLSA F.Supp.2d permits, quote,

3   "similarly-situated" employees to maintain collective actions to

4   remedy violations of the statute if such employees "consent in

5   writing." *See Flood*, 2016 WL 354078, at *2.  Potential

6   plaintiffs must "opt-in" to participate in an FLSA collective

7   action.  The FLSA does not guarantee an initiating plaintiff a

8   right to obtain a court-ordered notice to potential opt-ins;

9   rather, district courts have discretion to implement Section

10  216(b) by facilitating notice.  *See Myers v. Hertz*, 624 F.3d

11  537, 554.

12         *Myers* laid out the two-step process the courts in this

13  circuit use to determine whether to certify a collective action.

14  At the first step, plaintiffs must make a, quote, "modest

15  factual showing" that they and other plaintiffs "together were

16  victims of a common policy or plan that violated the law."

17  That's *Myers* at 555.  "If a plaintiff satisfies his 'modest'

18  burden, the court may authorize the plaintiff to send out

19  notices to potential opt-in plaintiffs who may be 'similarly

20  situated' to the named plaintiff with respect to the FLSA

21  violation alleged." *Flood* at page 2; *see Myers* at 555.

22  "Although the FLSA itself does not define the term 'similar

23  situated,' courts require that there be a factual nexus between

24  the claims of the named plaintiff or those who have chosen or

25  might potentially choose to opt into the action." *Warman v.*

170329durlingD          Decision

1   *American National Standards Institute*, 193 F.Supp.3d 318, 323

2   (S.D.N.Y. 2016).

3          "[C]ourts generally grant conditional certification"

4   because "the determination that the plaintiffs are similarly

5   situated is merely a preliminary one." *Jackson v. Bloomberg*,

6   298 F.R.D. 152, 158-159 (S.D.N.Y. 2014).

7          In contrast to certification under Rule of Civil

8   Procedure 23, "[u]nder the FLSA, 'conditional certification'

9   does not produce a class with an independent legal status, or

10  join additional parties to the action.  The sole consequence of

11  conditional certification is the sending of court-approved

12  written notice to employees who in turn become parties to the

13  collective action only by filing written consent with the

14  court." *Genesis Healthcare v. Symczyk*, 133 S. Ct. 1523, 1530.

15  "At the second stage, the district court will, on a fuller

16  record, determine whether a so-called 'collective action' may go

17  forward by determining whether [those] who have opted in are in

18  fact 'similarly situated' to the named plaintiffs." *Myers* at

19  555.  "The [c]ourt may decertify the collective action if it

20  determines that the opt-in [P]laintiffs are not in fact

21  similarly situated and the opt in [P]laintiffs' claims will be

22  dismissed without prejudice." *Flood* at page 2; *see Myers* at

23  555.

24          "The standard for conditionally certifying a collective

25  is a lenient evidentiary standard." *Delaney v. Geisha NYC*, 261

170329durlingD          Decision

F.R.D. 55, 58 (S.D.N.Y. 2009).  "In presenting evidence on the appropriateness of granting collection action status, the plaintiff's burden may be very limited, and require only a modest factual showing, but the burden is not nonexistent and the factual showing, even if modest, must still be based on some substance."  *Guillen v. Marshalls*, 750 F.Supp.2d 469, 480 (S.D.N.Y. 2010*); see Meyers* at 555, where the court said that "The modest factual showing cannot be satisfied simply by unsupported assertions..."  "[C]onditional certification may be granted on the basis of the complaint and the plaintiff's own affidavits.*" Ramos v. Platt*, 2014 WL 3639194, at *2 (S.D.N.Y. July 23, 2014); *see Alves v. Affiliated Home Care*, 2017 WL 511836, at *4, (S.D.N.Y. Feb. 8, 2017); *Khamsiri v. George & Frank's Japanese Noodle Restaurant*, 2012 WL 1981507, at *1, (S.D.N.Y. June 1, 2012).  "When there are ambiguities in the papers seeking collective action status, the court must draw all inferences in favor of the plaintiff at the preliminary certification stage."  *Jeong Woo Kim v. 511 East Fifth Street, LLC*, 985 F.Supp.2d 439, 446 (S.D.N.Y. 2013).

          The defendant argues that because "the parties have conducted significant discovery, the Court should apply a heightened standard in determining whether conditional certification is appropriate."  In *Korenblum v. Citigroup*, 195 F.Supp.3d 475, 482 (S.D.N.Y. 2016), the court applied a "modest 'plus'" standard for conditional certification where "discovery

170329durlingD            Decision

1   with respect to conditional certification ha[d] been completed."

2   At the time the instant motion was filed in this case, while

3   some discovery had occurred, it was not "significant" and no

4   depositions had been taken.  Further, to date, discovery is far

5   from completed.  I therefore decline to apply a heightened

6   standard at this stage.  *See Amador v. Morgan Stanley*, 2013 WL

7   494020, at *4 (S.D.N.Y. Feb. 7, 2013), where the court noted

8   "[T]he overwhelming case law in this Circuit clearly holds that

9   a heightened standard is not appropriate during the first stage

10  of the conditional certification process and should only be

11  applied once the entirety of discovery has been completed," not

12  just undertaken.

13       So, my role at this stage is simply to determine

14  whether the plaintiffs have sufficiently alleged that they and

15  the other employees in the potential collective were victims of

16  a common compensation policy that violated the FLSA.  *Jeong Woo*

17  *Kim* at 446.  If plaintiffs sufficiently establish that there is

18  a common policy that violated the FLSA, the defendant could

19  theoretically be liable either because (1) it dictated that

20  payment policy for delivery drivers, (2) it is a joint employer

21  of them, or (3) it is an apparent agent of its franchisees.

22  Defendant denies all of the above, but its arguments on this

23  point are premature.

24       Whether the defendant is a joint employer or a

25  parent/agent of its franchisees is a merits issue that I will

170329durlingD          Decision

1    not evaluate at this stage.  *See Watson v. Jimmy John's*, 2015 WL

2    8521293, at *3 (N.D. Ill. Nov. 30, 2015); *Salomon v. Adderley*,

3    847 F.Supp.2d 561, 555 (S.D.N.Y. 2012).

4         For now, I am evaluating whether plaintiffs have

5    sufficiently shown that they, and the members of the proposed

6    collective action, are similarly situated in that they were

7    victims of a common policy or plan that is unlawful under the

8    FLSA.  Plaintiffs can do this by demonstrating either that the

9    defendant dictated a payment policy for delivery drivers

10   employed by corporate and franchisee locations, or apart from

11   that, there is a common policy that exists class-wide.

12        Focusing first on the first possibility, the plaintiffs

13   have offered no evidence that defendant dictated the payment

14   policy for delivery drivers at all Papa John's restaurants,

15   including franchises.  The defendant has admitted that all

16   delivery drivers that it directly employs are reimbursed on a

17   per-delivery basis, although defendant has not conceded that the

18   per-delivery rate is so low as to violate the FLSA; but in any

19   event, the defendant has also offered evidence showing that

20   defendant is not involved in how franchisees pay their

21   employees.

22        The point of sale or POS technology that plaintiffs

23   rely on as evidence of the defendant's control over franchisees

24   driver payment policy shows that Papa John's locations collected

25   data on the number of deliveries being made, but the mere use of

170329durlingD          Decision

1    the POS system does not show how, or how much, franchisees paid

2    their delivery drivers, and the mere fact of PJI's presumed

3    ability to access that data via the POS system in no way

4    indicates that defendant dictated a nationwide delivery driver

5    payment policy.  Maybe plaintiff will come up with such

6    evidence, but so far it hasn't.

7           Turning to the second possible way plaintiffs could

8    establish a common practice in this case, "for purposes of

9    determining the viability of a collective for which conditional

10   certification is sought, the relevant practice that binds FLSA

11   plaintiffs together must be the one that is alleged to have

12   violated the statute itself."  *See martin v. Sprint*, 2016 WL

13   30334, at *6 (S.D.N.Y. Jan. 4, 2016).  Showing common policies

14   regarding issues unrelated to expense reimbursement, such as

15   wearing similar uniforms, or use of the Papa John's logo, or

16   even the general use of personal vehicles to make deliveries, is

17   not sufficient to demonstrate a common policy with respect to

18   the payment of drivers.  *See Martin* at page 6 where the court

19   said that "[T]he fact of a common job description or a uniform

20   training regiment does not, alone, make those persons subject to

21   it 'similarly situated' under the FLSA."

22          Plaintiffs have shown that there is a policy governing

23   payment of delivery drivers at corporate-owned stores at a rate

24   that results in the drivers receiving less than minimum wage, or

25   at least has made a modest showing to that effect; and that the

170329durlingD          Decision

1  same is true as to two franchisees, specifically, the

2  franchisees that employed Durling and PJPA, the franchisees that

3  employed Wolff and Morris, but such evidence is insufficient to

4  infer a nationwide policy.

5          Oddly, unlike the plaintiffs in *Perrin v. Papa John's*,

6  09 CV 1135 in the Eastern District of Missouri, whose

7  declarations were attached as Exhibit 1 to Mr. Frei-Pearson's

8  declaration, plaintiffs here do not say in their declarations

9  that the deficit from the insufficient per-delivery fees they

10  received drove their pay below the minimum wage, but assuming

11  that in plaintiffs' favor, all the plaintiffs here have shown is

12  an arguably inadequate corporate policy and an arguably

13  inadequate policy of two franchisees.

14          The amended complaint and the declarations offered by

15  plaintiffs showing the practices of the corporate-owned stores

16  and two franchisees are not enough for me to infer that the

17  other 780-something franchisees have the same common payment

18  policy with respect to delivery drivers.

19          Plaintiffs claim in a conclusory fashion that other

20  franchisees had the same policy but have shown no basis of

21  knowledge of anything occurring beyond their own stores or

22  franchisee.  *See Guillen*, 750 F.Supp.2d at 477, where a motion

23  for certification was denied where the plaintiff had no personal

24  knowledge about how stores other than those at which he worked

25  operated.

170329durlingD          Decision

1          Even taking defendant's declarations into account, they

2     showed that a few more franchisees did not use the IRS rate to

3     reimburse drivers, but there is no evidence that these

4     franchisees do not pay a rate reasonably related to driving and

5     wear and tear costs, or that what they pay is so low that the

6     drivers end up getting less than the minimum wage.

7          Therefore, in the absence of evidence of any direction

8     from defendant to its franchisees regarding how to pay drivers

9     and how much, and recognizing that the burden that plaintiffs

10    bear at this stage is a modest one, I cannot infer from the

11    policy of two franchisees, that nationwide 780-something other

12    franchisees reimburse delivery drivers on a per-delivery basis

13    that results in compensation below the minimum wage.  *See*

14    *Brickey v. Dolgencorp.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011),

15    which denied a motion for recertification where although the

16    plaintiffs offered some evidence that certain managers flouted

17    the defendant's policies, the plaintiffs did not show that such

18    activity was widespread or common, or that the managers did so

19    because they were told or encouraged to do so by the defendant.

20          *Martin v. Sprint*, 2016 WL 30334 on which defendant

21    relies, and which plaintiffs do not satisfactorily address, is

22    instructive here.  Like this case, *Martin* is different from the

23    cases on which plaintiff relies where a common practice likely

24    existed because a sole employer was being sued for FLSA

25    violations.  *See, e.g., Alves*, 2017 WL 511836, *1, 4, which

170329durlingD              Decision

1    conditionally certified a class of 30 plaintiffs employed by a

2    single employer where the lead plaintiff submitted a declaration

3    swearing that based on her observations and conversations, the

4    other employees performed similar tasks and were not paid

5    overtime.

6            In *Martin*, "[t]he declarants collectively represent[ed]

7    employees from only six Sprint partners, two of which [we]re

8    subcontractors of one intermediary, and three of which appeared

9    to be subcontractors of one another."  That's *Martin* at page 9.

10   The Court noted at page 8 that it was questionable whether such

11   a numerically and geographically limited number of declarations

12   would suffice to permit the inference of a unitary practice

13   across all states.

14           In addition to the small subset of the likely sizeable

15   number of Sprint Partners nationwide that the declarants wanted

16   to represent, the *Martin* court declined to conditionally certify

17   the class because, as in this case, the "plaintiff had not come

18   forward with any evidence that would situate the decision to

19   implement the wage-and-hour practices of which they complained

20   above the level of the declarant's immediate employers or the

21   intermediary companies with which some of those employers

22   contract."  That's *Martin* at page 10.

23           So, *Martin* is similar to this case in that the

24   plaintiffs all worked for different employers, and it is

25   therefore unlike the cases on which plaintiffs rely.  Plaintiffs

170329durlingD          Decision

1   rely most heavily on *Ochoa v. McDonald's*, 2016 WL 3648550 (N.D.

2   Cal. July 7, 2016) and *Watson v. Jimmy John's*.  Those were both

3   class action cases, but they are not helpful to plaintiff, even

4   on this motion.

5          *Ochoa* is distinguishable and inapposite because in that

6   case, all of the plaintiffs worked for the same franchisor.  *See*

7   *Ochoa* at page 1.  And there was simply no issue there as to

8   whether there existed a common practice or policy.

9          *Watson* is similarly unhelpful.  There, the issue was

10  whether assistant managers were exempt managerial employees and

11  the court examined whether assistant managers had similar

12  responsibilities across the class.  The plaintiffs in *Watson*

13  supported their motion for a conditional class certification,

14  not only with declarations containing first-hand knowledge from

15  employees spanning 11 locations in seven states, which described

16  nearly identical job duties and responsibilities, and not only

17  with several assistant manager job postings that were also

18  materially identical and supported the inference that there was

19  a common nationwide policy, but plaintiffs also had corporate

20  documentation, including systems, standards, operations,

21  manuals, and trainee materials, that showed that the franchisor

22  dictated the limits of the assistant manager's managerial

23  discretion.

24          Here, where the issue is the method and rate of payment

25  for delivery drivers, plaintiffs have far less evidence;

170329durlingD          Decision

1   specifically, no evidence that defendant dictated or even shaped

2   the relevant payment policy and evidence as to how, and how

3   much, drivers were paid from only two of 786 franchisees.

4          Plaintiffs have not cited, and I have not found, a case

5   certifying a nationwide class involving hundreds of franchisees

6   or subcontractors where the declarations offered describe the

7   policies of only two franchisees or subcontractors, and there is

8   no evidence that the franchisor or general contractor dictated

9   or encouraged the relevant practice.

10          If plaintiffs are correct that defendant has, or has

11   access to, information regarding how all franchisees pay their

12   drivers, or if plaintiffs collects it otherwise through

13   discovery, and if plaintiffs' suspicions, either that the

14   practice is dictated from corporate or that all franchisees do

15   it, or a respectable chunk of them do it, once it gets that

16   information, plaintiffs will be better suited to succeed on a

17   renewed motion.

18          And the converse is true:  If further discovery reveals

19   no corporate encouragement of the policy and no reason to

20   believe that it is something that's widespread, then plaintiffs

21   will not be well suited.

22          Plaintiffs in their reply suggested that I could

23   certify a class of just the corporate delivery drivers.  I

24   decline to do so now, in part because it seems like there is

25   such a class already certified in the *Perrin* case, and I'm not

170329durlingD             Decision

1   sure of the status of that case, or whether the policies of

2   which the *Perrin* plaintiffs complained continued into the

3   timeframe that would be covered by this case; and also because

4   if I am going to have just a corporate class, I may well

5   transfer the case to Kentucky.  *See Korenblum*, 195 F.Supp.3d at

6   488.

7          Recognizing the plaintiffs only have to make a modest

8   factual showing that those employed nationwide as delivery

9   drivers by defendant and defendant's franchisees are

10  similarly-situated and that its plausible that they together

11  were victims of a common policy or plan that violated the law, I

12  find that plaintiffs have not met that burden.  Accordingly, the

13  motion for conditional collective action certification is

14  denied, although without prejudice to renewal.  And the clerk of

15  court needs to terminate the motion 66, as well as 42.

16         So, we're staying here for the moment, unless

17  plaintiffs really want me to certify a class just of the

18  corporate employees, in which case, I would entertain a renewed

19  motion to transfer.

20         I won't put anybody on the spot to make any decisions

21  like that right now.  And plaintiffs, of course, are free to

22  continue with discovery and see if it can gather more evidence.

23         I don't mean to suggest that there's any magic formula

24  of the number of franchisees that have to follow a similar

25  policy.  All I'm saying now is that two out of 786 isn't going

170329durlingD          Decision

1    to fly.  Whether the right number is 20 or 200, or whether it's

2    some representative sampling of the largest ones, or a sampling

3    of small, medium and large, I don't know.  I'm not going to give

4    an advisory opinion.

5            All I can say is, now, I'm not persuaded that just

6    because PJPA and one other franchisee they do this, that

7    everybody does this, but that information may well come to you

8    as discovery proceeds.

9            Is there anything else we should do this morning

10   morning?

11           (No response)

12           I think that moots the motion for leave to file a

13   sur-reply, to strike the declarations, and to file supplemental

14   declarations.

15           Is there anything anyone else wants to discuss at this

16   time?

17           (No response)

18           Go forth and continue your discovery with Magistrate

19   Judge McCarthy.

20           Thank you, all.

21

22

23

24

25           (Continued on the following page)

170329durlingD            Decision

1          MR. FREI-PEARSON:  Thank you, your Honor.

2          MR. MAATMAN:  Thank you, your Honor.

3             - - -

4    Certified to be a true and correct

5    transcript of the stenographic record

6    to the best of my ability.

7    _____

     U.S. District Court
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25