20184bdurlc

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   WILLIAM DURLING, for themselves and
    all others similarly situated, et al.,
4
                   Plaintiffs,
5

6          v.                        16 Civ. 3592(CS)

7                                     DECISION

8   PAPA JOHN'S INTERNATIONAL, INC.,
    et al.,
9
                   Defendants.
10
    --------------------------------x
11

12                                   United States Courthouse
                                     White Plains, N.Y.
13                                   April 11, 2018

14

15

16

17  Before:  THE HONORABLE CATHY SEIBEL,
                                     District Judge
18

19

20                        APPEARANCES

21  FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
         Attorneys for Plaintiffs
22  JEREMIAH LEE FREI-PEARSON
    ANDREW CHARLES WHITE
23

24  SEYFARTH, SHAW, LLP
         Attorneys for Defendants
25  BRENDAN M. SWEENEY
```

1          THE DEPUTY CLERK:  The Honorable Cathy Seibel

2    presiding.

3          Durling against Papa Johns.

4          THE COURT:  Good morning, Mr. Frei-Pearson and

5    Mr. White.

6          MR. FREI-PEARSON:  Good morning, your Honor.

7          MR. WHITE:  Good morning, your Honor.

8          THE COURT:  And Mr. Sweeney.

9          MR. SWEENEY:  Good morning, your Honor.

10         THE COURT:  You all can have a seat.

11         As usual, I have many letters:  Mr. Maatman's March

12   20th letter regarding a stay, plaintiff's opposition thereto

13   dated April 4th, then plaintiff's March 21 letter requesting

14   leave to amend, and defendant's opposition to that letter dated

15   April 4th.  So there are a lot of moving parts here.

16         There's the third iteration of the motion for

17   conditional certification, which is not yet fully submitted,

18   but, based upon what's happened so far, seems to have a better

19   chance of succeeding than the previous two.

20         Then there's the renewed motion for transfer, which

21   is also not fully submitted, but also has a better chance of

22   succeeding than the previous one.

23         And the fact discovery, correct me if I'm wrong, is

24   coming to a close.  Or is that optimistic?

25         MR. FREI-PEARSON:  We're getting there, your Honor.

1    It's a little optimistic.  I think depositions are going to

2    stretch into June, and then there would be additional discovery

3    based on data that would be produced that has not yet been

4    produced pending resolution of conditional certification.

5              THE COURT:  All right.  It seemed like at least fact

6    discovery is scheduled to end by the end of the month.

7              MR. SWEENEY:  And just on our side, we've had a few

8    witness issues just with scheduling, so we just might need a

9    very small amount of additional time to schedule depositions

10   that plaintiffs had requested a while ago.  So we're just

11   having some -- but we've now offered dates for all of those.

12             THE COURT:  So April 30th might slip, but --

13             MR. SWEENEY:  But just a small slip.

14             THE COURT:  And that will be the end of fact

15   discovery, and then the rest is going to be expert discovery?

16             MR. FREI-PEARSON:  There will be fact discovery

17   relating to data that has not yet been produced, and then,

18   presuming that we're successful in our efforts to conditionally

19   certify a class, I believe defendants will take discovery

20   related to opt-ins.

21             THE COURT:  All right.  There are arguments for what

22   order all these things should be taken up in.  You could argue

23   that I should decide the motion for conditional certification

24   and, if I grant it, that's a reason to transfer because it will

25   be a corporate class.  You could argue that I should transfer

 1   because the judge in Kentucky should decide whether there's an

 2   FLSA collective.  You could argue I should consider the motion

 3   to amend first because if the new defendants are in, then that

 4   would be an argument against transferring.  I don't know what

 5   the right order is, but I have questions.

 6          It does seem that plaintiffs, if they were really

 7   interested in bringing in the franchisors who employed

 8   plaintiff Durling, they could have done that two years ago.

 9   The defendant is saying that the sudden interest in bringing --

10   did I say franchisors?  I think I meant franchisees.  I know I

11   meant franchisees.  The defendants are arguing that if the

12   plaintiffs really cared about the franchisees that collectively

13   operate as PJA Hudson Valley, they've known about them since

14   before the case was filed and that the sudden desire to add

15   them is a transparent attempt to avoid transfer.  It kind of

16   looks that way.

17          Why, at this stage of the game, when fact discovery

18   is coming to an end, should I allow new defendants to be added?

19          MR. FREI-PEARSON:  So Mr. Durling has always wanted

20   to represent his co-workers in a collective against Papa John's

21   who worked with him in New York.  That's been consistent from

22   day one.  Plaintiffs' original theory of the case was that

23   Mr. Durling could be one of the representatives of a nationwide

24   collective that would contain those co-workers.  We've since

25   received guidance from your Honor and, almost immediately after

1    receiving that guidance, we then realized that, under your

2    Honor's guidance, for Mr. Durling to represent a collective of

3    his workers, that collective would have to be more narrowly

4    defined than how we originally pled it, and that's why we

5    brought in his other employer as a joint defendant.

6            But Mr. Durling has always wanted to bring that

7    claim.  That claim remains live.  We would move to

8    conditionally certify that claim very shortly after your Honor

9    brought the other -- or gave us leave to amend the complaint so

10   that Mr. Durling is a potential representative of a collective

11   that's more narrow than the collective that he represents in

12   the original complaint.  We had -- well, that's the succinct

13   answer to your Honor's question.

14           THE COURT:  Is there a reason why I couldn't certify

15   the corporate collective that you're looking for, sever those

16   claims, transfer them to Kentucky, and just keep here the

17   Hudson Valley case?

18           MR. FREI-PEARSON:  Well, that creates some difficulty

19   with respect to the other named plaintiffs.  I think Mr. Morris

20   represents Delaware, and he would be seeking to certify a

21   collective of folks who worked for the same franchisee as he

22   does.

23           THE COURT:  That should go to Delaware, one would

24   argue.

25           MR. SWEENEY:  Can I?  I'm sorry.

```
 1              THE COURT:  Hold your thought.

 2              MR. SWEENEY:  Okay.

 3              THE COURT:  You'll get a chance.

 4              MR. FREI-PEARSON:  So discovery's already been taken

 5    on this case here.  It's all the same theory of -- the

 6    underlying merits in this case is exactly the same for the

 7    corporate stores and the franchisee stores.

 8              THE COURT:  Right, but I'm going to have a case where

 9    I have two or four or six or ten collectives that don't

10    overlap.  I just have never heard of anything like that.

11              MR. FREI-PEARSON:  Well --

12              THE COURT:  And it also seems burdensome and

13    inefficient.  Obviously, if I sever claims and transfer them to

14    their home states, so to speak, the parties aren't going to

15    recommence discovery.  They've already taken discovery.

16              I understand why you personally -- I mean, your

17    office is up the street.  You don't want to go to Delaware.

18    But what sense does it make for a court in New York to be

19    presiding over a collective made up of plaintiffs and

20    defendants who are all in Delaware or plaintiffs and defendants

21    who are all in Illinois when the theory that brought them

22    together is not flying?

23              MR. FREI-PEARSON:  Well, Papa John's itself

24    transferred one case that was based in Virginia to this court,

25    and Papa John's sought to transfer another case that was based
```

1    in another state.

2              We think, as your Honor said in your original -- or

3    in the most recent conditional certification motion, whether or

4    not Papa John's is liable for the actions of these franchisees,

5    that's a merit determination that your Honor hasn't reached.

6    What your Honor's decided is that we can't certify a single

7    nationwide collective, but we absolutely think we can certify

8    these franchisee collectives.  We think the exact same unitary

9    policy was applied to Mr. Durling and his co-workers, and the

10   defendant in that case, who's probably going to be the one who

11   can pay the judgment, is Papa John's, not PJ Hudson Valley, and

12   so they're already going to be here.  And the case against Papa

13   John's corporate is the same case against the same defendant,

14   as is the Delaware case, as is the Pennsylvania case.

15             THE COURT:  But it's a different theory.  The case

16   against the employees of the corporate stores is corporate had

17   a policy of underpaying us and we got underpaid.  The theory

18   with the franchisees is going to be different.  It's going to

19   be some sort of joint employer or agency theory.  So it's

20   not -- and -- I don't know what the facts are.  I'm not

21   predicting what I'm going to find.  But it's a tougher road to

22   hoe than you're going to have in the corporate stores.  It's

23   going to be easy to show that Papa John's is responsible for

24   what went on in the corporate store -- the PJI is responsible

25   for what went on in the corporate stores.  It's a heavier lift

1    to show that it's responsible for what went on in each of these

2    franchisees.  So it's not the same theory.

3            It may be that, as to the various franchisees, your

4    theory is the same.  I don't know that your facts will be the

5    same as to each mini collective, which is not to say that any

6    of this drives the decision, but if I am one of these new

7    defendants, which I'll call PJ Hudson Valley because you guys

8    do, I'm going to come in and say, well, it's all very nice that

9    you guys took discovery, but I wasn't there for that and so I

10   want to start over.

11           MR. FREI-PEARSON:  And so PJ Hudson Valley will make

12   Mr. Durling available for deposition at the earliest convenient

13   date they want.  We're not going to fight that.  And the

14   discovery that we need from PJ Hudson Valley is very minimal

15   because we already have the wage records, we already have from

16   Mr. Durling --

17           THE COURT:  Right, but PJ Hudson Valley is entitled

18   to not only take your clients' deposition, but to get discovery

19   from PJI.  It just seems like a duplication of effort.  That's

20   not the only factor.  I understand that.

21           Mr. Sweeney, you were dying to say something.

22           MR. SWEENEY:  Yes, your Honor.  And I think you're

23   absolutely right to focus on this issue, but one thing I want

24   to make sure is clear, the proposed amended complaint has nine

25   plaintiffs.  One has a claim against franchisees.  That's

1    Mr. Durling.  Three of them, Morris, Wolff and one other, were

2    plaintiffs represented by Mr. Frei-Pearson in a 2013 case

3    against their franchise employer.  So the suggestion that the

4    idea of suing franchisees just came up on your March 1st ruling

5    really doesn't hold water.  They sued and settled.  So

6    Mr. Morris --

7         THE COURT:  Well, they thought that Mr. Durling was

8    going to get to represent the whole country, and now that he's

9    not going to, they want him to at least represent his

10   franchisees -- the co-workers at his franchisors -- no, at his

11   employer's franchises.

12        MR. SWEENEY:  My point is their suggestion is take

13   this nationwide case and graft on the claims of one individual

14   against one franchisee, because the other ones they already

15   settled and were paid on.

16        For this PJPA -- this isn't the second bite at the

17   apple, this is the third bite at the apple, because they

18   started this in 2013 by suing the franchisee.  In 2016, when

19   they filed the original complaint in this case, it says in

20   paragraph 17 that Durling worked for a franchisee.  They knew

21   that then.  It's not fair to my client to have to now, as you

22   said, go back and basically restart this case for something

23   they could have done in 2016.  They knew --

24        THE COURT:  Well, let me make sure I understand.

25        Durling's the only one who worked for a franchisee.

1          MR. SWEENEY:  No.  Sorry.  Three others did.  But

2    they sued that franchisee, Mr. Frei-Pearson did, in 2013 in

3    Pennsylvania.  They settled that case in 2015.  They released

4    the franchisee.  None of them worked for the franchisee after

5    that.  They worked for these franchisees --

6          THE COURT:  That was that giant franchisee?  What was

7    it called?

8          MR. SWEENEY:  PJPA.

9          THE COURT:  PJPA.

10         MR. SWEENEY:  So Mr. Morris worked for PJPA from 2011

11   to 2013.  He released them in 2016.  Mr. Morton worked for them

12   from 2009 to 2013.  He released them in 2016.

13         And if you look at the complaint closely, the

14   Delaware and New Jersey claims and the Pennsylvania claims are

15   not actually against any franchisee.  They're only against my

16   client, as has always been the case here.

17         So the complaint only asserts claims against

18   franchisees for Durling, only under New York law.  I assume the

19   plan, then, is to just keep amending and keep adding, which

20   makes absolutely no sense.  They could have done it before.

21   They can do it in separate cases if they choose.  But there's

22   no reason to graft that onto this case.  And, obviously, I

23   don't think it would stop here.  It would have to keep going or

24   else it doesn't make any sense.  And, frankly, it doesn't make

25   any sense.  This case is against my client about the corporate

20184bdur1c

1   stores.  If there was going to be evidence about their

2   responsibility for a franchisee, it should have been developed

3   a long time ago.  It hasn't been.  So this case has its own

4   history and its own progress.  We shouldn't start over.  It

5   could have been done.  There's no cause --

6          THE COURT:  Well, do they have to start a case

7   against the franchisee -- no.  They were aiming higher.  They

8   were trying to get PJI on the hook --

9          MR. SWEENEY:  Right.

10          THE COURT:  -- because they doubt the franchisee has

11   money.  Of course, doubting the franchisee has money makes me

12   question why they want to add these defendants now.

13          MR. SWEENEY:  I think it's to avoid transfer.

14          THE COURT:  What is your view on whether, even if I

15   allow them, that would prevent transfer?  Why couldn't I take

16   the big case against the corporate stores and send that to

17   Kentucky and keep the Hudson Valley case here?

18          MR. SWEENEY:  Well, I think, if that happened, that

19   would be a new case against the Hudson Valley defendants.  They

20   have every right to have it be a new case.  I'm, obviously, not

21   representing them, but I think that's --

22          THE COURT:  Well, you represent PJI.

23          MR. SWEENEY:  Right.

24          THE COURT:  Is that something they would want to see

25   or not want to see?

1          MR. SWEENEY:  What they don't want to see is a case

2     in which they have to have co-defendants who are franchisees in

3     the same case that's been litigated for two years.  What

4     happens otherwise -- the truth is these franchisees have been

5     sued by Mr. Frei-Pearson and his co-counsel for years.

6     Mr. Potashnick, who's counsel in this case, has eleven cases

7     pending currently just against Papa John's franchisees.  So

8     they sue these franchisees all the time all over the place.  I

9     don't understand why they would need to be added to this case.

10          THE COURT:  Did they ever win?

11          MR. SWEENEY:  I'm sorry?

12          THE COURT:  Did they ever win?

13          MR. SWEENEY:  They settled some.  I honestly don't

14     know.  I don't represent any of the franchisees.  But they know

15     how to sue franchisees.  They've known since well before 2013.

16     They've sued them for years and years and years.

17          This case is different.  This case is against the

18     franchisor and its progressed a long way.  And your comments

19     about, you know, your decision not being a decision on the

20     merits certainly makes sense, but that's this case, and that

21     should be litigated in this case against this defendant that's

22     been the sole defendant for two years.  There's no reason, no

23     cause, to reset this case and start it over.

24          THE COURT:  What about the plaintiffs and claims that

25     the plaintiffs want to add?  They want to add new named

1   plaintiffs so that they can bring in state law claims from

2   three other states where opt-ins worked and they want to add

3   the plaintiff in the Achoual case.

4           MR. SWEENEY:  This case is a case against my client

5   and somebody like Colonel's, Limited, who we acknowledge is

6   affiliated.  I certainly can see -- obviously, we're going to

7   reserve all our rights to respond to that complaint because we

8   may have defenses individually, but I could certainly

9   understand that.

10          The thing we have a concern with is adding these new

11  defendants and this new franchisee theory.  This case should be

12  about corporate stores and the corporate defendant, and if your

13  Honor were to allow that, we would understand that, but that

14  doesn't really change the core of the case.  What changes the

15  core of the case is adding these franchisees that could have

16  been added two years ago.

17          THE COURT:  And your theory as to why I should stay

18  is what?

19          MR. SWEENEY:  It really goes to your first point

20  about the order in which things should be decided.  My opinion

21  is the case should go to Kentucky.  The judge in Kentucky --

22  and, of course, we're happy with your rulings so far, but we

23  just think that's the appropriate place for the case and the

24  judge in Kentucky should decide the rest of the issues in the

25  case.  So, really, it's more about the order of issues.

1          We've continued to work on discovery.  We understand

2     there's depositions that are going to happen.  But we don't

3     think that major decisions in the case should keep being made

4     until the transfer issue is made.  So, really, our request is

5     more to the order of issues.

6          THE COURT:  But the clock is ticking.  Are you

7     willing to toll the statute for the period of the stay?

8          MR. SWEENEY:  I would need to consult with my client,

9     but I think we would.

10          THE COURT:  Well --

11          MR. SWEENEY:  The core issue to us is really the

12     amendment in adding this franchisee theory in.  That's the

13     central issue to us.  And, obviously, the transfer issue, but

14     that stands on its own to a certain extent.

15          THE COURT:  Well, I'm not going to shoot from the hip

16     on something with this many moving parts.  And I don't know

17     what arguments either side will have either on the motion for

18     conditional certification or the motion to amend.  I guess I

19     have some idea on the motion to transfer.  But, as I said at

20     the top, it seems like the motion to certify collective of the

21     corporate stores has a greater likelihood of success than

22     before, as does the motion to transfer.  And success on either

23     of those, it seems to me, would have an effect on the motion to

24     amend because I'm not going to -- ironically, the plaintiff

25     succeeding on the collective of the corporate-owned stores

 1    makes it almost less sensible to add the franchisee here and

 2    makes it more sensible to have the case against the franchisee

 3    be a standalone case.  And, arguably, if I transfer the whole

 4    thing, it shouldn't be my call anyway.

 5          I'm not going to stay anything now.  I think the

 6    parties should proceed to wrap up their fact discovery.  The

 7    two motions that have already been made are going to be fully

 8    submitted soon, but we should probably set a schedule for that.

 9    And I will give further thought to whether I should decide that

10    first or last.  And you guys can put in your papers whatever

11    arguments you want to make to me about what order you think

12    makes the most sense.

13          So when would you like to make the motion to amend?

14          MR. FREI-PEARSON:  Your Honor, we can have it on file

15    in a week.

16          THE COURT:  Okay.  That would be April 18th.

17          How soon can you oppose it, Mr. Sweeney?

18          MR. SWEENEY:  If we could have two weeks.

19          THE COURT:  That would take us to May 2nd.

20          And reply?

21          MR. FREI-PEARSON:  One week, your Honor.

22          THE COURT:  May 9th.

23          And I think what would also be helpful, maybe by May

24    11th if you could each send a letter, no more than three pages,

25    stating what order you think I should take up the motions and

```
 1    why, and I'll get to them as soon as I can.
 2            If you're not going to -- I won't hold you to
 3    anything now, Mr. Sweeney, but if you're not going to oppose
 4    adding the new plaintiffs or the new claims, you could tell
 5    plaintiffs that and save a few trees, but you're, obviously,
 6    under no obligation to do that.
 7            All right.  It's like a Rubik's Cube, this case.
 8            Anything else we should talk about this morning?
 9            MR. SWEENEY:  Just one thing.
10            When we had originally submitted a letter about the
11    motion to transfer, we had proposed a briefing schedule.  I
12    don't think it was formally entered.
13            THE COURT:  Oh.  That was in the same letter, I
14    think, as your request for a stay.
15            MR. SWEENEY:  The first, yes.
16            So the only part that's relevant is the reply on the
17    18th.
18            THE COURT:  Yes.  That schedule is fine.
19            MR. SWEENEY:  Okay.  Thank you.
20            MR. FREI-PEARSON:  Your Honor, just one brief point.
21            THE COURT:  Yes.
22            MR. FREI-PEARSON:  I've tried these cases in
23    arbitration because it's very hard to get these defendants all
24    the way to trial.  The trial will be very simple when we get
25    there.  I promise your Honor that.  I know that procedural
```

stuff is very complicated, but the facts are not.

MR. SWEENEY:  We strongly disagree and will make it as complicated as possible.

THE COURT:  Well, that's why they pay you the big bucks.  But the trial is going to be I delivered 20 pizzas a night, I drove this many miles, here's what the IRS says the wear and tear on my car was, here's what I got paid.  Right?

MR. FREI-PEARSON:  That's it.

THE COURT:  I mean, the interesting part of this case is not really the merits so much as -- I mean, maybe there are defenses.

MR. SWEENEY:  And we certainly disagree that conditional certification of the corporate store cases even is appropriate, but we'll save that for our papers.

THE COURT:  Well, you might have defenses.

What's the defense if somebody's getting paid five bucks for a delivery?

MR. SWEENEY:  The suggestion that it's all a uniform policy and a simple equation is wrong.  Some of these plaintiffs, including Mr. Sobol, were paid at least a full dollar per hour above the minimum wage for some of the time.  So this is a minimum wage case.  If he doesn't have a minimum wage claim, he has no claim.  And he was paid, partly because of a local Louisville ordinance that required my client to pay him higher, but he was paid well above the FLSA minimum.

 1    That's part of the equation here.  If the whole expense issue

 2    doesn't drop him below minimum wage, there's no FLSA issue.

 3               THE COURT:  Well, that's true.

 4               MR. SWEENEY:  So I think that's a serious issue.

 5               THE COURT:  That sounds like what the trial would be

 6    about.

 7               MR. SWEENEY:  Well, we have delivery drivers who were

 8    paid as much as $12 an hour.  Some of them make a tremendous

 9    amount of additional money.  And the idea that they're paid

10    less than minimum wage just doesn't really fly in my opinion.

11               THE COURT:  Well, the tips don't get factored into

12    the minimum wage thing, do they?

13               MR. SWEENEY:  Well, they do up to the tip-credit

14    amount.

15               THE COURT:  Right.

16               MR. SWEENEY:  But the tip credit plus $12 an hour for

17    in-store time.  See, they're paid on a dual wage.  They're only

18    paid the tip-credit amount for the time on the road.  And some

19    of these guys are 20 hours in the store, 20 hours out of the

20    store.  Their 20 hours in the store, not always, but often, are

21    paid well above minimum wage.  And what matters is the net for

22    the week.  That's the FLSA analysis.

23               So the idea that the only thing that matters is --

24    and, also, the idea that there's some uniformity in expenses,

25    we pay different in every market.  We pay different as gas

```
1    prices fluctuate.  I say pay.  I meant we reimburse differently
2    all over the place.  So that's not, to me, something that can
3    be decided on a class basis.  There's a serious class issue
4    here.  And I understand that counsel has been successful in
5    many delivery driver cases.  I don't think this is that case.
6    This case is different.  When you pay a different amount in
7    each market, it changes things.  When you pay different hourly
8    rates, it changes things.
9              THE COURT:  So your theory would be if somebody wants
10   to -- if somebody's being underpaid at a corporate-owned store,
11   they have to sue store by store?
12             MR. SWEENEY:  No.  My theory is that if somebody is
13   not being underpaid, they don't have an FLSA claim.
14             THE COURT:  Well, right, but that's what gets decided
15   after.
16             MR. SWEENEY:  If their net -- well, I don't know,
17   because when it's so fractured, it's not a uniform policy.
18   There's not a uniform policy because part -- paying --
19   reimbursing drivers per delivery, as you said, is not illegal.
20   It's only illegal if you reimburse too little.  And the
21   reimbursements -- and it's really only illegal if your hourly
22   rate and your reimbursement put your net wages below the
23   minimum.  That's a complicated equation.
24             THE COURT:  Right, but they're alleging all those
25   things you just said, and whether it's true or not is for
```

1    another day.

2              MR. SWEENEY:  Right.  But my point is it's not simply

3    did you reimburse at the IRS rate.  These cases are not --

4              THE COURT:  True.

5              MR. SWEENEY:  -- that simple.

6              THE COURT:  They have to allege that whatever rate

7    they got reimbursed at was too low and, therefore, it pushed

8    them below the minimum wage.  But if they allege that and they

9    put in affidavits that say that, whether it's true or not is

10   not something I decide on a motion for a collective action.

11             MR. SWEENEY:  But the hourly rates are objective.  We

12   have records on what they were paid hourly, and if they're

13   above a certain rate, there's no way you have a minimum wage

14   violation.

15             THE COURT:  Well, if the minimum wage is $11 and

16   somebody's getting $12 an hour irrespective of reimbursement,

17   then they don't have a minimum wage claim.

18             MR. SWEENEY:  And that's some of the people in the

19   proposed collective.  Absolutely, objectively, that is some of

20   the people in the proposed collective.

21             MR. FREI-PEARSON:  May I briefly respond, your Honor?

22             THE COURT:  Sure.

23             MR. FREI-PEARSON:  These are not new defenses.  As

24   Judge David Baker in Florida said, this is all about simple

25   math.  All of the defenses counsel is reciting were defenses

1    that were made in Perin v. Papa John's where a collective was

2    certified and then individual Rule 23 classes were certified.

3         It's simple math.  There are some folks who got paid

4    a little bit more than other people.  There's some folks who

5    drove a little bit more than other people.  But when you do the

6    math on behalf of this collective, the drivers were

7    dramatically underpaid.  We're not talking about, you know, a

8    penny.  We're talking about massive underpayment.

9         THE COURT:  Well, look, if you have a collective

10   where, when you do the arithmetic, you know, 90 percent of them

11   or 95 percent of them, or 85, a lot of them are going to be

12   entitled to money and some of them aren't.  I'm not sure that's

13   a reason not to certify the collective.  It's a reason to do

14   the math properly later on.  I mean, by certifying the

15   collective, I'm not saying everybody wins.  I'm just saying it

16   ought to be litigated together.

17        It may be that it's not manageable to litigate it

18   together, and that's certainly something you can raise, but if

19   there's a common policy and, in some instances, for whatever

20   corky reason, there's somebody here or there who was not harmed

21   by that policy in the same way as the rest of the collective,

22   I'm not sure that that's a reason not to certify the

23   collective.  That's a reason why, in the long run, that person

24   shouldn't get any money.

25        MR. SWEENEY:  Well, my point is on your 90 percent.

1  There's not a common unlawful policy without the numbers.

2              THE COURT:  Well, I made up that number, but, yeah,

3  obviously, if it was going to be a situation where the

4  arithmetic was going to be wildly different for everybody and

5  we were going to have to -- and there was no commonality, then

6  it wouldn't be appropriate, but if there is a common policy to

7  which they were subjected and the effect on each of them was

8  different, you guys will brief for me whether that means I

9  should or should not certify.

10             MR. FREI-PEARSON:  I don't know if your Honor wants

11  to hear more from me on this.

12             THE COURT:  Nothing personal, but no.

13             MR. FREI-PEARSON:  I completely understand.

14             MR. SWEENEY:  Then I'll take the same direction.

15             THE COURT:  I'll look for your papers and your

16  letters and I'll get to work.

17             MR. SWEENEY:  Thank you.

18             MR. FREI-PEARSON:  Thank you, your Honor.

19             THE COURT:  Thank you.

20

21                           - - - -

22

23

24

25