## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **WILLIAM DURLING, MICHAEL MORRIS, JAMES MORTON, JR., RICHARD SOBOL, MUHAMMAD SULTAN** and **TOM WOLFF,** for themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**PAPA JOHN'S INTERNATIONAL, INC.,**<br><br>Defendant. | Case No. 7:16-cv-03592-CS-JCM<br><br>Second Amended Consolidated Class / Collective Action |

## CONSOLIDATED CLASS / COLLECTIVE ACTION COMPLAINT

William Durling, Michael Morris, James Morton, Jr., Richard Sobol, Muhammad Sultan, and Tom Wolff (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submit the following class and collective action complaint against Papa John's International, Inc. ("PJI"). The allegations concerning Plaintiffs' acts and status are based on their actual knowledge, and their allegations concerning all other matters are based on information, belief and the investigation of counsel:

## NATURE OF THE ACTION

1. This action seeks to redress PJI's systematic policy and practice of paying its delivery drivers hourly wages that are well below the minimum wage mandated by the Fair Labor Standards Act of 1938, 29 U.S.C. §§201 *et seq.* ("FLSA"); the New York Labor Law, N.Y. Lab. Law, Art. 19 § 650 *et seq.*, ("NYLL"), "); the Delaware Minimum Wage Act, 19 Del. C. § 901 *et seq.* ("DMWA"); the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, *et seq.* ("NJWHL"); and the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, *et seq.* ("PMWA").

2.     The FLSA, NYLL, DMWA, NJWHL, and PMWA, like virtually all minimum wage laws, require employers to provide their employees with sufficient reimbursements for employment-related expenses ("kickbacks") to ensure that employees' hourly wages equal or exceed the required minimum wage after such expenses are deducted from hourly wages.  PJI, however, systematically under-reimbursed its delivery drivers for vehicular wear and tear, gas and other driving-related expenses, thereby ensuring that all of PJI's delivery drivers are effectively paid below the minimum wage (nominal wages – unreimbursed vehicle costs = subminimum net wages) during some or all workweeks.

3.     PJI has directly owned and operated at least 708 corporate-owned Papa John's stores across the United States.  These include both stores where PJI (or a wholly-owned subsidiary) is the sole owner and operator, and stores operated as "joint ventures" with franchisees in which PJI owns a majority share.  These joint venture stores include but are not limited to, all stores operated by Colonel's Limited, LLC.[1]

4.     In addition to operating hundreds of corporate-owned Papa John's stores across the country, PJI has grown rapidly by selling the right to operate its stores to franchisees.  But because of the strict control that PJI actively exercises over the pricing of its products, royalties, fees, operations, and other factors influencing what its franchisees are able to pay their employees, PJI is also a joint employer of all of the delivery drivers at the franchised Papa John's stores.  Indeed, PJI's franchisees cannot operate profitably in accordance with PJI's rules and pay PJI its royalties

---

[1]     *See* PJI Corporate's 4th Quarter 2017 Form 10-K, available at http://ir.papajohns.com/secfiling.cfm?filingID=1558370-18-1176, at 6 (representing that PJI Corporate's "Company-owned" stores include approximately "246 restaurants owned in joint venture arrangements with franchisees in which the Company has a majority ownership position and control"); ECF No. 293 (identifying Colonel's Limited, LLC as one such joint venture).

and fees without setting its delivery reimbursement rates at levels that result in state and/or federal minimum wage violations.

5.      PJI has created an apparent agency relationship with its franchisees by requiring all of the delivery drivers who are jointly employed by franchisees to, *inter alia*, wear Papa John's uniforms, affix Papa John's signage to their cars, apply for jobs that are presented as "Papa John's" positions, watch Papa John's training videos on a regular basis, and tell customers they work for "Papa John's."

6.      Moreover, PJI has the ability to fire drivers at its franchisees and is, therefore, a joint employer of drivers at franchisee stores.

7.      Plaintiffs bring this claim as a collective action pursuant to 29 U.S.C. §216(b) for all persons employed as delivery drivers during the maximum allowable limitations period at any Papa John's store in the United States operated by PJI.

8.      Plaintiff Durling brings his NYLL claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed as delivery drivers during the maximum allowable limitations period at any Papa John's store in the state of New York operated by franchisees of PJI.

9.      Plaintiff Morris brings his DMWA claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed as delivery drivers during the maximum allowable limitations period at any Papa John's store in state of Delaware operated by PJPA LLC, an entity that, together with PJI, jointly employed Plaintiff Morris.

10.      Plaintiff Morton brings his PMWA claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed as delivery drivers during the maximum allowable limitations period at any Papa John's store in state of Pennsylvania operated PJPA LLC, an entity that, together with PJI, jointly employed Plaintiff Morton.

11.     Plaintiff Wolff brings his NJWHL claim as a class action pursuant to Fed. R. Civ. P. 23 for all persons employed as delivery drivers during the maximum allowable limitations period at any Papa John's store in the state of New Jersey operated by PJPA LLC, an entity that, together with PJI, jointly employed Plaintiff Morris.

## JURISDICTION AND VENUE

12.     This court has jurisdiction of this action under the FLSA, 29 U.S.C. § 216(b), and under 28 U.S.C. § 1331 (federal question jurisdiction).

13.     Jurisdiction is also authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy exceeds $5,000,000.00.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff Durling resides in this District, worked for PJI in this District and suffered the losses at issue in this District.  PJI is also liable for operations at multiple Papa John's pizza stores in this District; PJI maintains significant business contacts within this District; and PJI engaged in the unlawful conduct alleged in this Complaint within this District.

## THE PARTIES

15.     Mr. Durling is an adult resident of Poughkeepsie, New York, in Dutchess County, who worked as a delivery driver for a Papa John's store at 187 Church Street in Poughkeepsie, New York from January 2015 to June 2015.

16.     Mr. Morris is an adult resident of Middletown, Delaware, in New Castle County, who worked as a delivery driver for a Papa John's Pizza store at 386 Main Street in Middletown, Delaware from approximately December 2011 through January 2013.

17.     Mr. Morton is an adult resident of King of Prussia, Pennsylvania, in Montgomery County, who worked as a full-time delivery driver for Papa John's Pizza stores on West Ridge Pike in Conshocken, Pennsylvania, on Ridge Avenue in Roxborough, Pennsylvania, and on East DeKalb Pike in King of Prussia, Pennsylvania from May 2009 to September 2013.

18.     Mr. Sobol is an adult resident of Louisville, Kentucky, in Jefferson County, who has worked as a full-time delivery driver for a corporate-owned Papa John's Pizza store at 5363 Dixie Highway in Louisville, Kentucky from 2011 to the present.

19.     Mr. Sultan is an adult resident of Woodbridge, Virginia, in Prince William County, who worked as a delivery driver for a Papa John's store at 4529 Duke Street in Alexandria, Virginia from approximately 2003 to October 2016.

20.     Mr. Wolff is an adult resident of Medford, New Jersey, in Burlington County, who worked as a part-time delivery driver for a Papa John's Pizza store at 617 Sokes Road in Medford, New Jersey from September 2012 through October 2014.

21.     PJI employs more than 21,500 employees, as either a direct or joint employer, and operates more than 4,600 pizza stores worldwide.  PJI directly operates the store where Plaintiffs Sobol and Sultan have worked, and jointly operates the stores where Plaintiffs Durling, Morris, Morton, and Wolff have worked. PJI is a Delaware corporation and maintains its corporate headquarters and principal place of business in Jeffersontown, Kentucky. Throughout the relevant period, PJI devised, implemented, and accomplished the improper acts and practices described herein.

## BACKGROUND FACTS

### JOINT EMPLOYMENT AND VICARIOUS LIABILITY ALLEGATIONS

22.     While transferring the financial risk of opening and operating new stores by selling franchises, PJI still maintains and exercises more than enough active operational control of its

franchised stores to be considered a "joint employer" under the broad definition of employer provided by the FLSA and similar state laws. Indeed, discovery has shown that PJI has made hundreds of millions of dollars in excess profits by establishing a franchise system that effectively requires under-reimbursing its delivery drivers.

23.     All Papa John's franchise stores hold themselves out to the public and to their delivery drivers as being "Papa John's."  Deliveries and orders are all performed through PJI's website and/or its uniform order and delivery system and there is no functional difference, either to the public or to delivery drivers, between a franchise store and a corporate store.  Franchisees are required to purchase supplies and hardware and license software systems directly from PJI, and they must purchase all of the other supplies either from PJI or from an approved source.

24.     Throughout the Class Period, PJI was actively and directly engaged in the day-to-day operation and management of all Papa John's restaurants, including those where Plaintiffs worked. Through its standardized written policies, in-person and online training, and regular evaluations of stores and employees, PJI supervises, controls, manages, and/or assists all individuals and business entities who own, operate, supervise, control, and/or manage Papa John's restaurants, both corporate and franchise.

25.     PJI establishes standardized criteria for hiring delivery drivers.  PJI provides its franchisees with a "Papa John's Operations Manual" ("Manual") with which they must comply. Franchisees must follow directions provided in the Manual with respect to hiring, training, and supervising their delivery drivers.  Franchisees are evaluated by PJI on their compliance with the Manual, and risk losing their franchise if PJI finds they are non-compliant.

26.     When employees, including Plaintiffs, are hired by PJI's franchisees, their employers tell them they work for "Papa John's."  Plaintiffs all understood themselves to be Papa John's employees.

27.     PJI also advertises itself as the employer in job postings for delivery driver positions at franchisee-owned restaurants.   Online job postings through services like Indeed.com or Monster.com regularly draw no distinction between corporate-owned and franchisee-owned stores, and applicants are given no indication they are applying to work for any entity other than "Papa John's."

28.     PJI's delivery drivers also perform their jobs in accordance with standard policies, systems, procedures, and requirements that PJI promulgates.  PJI's Manual directs franchisees on how to classify their various workers, including delivery drivers, and provides the tasks and responsibilities for each of those various job classifications.

29.     PJI's control of the manner in which franchisees reimburse delivery drivers is demonstrated by the fact that all of the Papa John's franchises at which Plaintiffs were employed follow the same policies as PJI's corporate-owned stores.  This is no mere coincidence.

30.     While delivery drivers could potentially reduce the degree to which they are undercompensated for their vehicle expenses by taking multiple deliveries per trip, thus reducing their gas usage and vehicular wear-and-tear, PJI directly discourages this practice at both corporate-owned and franchisee-owned restaurants.  One of the metrics on which PJI evaluates all stores, corporate-owned and franchisee-owned alike, is how many deliveries are completed in a relatively short amount of time after the order is placed.  PJI explicitly tells store leadership at both corporate-owned and franchisee-owned stores to limit and discourage their drivers from waiting for multiple orders per run, so as to improve their score on this evaluation metric.

31.     PJI's delivery drivers also interface with PJI-provided computerized systems, programs, and databases to perform their jobs.  This includes PJI's proprietary point-of-sale ("POS") technology, which PJI requires restaurants throughout North America to use and which allows PJI to directly oversee its franchisees' operations.[2]  PJI's POS system was used as the timekeeping system in the stores where Plaintiffs worked, identifies the deficient wages at the heart of this action, and was instrumental in integrating franchisees into PJI's nationwide business.

32.     Indeed, PJI's POS system is designed to specifically flag any instance where a driver -- at either a corporate or franchisee-owned store -- is reimbursed at a rate equal to or above the IRS rate.  PJI itself maximizes its profits by making sure that it reimburses corporate drivers at rates well below the IRS rate.  PJI also explicitly instructs franchisees that they are not required to reimburse the actual costs of delivery drivers' vehicle operations, and that they can reimburse delivery drivers less than the IRS rate.  Tellingly, all Papa John's stores -- both corporate and franchisee -- reimburse drivers at rates well below the IRS rate.

33.     As part of the hiring process, delivery drivers at both corporate-owned and franchisee-owned stores enter information on their vehicles and vehicle insurance into PJI's proprietary POS system, enabling PJI to track compliance with its requirements for delivery drivers at all stores.

34.     All of Papa John's delivery drivers, including both corporate and franchise delivery drivers, perform their jobs using materials and technology that PJI selected and supplied, including

---

[2] *See* Papa John's International, Inc. Form 10-K filing for the Fiscal Year ended December 29, 2013, available at http://ir.papajohns.com/secfiling.cfm?filingid=1104659-14-13226&cik= ("Our proprietary PROFIT System, point-of-sale technology ("POS"), is in place in all North America traditional Papa John's restaurants. … We believe the PROFIT System also enhances restaurant-level marketing capabilities. Polling capabilities allow us to obtain restaurant operating information, providing us with timely access to sales and customer information. The PROFIT System is also closely integrated with our digital ordering solutions in all domestic traditional Papa John's restaurants, enabling Papa John's to offer nationwide digital ordering to our customers.") (accessed Dec. 9, 2017).

PJI's proprietary POS technology, which tracked individual delivery orders and tasks, including the locations to which they drove as part of their employment duties.

35.     Franchisees' delivery drivers were supervised in the performance of their work according to criteria set by PJI.  PJI established the roles and responsibilities of various supervisors, managers and shift leaders through universal training programs that all employees at both corporate-owned and franchisee-owned stores were required to undertake.  Delivery drivers at both corporate-owned and franchisee-owned stores are required to undergo online training courses designed and provided by PJI.  PJI tracks and audits all drivers' completion of these training courses.  These PJI-produced training courses, which franchisee delivery drivers are required to complete, directly reinforce the message that the delivery drivers are part of the "Papa John's team."

36.     PJI is a joint employer of its franchisees' delivery drivers because, *inter alia*,  it exercises control over the process by which they are hired and fired, exercises control over the work they perform, actively directs the manner in which they perform their work, inspects and supervises their work, promulgates policies and procedures governing their employment (including the work, time, compensation, and overtime policies and procedures at issue here), enforces these policies and procedures, and calculates the compensation they received.

37.     PJI specifically values uniformity across the Papa John's brand.  As a result of this emphasis on uniformity, the practical and economic day-to-day reality of delivery drivers' employment is the same at franchisee-owned and corporate-owned stores.  This day-to-day reality is controlled by the policies that are promulgated and enforced by PJI at all such stores.

38.     PJI has hidden behind its abuse of the franchise model to disclaim any responsibility for the policies and practices it effectively dictates at its franchisees' restaurants, despite knowing those policies violate state and federal law.

39.     The wage theft at issue in this action is neither an isolated incident, nor is it due to the actions of rogue franchisees.  Rather, the serial underpayment of delivery drivers is an integrated part of PJI's business model intended to maximize profits, both in its corporate-owned stores and in its franchised stores.

40.     Multiple civil and criminal actions against PJI and its franchisees have identified widespread, systemic violations throughout PJI's franchise network.[3]  This ongoing pattern of frequent violations led former New York Attorney General Eric Schneiderman to repeatedly call on PJI "to step up and stop the widespread lawlessness plaguing [its] businesses and harming the workers who make and deliver [its] food."[4]

---

[3] *See* Jessica Mason Pieklo, *Papa John's Ordered to Pay Almost $800,000 in Wage Theft Case*, REWIRE, Feb. 9, 2015, https://rewire.news/article/2015/02/09/papa-johns-ordered-pay-almost-800000-wage-theft-case/ (reporting on wage theft case against New York Franchisee Emstar Pizza, Inc.); Laila Kearney, *Papa John's To Pay $2 Million After Short-Changing New York Delivery Workers*, HUFFINGTON POST, Mar. 5, 2015, http://www.huffingtonpost.com/2015/03/05/papa-johns-franchise-ord_n_6811852.html (reporting on wage violations case against New York franchisee New Majority Holdings, LLC);  James McNair, *Papa John's to Settle Claims it Underpaid Delivery Drivers*, KENTUCKY CENTER FOR INVESTIGATIVE REPORTING, Aug. 7, 2015, http://kycir.org/2015/08/07/papa-johns-to-settle-claims-it-underpaid-delivery-drivers-in-six-states/ (reporting on under-reimbursement case against PJI on behalf of drivers in Missouri, Florida, Illinois, North Carolina, Arizona, and Maryland); Dave Jamieson, *Papa John's Stores To Dish Up Half A Million Dollars In Wage Theft Case*, HUFFINGTON POST, Oct. 15, 2015, http://www.huffingtonpost.com/entry/papa-johns-wage-theft-case_us_561fc478e4b050c6c4a4854b  (reporting on wage theft case against four New York franchisees); Dave Jamieson, *Papa John's Franchise Gets Jail Time For Failing To Pay Full Wages*, HUFFINGTON POST, Nov. 16, 2015, http://www.huffingtonpost.com/entry/papa-johns-wage-theft_us_564a16e9e4b045bf3df02826 (reporting on wage theft case against a New York franchisee BMY Foods).

[4] *Papa John's To Pay $2 Million After Short-Changing New York Delivery Workers*, *supra* note 3; *Papa John's Stores To Dish Up Half A Million Dollars In Wage Theft Case*, *supr*a note 3.

41.     PJPA, LLC ("PJPA"), the franchisee that employed Plaintiffs Morton, Wolff and Morris (the "PJPA Plaintiffs") provides a typical example of PJI's abuse of the franchise system to profit at delivery drivers' expense while, at the same time, attempting to use legal trickery to evade liability.

42.     PJPA was a profitable company and PJI profited from having PJPA as a franchisee. PJI and its franchisees have benefitted from an intensely intertwined financial relationship.   In November 2008, PJI loaned PJPA approximately $9 million in startup money.   PJPA has paid down that loan to approximately $2,200,000, and also paid PJI millions of dollars in royalties and other fees.   Yet, shortly after the PJPA Plaintiffs sued PJPA for the unlawful wage practices at issue, PJI indicated that it would require full payment of the balance due (in addition to other moneys PJPA regularly paid PJI) and refused to negotiate any further payment plan or any accommodation to allow PJPA to pay the drivers for the minimum wage violations that occurred when PJPA followed PJI's policy.

43.     In the action against PJPA for under-reimbursing its drivers in violation of minimum wage law, the PJPA Plaintiffs obtained conditional certification, and won numerous discovery motions as well as a temporary restraining order.   Nonetheless, solely because of PJI's actions, the PJPA Plaintiffs were severely limited in their recovery from PJPA.   After the PJPA Plaintiffs filed suit, PJI abruptly and deliberately placed PJPA under significant financial hardship by requiring PJPA to immediately pay off the remainder of its outstanding loan balance and indicating it would not provide PJPA with any funds to resolve the legal claims against it.   As part of the PJPA litigation, U.S. Magistrate Judge Timothy R. Rice (E.D. Pa.) appointed an independent economic expert to review PJI's finances.   After an extensive review of PJPA's finances, this expert concluded that -- due to PJI's decision to recall its loan to PJPA and withhold further financial

assistance until PJPA settled the lawsuit against it -- PJPA could only afford to pay its aggrieved delivery drivers a fraction of the value of their claims.[5]   PJI was thus able, through its financial control over PJPA, to effectively prevent PJPA from adequately reimbursing its drivers for the wage and hour violations that were due to PJI s policies and that, ultimately, padded PJI's profits.

44.      By over-reaching on its operational control of franchised stores, PJI is able to limit delivery drivers' recoveries in suits against its franchisees.  For example, by calling due a loan to PJPA in response to the litigation against the franchisee, PJI siphoned off the funds that would have been otherwise available to compensate the drivers it harmed through its unlawful policies. At the same time, PJI was guaranteed to make money because -- in addition to repaying the loan -- PJPA and other franchisees also paid PJI substantial additional sums for PJI's guidance in running the business.

45.      Because PJI has deliberately used its franchisees as a liability shield while actively exercising economic control over them, PJI must accept the financial responsibility that comes with allowing an often under-capitalized franchisee to limit delivery drivers' ability to recover for blatant minimum wage violations.

## PJI'S FRANCHISEES ARE APPARENT AGENTS OF PJI

46.      At all material times, PJI's franchisees acted as agents of PJI.  Franchisees employed Plaintiffs Durling, Morris, Morton, Wolff and other delivery drivers for the mutual benefit of PJI and those franchisees.

47.      PJI's actions gave clear indication to franchisee employees that those employees, including Plaintiffs and Class members, were Papa John's employees.

---

[5] *See* Settlement Agreement at 4-5, *Bellaspica v. PJPA*, No. 13-3014 (E.D. Pa. Mar. 25, 2016) (Dkt. No. 139 – Attachment 3).

48.     While working, Plaintiffs and other delivery drivers were required to affix Papa John's signs to their vehicles, to wear uniforms (shirts, hats, and coats) prominently featuring the Papa John's logo and to use delivery bags featuring the Papa John's logo.

49.     Prospective employees at franchisee stores fill out applications for employment that prominently feature the Papa John's logo and reference working for "Papa John's."  While being interviewed, applicants are told by franchisees that they will be working for "Papa John's."

50.     PJI required the use of Papa John's uniforms, bags, and signs at both corporate and franchise restaurants, and required or permitted the use of the Papa John's logo on job applications for franchisee stores, fully aware that doing so gave rise to the reasonable belief that the delivery drivers were Papa John's employees and part of the "Papa John's team." Delivery drivers, including Plaintiffs, relied on the apparent authority of franchisees to hire them as Papa John's employees.

51.     Throughout their employment, Plaintiffs and delivery drivers were required to view monthly training videos produced and provided by PJI.  These videos repeatedly stated that the employees were members of the "Papa John's team," and instructed the employees to perform job functions according to Papa John's standards.  These training videos are the same for employees at corporate-owned and franchisee-owned stores, and are accessed through PJI's own internet content service.

52.     Delivery drivers at franchisee-owned stores are also subject to regular in-store evaluations by PJI.  PJI specifically evaluates whether delivery drivers complete PJI's training programs and whether the store, drivers' uniforms, and drivers' vehicles prominently present themselves as part of "Papa John's."  These evaluations directly determine whether the franchisee-owned store remain open or whether PJI will revoke the franchisee's license.

53.     A franchisee manager has reported that PJI employees instructed franchisees to take action, up to and including termination, when franchisee delivery drivers failed to meet PJI's standards.

54.     In reasonable reliance upon the representations made by the franchisees throughout their job applications, hiring process, and day-to-day work (representations consistently reinforced and allowed by PJI), and by PJI directly through their training videos and store evaluations, delivery drivers including Plaintiffs believed they were Papa John's team members and employees. In relying on these representations, Plaintiffs and other delivery drivers performed the work required of them by Papa John's franchisees and received the sub-minimum wages at issue in this action.

55.     The control PJI has asserted and continues to assert over its franchisees exceeds any control necessary to protect Papa John's trademark or good will.

56.     PJI authorized and condoned the violations alleged herein, and franchisees acted within the course and scope of their agency as agents of PJI.

### PJI'S FAILURE TO PAY MINIMUM WAGES TO DELIVERY DRIVERS

57.     During a typical ten-hour shift, delivery drivers spend about six to seven hours "on the road" making deliveries.

58.     Throughout the relevant period, PJI required its delivery drivers to maintain and provide a safe, functioning, insured, and legally-operable automobile to make deliveries.  These vehicles, typically two- and four-door passenger cars, weigh less than 10,000 pounds.

59.     Throughout the relevant period, PJI required its delivery drivers to bear the "out-of-pocket" costs associated with their vehicles, including costs for gasoline, vehicle depreciation, insurance, maintenance, parts, fluids, and repairs.

60.    For decades, the Internal Revenue Service ("IRS") has calculated and published a standard mileage reimbursement rate ("IRS rate") for businesses and employees to use in computing the minimum deductible costs of operating an automobile for business purposes.

61.    The IRS rate was $0.565 per mile in 2013, was $0.56 per mile in 2014, was $0.575 per mile in 2015, was $0.54 per mile in 2016, was $0.535 per mile in 2017, was $0.545 per mile in 2018, and is $.58 per mile in 2019.

62.    Since 2010, reputable companies that study the cost of owning and operating a motor vehicle and/or estimating reasonable reimbursement rates for vehicular travel, including the American Automobile Association ("AAA"), have set the average cost of operating a vehicle at more than $0.53 per mile.

63.    PJI's delivery drivers typically experienced lower gas mileage, more rapid vehicle depreciation, higher insurance rates and greater vehicular expenses than the average business driver because they typically drove in urban areas, in start-and-stop traffic, on a tight schedule, at night, and in inclement weather.

64.    Thus, during the relevant period, the actual "out-of-pocket" costs that PJI's delivery drivers paid to provide a safe, functioning, insured and legally-operable automobile for their deliveries was at least $0.535 per mile.

65.    PJI's 30(b)(6) witness testified that its delivery drivers made an average of three-and-a-half deliveries per hour spent making deliveries, which required them to drive an average of 17.5 miles each hour (five miles per delivery), meaning they paid "out-of-pocket" about $9.36 or more (17.5 miles x $.535 per mile cost) per hour to provide, operate, and maintain their vehicles.  In truth, delivery drivers made a higher average of deliveries per hour.

66.     When PJI's delivery drivers worked "on the road," they were paid an hourly wage at or above the tipped minimum, plus a set amount per delivery to ostensibly offset their vehicle costs.  However, this set amount systematically provided delivery drivers less than their vehicle costs incurred in performing the job, and resulted in minimum wage violations in some or all workweeks worked by each PJI delivery driver.

67.     For example, in October 2016, PJI paid Plaintiff Sobol and his fellow delivery drivers at PJI's store located at 5363 Dixie Highway, Louisville, Kentucky $7.25, including a tip credit applied to the time they spent making deliveries, plus $0.95 per delivery to offset their vehicle costs, an average total of $10.58 per hour ($7.25 per hour + (3.5 deliveries x $0.95 per delivery).  However, after subtracting vehicle cost of about $9.36 per hour, Plaintiff Sobol's hourly net wages for work time spent making deliveries totaled only $1.22 per hour ($7.25 per hour nominal wages + $2.85 per hour vehicle reimbursements - $9.36 per hour vehicle costs).   That equates to an overall net wage rate of approximately $3.63 per hour (($7.25 in-store wage rate x 40% of work time) + ($1.22 "on-the-road" net hourly wage x 60% of work time)).

68.     Indeed, PJI's own documents reflect that, as of approximately April 21, 2017, drivers at Papa John's per delivery stores are reimbursed an average of approximately $1.20 per delivery, which equates to $0.24 per mile (with corporate-owned stores and franchisee-owned stores both reimbursing the drivers at an effective rate of $0.24 per mile).  These reimbursement amounts are less than half of the IRS rate and are far too low to reasonably reimburse any drivers for their actual expenses.

69.     Based on a $1.20 reimbursement per delivery, PJI pays its delivery drivers in states maintaining a minimum wage rate equivalent to the federal minimum wage, either with or without a tip credit, an average net wage of only $2.09 per hour while making deliveries ($7.25 per hour

nominal wage + $4.20 ($1.20 x 3.5 deliveries per hour)  - $9.36 per hour vehicle costs = $2.09 net

wage per hour).  That equates to an overall net wage rate of approximately $4.15 per hour (($7.25

in-store hourly wage x 40% of work time) + ($2.09 "on-the-road" net hourly wage rate x 60% of

work time)).

## FLSA COLLECTIVE ACTION ALLEGATIONS

70.   Plaintiffs bring a collective action pursuant to 29 U.S.C. §216(b) on behalf of a

proposed collective defined to include:

> All persons PJI employed as a delivery driver during any workweek
> in the maximum limitations period. Any delivery drivers who
> participated in the settlement with PJI in *Perrin v. Papa John's Int'l,
> Inc.*, No. 09-1135 (E.D. Mo. Jan. 12, 2016) will be ineligible for
> recovery for the time period specifically covered in the Perrin
> settlement.  Further excluded from the class are the claims for work
> at franchisee-owned stores of any delivery drivers who worked for
> franchisees other than PJPA that are currently involved in class or
> collective litigation relating to delivery driver under-reimbursed PJI
> shall be entitled to an offset as to delivery drivers who participated
> in   settlements   of   claims   for   under-reimbursements   with
> franchisees.[6]

71.    Plaintiffs reserve the right to modify the proposed collective definition at a later

stage of litigation.

72.    Plaintiffs are members of the proposed collective they seek to represent because they

worked for PJI as delivery drivers during the relevant period and suffered the minimum wage

violation alleged above relating to work "on the road."

73.    This action may be properly maintained as a collective action on behalf of the putative

Class because, during the relevant period:

    a.      Plaintiffs and the Class members had the same employer;

---

[6] Plaintiffs are mindful of this Court's previous rulings on conditional certification (*see* ECF
Minute Entries for Mar. 29, 2017 and Mar. 1, 2018) and intend to abide by those rulings.  Plaintiffs
plead this broader collective in order to preserve their rights.

b.    Plaintiffs and the Class members performed the same type of work;

c.    Plaintiffs and the Class members were governed by the same compensation policies, practices and systems;

d.    Plaintiffs and the Class members were subjected to the same policies relating to the payment of supplemental wages to offset vehicle maintenance costs;

e.    Plaintiffs and the Class members were governed by the same payroll policies, practices and systems; and

f.    PJI's labor relations and human resources systems were centrally-organized and controlled, and controlled the policies and practices at issue in this case.

74.    Plaintiffs estimate that the collective group, including both current and former employees over the relevant period, will include thousands of members.  The precise number of members should be readily available from PJI's business records, and from input received from the Class members as part of the notice and "opt-in" process provided by 29 U.S.C. §216(b).  Given the composition and size of the Class, its members may be informed of the pendency of this action directly via U.S. mail, e-mail and/or the posting of written notices at PJI's work sites.

75.    Plaintiffs reserve the right to modify the proposed collective definition at a later stage of litigation.

76.    Plaintiffs Sobol and Sultan are members of the proposed collective they seek to represent because they worked for PJI as a delivery driver during the relevant period and suffered the minimum wage violation alleged above relating to work "on the road."

77.    This action may be properly maintained as a collective action on behalf of the putative Class because, during the relevant period:

a.    Plaintiffs Sobol and Sultan and the Class members had the same employers;

b.    Plaintiffs Sobol and Sultan and the Class members performed the same type of work;

c.    Plaintiffs Sobol and Sultan and the Class members were governed by the same compensation policies, practices and systems;

d.    Plaintiffs Sobol and Sultan and the Class members were subjected to the same policies relating to the payment of supplemental wages to offset vehicle maintenance costs; and

e.    Plaintiffs Sobol and Sultan and the Class members were governed by the same payroll policies, practices and systems.

78.    The collective group, including both current and former employees over the relevant period, includes thousands of members.  The precise number of members should be readily available from PJI's personnel, scheduling, time and payroll records, and from input received from the Class members as part of the notice and "opt-in" process provided by 29 U.S.C. §216(b).  Given the composition and size of the Class, its members may be informed of the pendency of this action directly via U.S. mail, e-mail and/or the posting of written notices at PJI's work sites.

## STATE LAW CLASS ACTION ALLEGATIONS

79.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff William Durling brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons PJI, as a joint employer with a franchisee or based on the apparent agency of a franchisee, employed as a delivery driver during any workweek in the maximum limitations period at a store owned or operated by any franchisee in New York ("the New York Class").

80.    The New York Class specifically excludes PJI; any parent, subsidiary, or affiliate of PJI; any entity in which PJI has or had a controlling interest, or which PJI otherwise controls or

controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of PJI; and the Court and Court personnel.

81.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Mike Morris brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons PJI, as a joint employer with PJPA, LLC or through PJPA, LLC acting as PJI's apparent agent, employed in Delaware as a delivery driver during any workweek in the maximum limitations period (the "Delaware Class").

82.     The Delaware Class specifically excludes PJI; any parent, subsidiary, or affiliate of PJI; any entity in which PJI has or had a controlling interest, or which PJI otherwise controls or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of PJI; and the Court and Court personnel.

83.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff James Morton, Jr. brings this class action on behalf of himself and the following Class of similarly-situated individuals:

> All persons PJI, as a joint employer with PJPA, LLC or through PJPA, LLC acting as PJI's apparent agent, employed in Pennsylvania as a delivery driver during any workweek in the maximum limitations period (the "Pennsylvania Class").

84.     The Pennsylvania Class specifically excludes PJI; any parent, subsidiary, or affiliate of PJI; any entity in which PJI has or had a controlling interest, or which PJI otherwise controls or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of PJI; and the Court and Court personnel.

85.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tom Wolff brings this class action on behalf of himself and the following Class of similarly-situated individuals:

All persons PJI, as a joint employer with PJPA, LLC or through PJPA, LLC acting as PJI's apparent agent, employed in New Jersey as a delivery driver during any workweek in the maximum limitations period (the "New Jersey Class").

86.     The New Jersey Class specifically excludes PJI; any parent, subsidiary, or affiliate of PJI; any entity in which PJI has or had a controlling interest, or which PJI otherwise control or controlled; any officer, director, employee, legal representative, predecessor, successor, or assignee of PJI; and the Court and Court personnel.

## CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (On Behalf Of The FLSA Collectives)

87.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth above.

88.     PJI is an "employer" as defined by 29 U.S.C. § 203(d).

89.     Plaintiffs and the collective group members are "employees" as defined by 29 U.S.C. § 203(e)(1) and "tipped employees" as defined by 29 U.S.C. § 203(t).

90.     The direct and supplemental wages PJI paid to Plaintiffs and the collective group members are "wages" as defined by 29 U.S.C. § 203(m).

91.     PJI is an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A).

92.     Plaintiffs and the Class members are similarly situated individuals within the meaning of 29 U.S.C. §216(b), and Plaintiffs and the Class members were covered employees entitled to the FLSA's protections.

93.     This Count arises from PJI's violation of the FLSA, 29 U.S.C. § 206(a)(1), for failing to pay Plaintiffs and the Class members the required minimum wage for each hour they worked.

94.     Throughout the relevant period, the federal minimum wage rate has been $7.25 per hour.

95.     PJI failed to pay Plaintiffs and the putative Class members the required minimum wage for their work "on the road."

96.     PJI paid its delivery drivers hourly wages at or near the applicable minimum for their hours worked, including a tip credit applied to the time they spent working "on the road."  Based on nationally-accepted minimum reimbursement calculations for business travel, Plaintiffs and the Class members wound up having to pay out-of-pocket approximately $5.35 per hour worked (about 10 miles driven per hour of work time x $0.535 vehicle cost per mile) to provide, operate and maintain their vehicles.  PJI reimbursed delivery drivers substantially less than $5.35 per hour of "on the road" work time for their driving expenses, and thereby pushed delivery drivers' actual hourly wage well below the statutory minimum.  Thus, PJI's wage system for delivery drivers working "on the road" presents a clear FLSA violation.

97.     In failing to ensure that Plaintiffs and the collective group members received at least the tipped minimum wage rate for each hour they worked "on-the-road," PJI acted willfully and with reckless disregard of clearly applicable FLSA provisions.

98.     PJI has no good faith justification or defense for failing to pay Plaintiffs and the collective group members all wages mandated by the FLSA.

### COUNT II - VIOLATION OF THE NEW YORK LABOR LAW
### (On Behalf Of The New York Class)

99.     Plaintiff William Durling repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth above.

100.     Through its conduct described above, PJI has engaged in deceptive acts and practices that resulted in injury to Plaintiff Durling and the other members of the New York Class.

101.    The unpaid wages at issue in this litigation are "wages" as defined by NYLL § 190(1).

102.    Plaintiff Durling and the New York Class members are "employees" as defined by NYLL § 190(2).

103.    PJI is an "employer" as defined by NYLL § 190(3).

104.    Throughout the relevant period, PJI was an employer obligated to comply with the NYLL's requirements, and Plaintiff Durling and the New York Class members were covered employees entitled to the NYLL's protections.

105.    NYLL § 193 prohibits employers, among other things, from requiring an employee to make payments by separate transaction, unless such charge or payment is permitted as a deduction from wages under the NYLL.

106.    NYLL § 193 prohibits deductions from wages that are not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency and are not expressly authorized in writing by the employees and are not for the benefit of the employee.

107.    NYLL § 198-b(2) prohibits persons, among other things, from requesting, demanding, or receiving, either before or after such employee is engaged, a return, donation, or contribution of any part or all of said employee's wages, salary, supplements, or other thing of value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such employee from procuring or retaining employment.

108.    As alleged herein, PJI, pursuant to its policies and practices, have reimbursed delivery drivers less than the reasonably approximate amount of their automobile expenses to such an extent that it diminishes the delivery drivers' net wages below New York's minimum wage.

109.    New York's minimum wage was $7.25 per hour in 2013, was $8.00 per hour in 2014, Was $8.75 per hour in 2015, was $9.00 per hour in 2016, was $9.70 per hour in 2017, was $10.40 per hour in 2018, and is $13.50 in 2019.

110.    PJI, pursuant to its policies and practices, violated the NYLL by requiring *de facto* deductions for vehicle expenses that are not authorized under the NYLL and/or that reduce delivery drivers' net wages below the minimum.

111.    Plaintiff Durling and all other members of the New York Class are victims of uniform compensation and vehicle cost reimbursement policies; and these uniform policies, in violation of the NYLL, have been applied, and continue to be applied, to all PJI's delivery drivers.

112.    As a result of the aforesaid violations of the NYLL's minimum wage provisions, PJI has unlawfully caused *de facto* deductions from the wages of Plaintiff Durling and all other New York delivery drivers that resulted in minimum wages being unlawfully withheld by PJI from Plaintiff and all other delivery drivers.

113.    NYLL § 633(1) provides that Plaintiff Durling and all other delivery drivers are entitled to damages equal to the amount of the unpaid minimum wages during the relevant period, plus periods of equitable tolling.

114.    NYLL § 633(1) further provides that Plaintiff Durling and all other delivery drivers are entitled to an award of their costs incurred in pursuing this claim, an award of reasonable attorneys' fees incurred in pursuing this claim and an award of prejudgment interest at the applicable rate.

115.    Under NYLL § 633(1) PJI is liable for a penalty in the amount of 100% of the total of the amount due during the relevant period as PJI cannot prove a good faith basis to believe that its underpayment was in compliance with the law.

### COUNT IV - VIOLATION OF THE DELAWARE MINIMUM WAGE ACT
#### (On Behalf Of The Delaware Class)

116.   Plaintiff Michael Morris repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth above.

117.   Through its conduct described above, PJI has engaged in deceptive acts and practices that resulted in injury to Plaintiff Morris and the other members of the Delaware Class.

118.   The unpaid wages at issue in this litigation are "wages" as defined by 19 Del. C. § 901(7).

119.   PJI is an "employer" as defined in 19 Del. C. § 901(4).

120.   Plaintiff Morris and the Delaware Class members are "employees" as defined by 19 Del. C. § 901(3).

121.   Throughout the relevant period, PJI was an employer obligated to comply with the DMWA's requirements, and Plaintiff Morris and the Delaware Class members were covered employees entitled to the DMWA's protections.

122.   This Count arises from PJI's failure to pay Plaintiff Morris and the Delaware Class members the required minimum wage for each hour they worked in violation of 19 Del. C. § 902.

123.   During the applicable recovery period, PJI paid Plaintiff Morris and the Delaware Class the exact Delaware minimum wage, or at least very close to the exact Delaware minimum wage. Delaware does not permit employers to use tip credits to fulfill the minimum wage requirement.

124.   Delaware's minimum wage was $7.25 per hour prior to 2014, was $7.75 per hour in 2014, was $8.25 per hour from 2015 through 2018, and is $8.75 per hour in 2019.

125.   Since PJI under-reimbursed Plaintiff Morris and the Delaware Class members for their "out-of-pocket" expenses, it also necessarily failed to pay them Delaware's minimum wage.

126.   PJI knew, or should have known, that its employment practices and policies resulted in the minimum wage violations pled here.

127.    In failing to ensure that Plaintiff Morris and the Delaware Class members actually received the applicable minimum wage rate for each hour they worked, PJI acted willfully, or with reckless disregard for clearly applicable DMWA provisions.

128.    PJI has no good faith justification or defense for failing to pay Plaintiff Morris and the Delaware Class members the minimum wage required by the DMWA for each hour they worked.

129.    Pursuant to 9 Del. C. § 911(a), Plaintiff Morris and the Delaware Class members are entitled to the full amount Delaware's minimum wage minimum wage less any amount actually paid, together with costs and reasonable attorney's fees.

### COUNT VIII - VIOLATION OF THE NEW JERSEY WAGE AND HOUR LAW
### (On Behalf Of The New Jersey Class)

130.    Plaintiff Tom Wolff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth above.

131.    Through its conduct described above, PJI has engaged in deceptive acts and practices that resulted in injury to Plaintiff Wolff and the other members of the New Jersey Class.

132.    The unpaid wages at issue in this litigation are "wages" as defined by N.J.S.A. 34:11-56a1(d).

133.    PJI is an "employer" as defined in N.J.S.A. 34:11-56a1(g).

134.    Plaintiff Wolff and the New Jersey Class members are "employees" as defined by N.J.S.A. 34:11-56a1(h).

135.    The NJWHL law requires the payment of New Jersey's minimum wage by employers who employ any person in New Jersey.   N.J.S.A. § 34:11-56a4; N.J.A.C. §§ 12:56-3.1 & 12:56-14.2.

136.     This Count arises from PJI's failure to pay Plaintiff Wolff and the New Jersey Class members the required minimum wage for each hour they worked in violation of N.J.S.A. 34:11-56a.

137.     During the applicable recovery period, PJI paid Plaintiff Wolff and the New Jersey Class the exact New Jersey minimum wage, or at least very close to the exact New Jersey minimum wage, either with or without a tip credit.

138.     New Jersey's minimum wage was $7.25 per hour in 2013, was $8.25 per hour in 2014, was $8.38 per hour in 2015 and 2016, was $8.44 per hour in 2017, was $8.60 per hour in 2018, and is $8.85 in 2019.

139.     PJI, pursuant to its policy and practice, violated the NJWHL by *de facto* deductions for vehicle expenses which have reduced Delivery Drivers' net wages below New Jersey's minimum wage.

140.     Plaintiff Wolff and all other members of the New Jersey Class are victims of uniform compensation and vehicle cost reimbursement policies; and these uniform policies, in violation of the NJWHL, have been applied, and continue to be applied, to all PJI's Delivery Drivers.

141.     As alleged herein, PJI, pursuant to its policy and practice, has reimbursed Delivery Drivers less than the reasonably approximate amount of their automobile expenses to such an extent that it diminishes the Delivery Drivers' net wages below New Jersey's minimum wage.

142.     Pursuant to N.J. Stat. Ann. § 34:11-56a25, Plaintiff Wolff and all New Jersey Class members are entitled to damages equal to the difference between the minimum wage and net wages received after deducting job-related expenses.

143.     PJI knew, or should have known, that its employment practices and policies resulted in the minimum wage violations pled here.

144.    In failing to ensure that Plaintiff Wolff and the New Jersey Class members actually received the applicable minimum wage rate for each hour they worked, PJI acted willfully, or with reckless disregard for clearly applicable NJWHL provisions.

145.    PJI has no good faith justification or defense for failing to play Plaintiff Wolff and the New Jersey Class members the minimum wage required by the NJWHL for each hour they worked.

146.    Pursuant to N.J.S.A. 34:11-56a25, Plaintiff Wolff and the New Jersey Class are entitled to recover the difference between New Jersey's minimum wage and the amount of net wages paid, together with costs and reasonable attorney's fees as determined by the Court.

### COUNT IX - VIOLATION OF THE PENNSYLVANIA WAGE AND HOUR LAW
### (On Behalf Of The Pennsylvania Class)

147.    Plaintiff James Morton Jr. repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

148.    Through its conduct described above, PJI has engaged in deceptive acts and practices that resulted in injury to Plaintiff Morton and the other members of the Pennsylvania Class.

149.    The unpaid wages at issue in this litigation are "wages" as defined by Penn.  43 P.S. §§ 333.103(d).

150.    PJI is an "employer" as defined in 43 P.S. §§ 333.103(g).

151.    Plaintiff Morton and the Pennsylvania Class members are "employees" as defined by 43 P.S. §§ 333.103(h).

152.    The PMWA law requires the payment of Pennsylvania's minimum wage by employers who employ any person in Pennsylvania.   43 P.S. §§ 333.103(g) & (h); 333.104.

153.    This Count arises from PJI's failure to pay Plaintiff Morton and the Pennsylvania Class members the required minimum wage for each hour they worked in violation of 43 P.S. §§ 333.103(g) & (h); 333.104.

154.    During the applicable recovery period, PJI paid Plaintiff Morton and the Pennsylvania Class the exact Pennsylvania minimum wage, or at least very close to the exact Pennsylvania minimum wage, either with or without a tip credit.

155.    Pennsylvania's minimum wage has been $7.25 per hour since 2009.

156.    PJI, pursuant to its policy and practice, violated the PMWA by *de facto* deductions for vehicle expenses which have reduced Delivery Drivers' net wages below Pennsylvania's minimum wage.

157.    Plaintiff Morton and all other members of the Pennsylvania Class are victims of uniform compensation and vehicle cost reimbursement policies; and these uniform policies, in violation of the PMWA, have been applied, and continue to be applied, to all PJI's Delivery Drivers.

158.    As alleged herein, PJI, pursuant to its policy and practice, has reimbursed Delivery Drivers less than the reasonably approximate amount of their automobile expenses to such an extent that it diminishes the Delivery Drivers' net wages below Pennsylvania's minimum wage.

159.    Pursuant to 43 P.S. § 333.113, Plaintiff Morton and all Pennsylvania Class members are entitled to damages equal to the difference between the minimum wage and net wages received after deducting job-related expenses,

160.    Pursuant to 43 P.S. § 333.113, Plaintiff Morton and the Pennsylvania Class are further entitled to an additional amount equal to twice the unpaid wages, costs and reasonable attorney's fees.  Plaintiff Morton and the Pennsylvania Class are entitled to pre-judgment and post-judgment interest as provided by law.

WHEREFORE, Plaintiffs respectfully pray for an Order:

a.    certifying this matter to proceed as a class action;

b.  approving Plaintiffs as adequate Class representatives of their respective Classes;

c.  appointing Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Weinhaus & Potashnick to serve as Class Counsel;

d.  appointing Stephen Zouras, LLP and Paul LLP to serve as Liaison Counsel;

e.  requiring PJI to provide the names and current (or best known) addresses of all members of the identified Collectives and Classes;

f.  authorizing Class Counsel to issue a notice informing the Class members that this action has been filed, of the nature of the action, and of their right to opt out of this lawsuit;

g.  finding that PJI willfully violated the applicable provisions of the FLSA by failing to pay all required wages to Plaintiffs and the collective group members;

h.  finding that PJI willfully violated the applicable provisions of applicable state laws by failing to pay all required wages to class members;

i.  granting judgment in favor of Plaintiffs and the members of the collective group and each class on all Counts;

j.  awarding all available compensatory damages in an amount to be determined;

k.  awarding an equal amount of liquidated damages as provided by the FLSA and applicable state laws;

l.  awarding reasonable attorneys' fees and reimbursement of all costs and expenses incurred in litigating this action;

m.  awarding all available equitable and injunctive relief precluding the continuation of the policies and practices pled in this Complaint;

n.  awarding any further relief the Court deems just, necessary and proper;

o.  granting leave to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; and

p.  maintaining jurisdiction over this action to ensure PJI's compliance with the foregoing.

### DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned counsel, hereby demand a jury trial in the above-captioned matter.

February 22, 2019                                Respectfully submitted,

By:   */s/ Jeremiah Frei-Pearson*
Jeremiah Frei-Pearson
D. Greg Blankinship
Antonino Roman
Andrew C. White
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Tel: (914) 298-3281
jfrei-pearson@FBFGLaw.com

**WEINHAUS & POTASHNICK, LLP**
Mark Potashnick
11500 Olive Blvd., Suite 133
St. Louis, Missouri  63141
Telephone: (314) 997-9150
Facsimile: (314) 997-9170
markp@wp-attorneys.com
*Pro Hac Vice*

**PAUL, LLP**
Richard M. Paul III (*pro hac vice*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone:     (816) 984-8100
Rick@PaulLLP.com
*Pro Hac Vice*

**STEPHAN ZOURAS, LLP**
David J. Cohen

604 Spruce Street
Philadelphia, PA 19106
Tel: (215) 873-4836
dcohen@stephanzouras.com
*Pro Hac Vice*

James B. Zouras
Ryan F. Stephan
Andrew Ficzko
Catherine T. Mitchell
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
Tel: 312-233-1550
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was served on all counsel of record via the Court's electronic case filing system on this 22nd day of February, 2019.

*/s/ Jeremiah Frei-Pearson*