UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

WILLIAM DURLING, MICHAEL MORRIS,　　　:
JAMES MORTON, JR., RICHARD SOBOL,　　　:
MUHAMMAD SULTAN and TOM WOLFF,　　　:
for themselves and all others similarly situated,　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiff,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　- against -　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
PAPA JOHN'S INTERNATIONAL, INC.,　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendant.　　　　　　:

------------------------------------------------------------ X

Case No. 7:16-CV-03592

Class/Collective Action

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DECERTIFICATION

Dated: New York, New York
　　　　March 7,  2022

Gerald L. Maatman Jr.
Kristine Argentine
Matthew Gagnon
Michael L. DeMarino
Lisa L. Savadjian

SEYFARTH SHAW LLP

620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 218-5500
Facsimile: (212) 218-5526

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................... 1

II.  RELEVANT FACTS ...................................................................... 3

    A.  PJI's Reimbursement Rates Vary Drastically Among Corporate Stores And Delivery Drivers .............................................................. 6

    B.  PJI's Hourly Rates Vary Significantly Across And Within Corporate Stores ................................................................................... 7

    C.  Delivery Drivers Varied To The Extent They Used Their Vehicles For Personal Use And Non-Papa John's Employment ................................ 8

    D.  Named Plaintiffs Sultan And Sobol Had Unique Employment Conditions .......... 8

III.  ARGUMENT ............................................................................. 9

    A.  Plaintiffs Have The Burden Of Proving That They Are Similarly-Situated On The Controlling Issue Of Whether They Suffered A Kickback ..................... 9

    B.  Plaintiffs Have Failed To Demonstrate That They And Opt-Ins Are Similarly-Situated On The Controlling Issue Of Whether They Suffered A Kickback .................................................................................. 11

        1.  No Common Unlawful Company Policy Or Practice Exists ................... 11

        2.  Plaintiffs And The Opt-Ins Lack Material Similarity .............................. 13

    C.  Plaintiffs And The Opt-Ins Lack Common Evidence That Would Allow A Trier Of Fact To Decide Liability For The Collective Action As A Whole ......... 18

        1.  Plaintiffs Lack Common Evidence Of A "Minimum" Amount For Vehicle Expenses .................................................................. 18

        2.  The IRS Rate Is Not The "Minimum" Amount Of Vehicle Expenses ................................................................................ 24

    D.  Fairness, Procedural Considerations, And Individual Defenses Require Decertification .......................................................................... 24

IV.  CONCLUSION .......................................................................... 25

80324994v.1

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Abe v. Virginia Dep't of Env't Quality*,
No. 3:20-CV-270, 2021 WL 1845324 (E.D. Va. Apr. 6, 2021) ............................................25

*Arriaga v. Fla. Pac. Farms, L.L.C.*,
305 F.3d 1228 (11th Cir. 2002) ............................................11

*Bradford v. Team Pizza, Inc.*,
No. 1:20-CV-00060, 2020 WL 5987840 (S.D. Ohio Oct. 9, 2020) ........................................14

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ............................................19

*Brown v. Barnes & Noble, Inc.*,
252 F. Supp. 3d 255 (S.D.N.Y. 2017)............................................12, 18

*Buehlman v. Ide Pontiac, Inc.*,
345 F. Supp. 3d 305 (W.D.N.Y. 2018) ............................................17

*Criddell v. Premier Healthcare Servs.*,
LLC, No. 16-CV-5842, 2017 WL 2079653 (C.D. Cal. Feb. 9, 2017)....................................14

*Dieffenbauch v. Rhinehart R.R. Constr., Inc.*,
No. 8:17-CV-1180, 2021 WL 365850 (N.D.N.Y. Feb. 3, 2021)............................................10

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011)............................................20, 23

*In Re Graphics Processing Units Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008)............................................20

*Gregory v. Dillard's, Inc.*,
565 F.3d 464 (8th Cir. 2009) ............................................20

*Hernandez v. Fresh Diet, Inc.*,
No. 12-CV-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014)....................................13, 25

*Hernandez v. United Auto Credit Corp.*,
No. 08-CV-03404, 2010 WL 1337702 (N.D. Cal. Apr. 2, 2010) ............................................9

*Hoffman-LaRoche Inc. v. Sperling*,
493 U.S. 165 (1989)............................................9

*Julian v. MetLife, Inc.*,
No. 17 Civ. 957, 2021 WL 3887763 (S.D.N.Y. Aug. 31, 2021) .......................................12, 18

*Kennedy v. Mountainside Pizza, Inc.*,
No. 19-CV-01199, 2020 WL 5076756 (D. Colo. Aug. 26, 2020) ...........................................24

*Martinez-Trumm v. Citywide Home Loans*,
No. 2:18-CV-103, 2018 WL 3037395 (D. Utah June 19, 2018) ............................................11

*McEarchen v. Urb. Outfitters, Inc.*,
No. 13-CV-3569, 2017 WL 3912345 (E.D.N.Y. Sept. 6, 2017) ...........................................18

*Myers v. Hertz Cor*p.,
624 F.3d 537 (2d Cir. 2010)...................................................................................................10

*Pino v. Harris Water Main & Sewer Contractors Inc.*,
No. 17-CV-5910, 2020 WL 5708889 (E.D.N.Y. Sept. 23, 2020) .........................................17

*Reed v. Advoc. Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)..............................................................................................20

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ..............................................................................................20

*Scott v. Chipotle Mexican Grill, Inc.*,
954 F.3d 502 (2d Cir. 2020)......................................................................................... *passim*

*Scott v. SSP Am., Inc.*,
No. 09-CV-4399, 2011 WL 1204406 (E.D.N.Y. 2011) ...........................................................3

*Southern California Pizza Wage and Hour Cases*, No. JCCP 4725,
2016 WL 3513505 (Cal. Super. June 24, 2016) .......................................................13, 14, 16

*Sullivan v. PJ United, Inc.*,
362 F. Supp. 3d 1139 (N.D. Ala. 2018), *opinion vacated in part on
reconsideration* (Aug. 7, 2018)..........................................................................................16, 24

*Sullivan v. PJ United, Inc.*, No. 7:13-CV-01275-LSC,
2018 WL 10345326 (N.D. Ala. June 22, 2018).....................................................12, 13, 14, 16

*Thind v. Healthfirst Mgmt Servs.*,
LLC, No. 14 Civ. 9539, 2016 WL 7187627 (S.D.N.Y. Dec. 9, 2016) ...................................10

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021).............................................................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)...................................................................................................... *passim*

iii

*Vecchio v. Quest Diagnostics Inc.*,
  No. 16 Civ. 5165, 2020 WL 5604080 (S.D.N.Y. Sept. 18, 2020) .................................. *passim*

*Wass v. NPC Int'l, Inc.*,
  688 F. Supp. 2d 1282 (D. Kan. 2010) ..............................................................................12, 16

*Zivali v. AT&T Mobility, LLC*,
  784 F. Supp. 2d 456 (S.D.N.Y. 2011) ..............................................................................10, 25

**Statutes**

FLSA ............................................................................................................................. *passim*

Portal to-Portal Act, Pub. L. No. 80-49, § 5(a), 61 Stat. 84, 87 (1947) ...........................9

**Other Authorities**

29 C.F.R. § 531.6(b) .............................................................................................................11

29 C.F.R. § 531.35 ...............................................................................................................11

29 C.F.R. § 778.217(d) ........................................................................................................17

80324994v.1

I.   **PRELIMINARY STATEMENT**

On July 20, 2018, the Court permitted Plaintiffs to send notice of this action to thousands of current and former delivery drivers employed by Papa John's International Inc. ("PJI"). (*See* Declaration of Gerald L. Maatman, Jr., Ex. 1, Jul. 20 Hrg. Tr. 24:20-21.) Noting that Plaintiffs merely met the "modest factual showing" and "low standard of proof" for conditional certification, the Court forewarned Plaintiffs of the more rigorous step of the process, explaining that "[w]hen that time comes" the Court will determine whether the collective action may "go forward." (*Id.* 18:14-20.) That day has arrived. The issue now is whether Plaintiffs and those who joined the collective action (the "Opt-Ins") are, in actuality, similarly-situated relative to their alleged minimum wage violation. The answer is that they are not, and under the higher evidentiary burden applicable at this stage of the case, the collective action must be decertified.

Plaintiffs must show that a jury could decide in one proceeding, based on representative proof, that all 9,700 or so Opt-Ins suffered a minimum wage violation in the form of a "kickback" because their vehicle-cost reimbursements from PJI were insufficient and what their purported damages might be, if any. That showing cannot be made. As this Court has noted, "whether the amount that a particular plaintiff was reimbursed pushed that individual below the minimum wage is a factual question." (*Id.* 16:1-2.) And, given the myriad of individualized issues surrounding that question, there is no material similarity among the Opt-Ins, and the "manageability issues" that the Court deferred addressing at the first stage now warrant decertification.

Specifically, the record evidence demonstrates that the Opt-Ins do not share facts "material to the disposition of their FLSA claims." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020). Whether a delivery driver has a claim for a minimum wage violation in a specific workweek turns on a number of individual variables, including: the driver's rate of pay; the number of miles driven while making deliveries; the driver's reimbursement rate; the number of hours

worked in a week; the number of hours spent making deliveries; and the driver's vehicle costs. Their purported damages are likewise individualized.

These answers are not uniform for delivery drivers working at the same store, much less across different geographic regions nationwide. A driver's vehicle cost, *alone*, raises a host of individualized questions, such as the year of the vehicle, the type of vehicle, its gas mileage, depreciation, and whether it was used for other jobs and/or for personal use. Recognizing that there is no collective-wide proof that answers these questions, Plaintiffs' purported proof consists of the fatally flawed expert report of Scott Conlon ("Conlon"), which inappropriately uses a cherry-picked "composite" vehicle to allegedly demonstrate that PJI's vehicle reimbursement program did not reasonably approximate delivery drivers' vehicle expenses. That opinion is pure fiction.

First, Conlon's vehicle cost calculation is not based on the estimated actual expenses incurred by Plaintiffs or any Opt-In member, but on expenses of a hypothetical "composite" vehicle pieced together for litigation. It tells us nothing about the common minimum vehicle costs for each collective action member. Courts reject such fictitious plaintiffs and purported common proof that consists of nothing more than an average. This proof is not representative because it is not shared by all (or even most) individuals in the collective action. Rather, a composite vehicle results in a fictional plaintiff and is not probative of any individual's claim, and using modeling and assumptions that do not reflect the individual characteristics of the Opt-Ins is not appropriate. As such, Plaintiffs' purported common proof is improper under the standard articulated by the U.S. Supreme Court in *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 458 (2016). Because Conlon's vehicle cost figures are not the minimum vehicle costs incurred by the Opt-Ins, they cannot be used by Plaintiffs or an Opt-In to "establish liability in an individual action." *Id.* Indeed, neither

2

Plaintiffs nor an Opt-In would be able to rely on the hypothetical vehicle costs of a vehicle he never drove and driving conditions he never encountered, to establish his own individual claim.

Second, Plaintiffs cannot prove that a "kickback" minimum wage violation occurred in a FLSA workweek by merely demonstrating that PJI's reimbursement is unreasonable insofar as it does not "reasonably approximate" delivery drivers' vehicle expenses. The ultimate liability question is whether delivery drivers, on a collective-wide basis, incurred under-reimbursement of their expenses to the extent that their expenses drove their hourly wage below the minimum wage. As the Court made clear in its decision denying Plaintiffs' second Motion for Conditional Certification, a "per delivery" reimbursement policy does not violate the FLSA. (Ex. 2, Mar. 1, 2018 Hrg. Tr. 15:6-10.) The Court opined that a violation arises only if the employer sets a "per-delivery reimbursement rate that is too low to compensate for the costs associated with making the delivery" such that the result is a FLSA violation. (*Id.*) For all of the variables discussed below, Plaintiffs lack material similarity with regard to resolving that question. *See Scott*, 954 F.3d at 516.

Because the questions at the heart of this case "must be [answered] on a case-by-case basis," the conditionally certified collective action cannot stand and must be decertified. *Scott v. SSP Am., Inc.*, No. 09-CV-4399, 2011 WL 1204406, at *6 (E.D.N.Y. 2011).

## II. <u>RELEVANT FACTS</u>

At all relevant times, PJI's corporate and joint-venture stores were dispersed across 17 different states, located across the Northeast, Southeast, Midwest, South, and Arizona.[1] (Ex. 3, Saad Report ¶ 77.) These geographic differences are material to Plaintiffs' claims because they

---

[1] Richard Sobol and Muhammad Sultan are the only Named Plaintiffs in the conditionally-certified collective action. Of the five original Named Plaintiffs, only one – Sobol – was employed at a corporate-owned restaurant. (ECF No. 210, Heelan June 20, 2017 Dec. ¶ 6.) Sultan worked at a PJI joint-venture store. (*See* February 6, 2019 Minute Entry granting in part motion for leave to amend complaint.) On July 20, 2018, the Court granted Plaintiffs' renewed motion for conditional certification of a collective action comprised of delivery drivers who worked at PJI corporate-owned and joint-venture stores only. (*See* July 23, 2018 Minute Entry memorializing Oral Bench Ruling).

impact vehicle costs-per-mile. (*Id.*) Plaintiffs claim that their incurred vehicle costs caused their effective hourly wage to fall below the minimum wage. (SAC ¶¶ 66, ECF No. 437.) A number of individualized factors materially impact each delivery's driver's vehicle costs:

*Vehicle Types and Age Varied Significantly.* The evidence demonstrates that the make, model, and year of the vehicles driven by delivery drivers varied significantly. PJI's database contains ████ unique automobile makes and models. (Saad Report ¶ 78, n. 69.) Indeed, ████ of drivers reported having compact cars; ████ reported having midsize cars; ████ reported having a Sport Utility Vehicle (SUV); and ████ reported driving a car from 14 other EPA vehicle size class categories. (*Id.*) Vehicle age varied significantly, ranging from ████████████ (Saad Report ¶ 79.) While Plaintiffs' expert Conlon assumes that all delivery drivers drove a vehicle ████ years old, only ████ of delivery drivers drove a vehicle of that vintage. (*Id.*¶ 79, Ex. 16.) These differences are material to Plaintiffs' claims because the size, weight, engine sizes, gas mileage, and age of a vehicle can all significantly impact the "per-mile costs" of operating a vehicle.

*Fuel Costs Varied Significantly.* Fuel is the largest per-mile expense and varies significantly over time, from location to location, across brands and grades of gasoline in the same geographic area, based on the fuel efficiency of the vehicle, and whether the vehicle is driven in the city or highway. Comparing just the cost of fuel, the evidence shows that it varied by state, ranging from ████████████████████ in different states (Saad Report ¶ 42), by time, ranging ████████████████████████████████ (*id.* ¶ 96), and by geographic location, ranging from ████ ████████████████████████ (*id.* Ex. 41). Tremendous variation also exists in the miles-per-gallon (MPG) among the vehicles utilized by

delivery drivers, due to factors such as the vehicle type, the type of driving (highway or city), and maintenance history of the vehicle. (*Id.* ¶ 81.) Also, maintaining the upkeep of the vehicle, keeping tires properly inflated, and using the correct oil can impact ████████████████. (*Id.*) On top of this, the *average* MPG varies state-to-state ████████████ (*Id.* ¶ 82.) Compounding this variation, the average MPG varies by store location and even within a particular store location. (*Id.* ¶ 83 (████████████████████████████████).)

*Miles Driven Per Delivery Varies Significantly.* The variation in miles driven per delivery is material to Plaintiffs' alleged minimum wage violation because drivers were reimbursed on a per-delivery basis; thus, the shorter the distance per delivery, the greater the reimbursement rate per mile. The miles driven per delivery varied by store location, ranging from ████████, and by within a store, ranging, for example, from an average ████████ miles at store 417. (Saad ¶ 86.) This means that at the *same* store, while one driver averages ███ miles per delivery, another delivery driver averages ███ miles per delivery. (*Id.* Appendix Ex. 28.) By contrast, at store number 186, the range is closer, with one driver averaging on the low end ████ per delivery, and another driver averaging on the high end ████ per delivery. (*Id.* Appendix Ex. 26.)[2] Consistent with this data, Opt-Ins testified that their miles per delivery varied, depending on whether they drove in urban or rural area (*see* Ex. 9, Opt-In Testimony Chart), and other location-specific factors, such as whether a store that is located in a college town. (*See id.*)

*The Number Of Deliveries Per Hour Varies Across Delivery Drivers.* There is also tremendous variation in the number of deliveries made per hour across states, ranging from an ████████████████████████████████████ (Saad Report ¶ 92), across stores, ranging from an average of ███ deliveries per hour at store 4701 to ███ at store 9 (*id.*), and

---

[2] Exhibits 26 through 30 of the Saad Report Appendix demonstrate the tremendous variability of the average number of miles driven per delivery by delivery driver at the top five store locations. (Saad Report ¶ 86, Appendix Ex. 25-30.)

even within a particular store, ranging, for example, an average of ██ deliveries per hour from one delivery driver to the next at store 186 (*id.* Appendix Ex. 35). By contrast, at store 1121, the range is significantly smaller, with ███ deliveries per hour. (*Id.* Ex. 38.)[3]

These differences are material to resolving any Opt-Ins' minimum wage claim because the more deliveries per hour, the higher the reimbursement rate and, thus the effective hourly rate.

### A.     PJI's Reimbursement Rates Vary Drastically Among Corporate Stores And Delivery Drivers

During the relevant time period, PJI used a sophisticated reimbursement methodology based on three sets of data, including: (i) ████████████████████████████ ████████████████████████ (Declaration of Billy Higdon ¶ 7, ECF No. 217, filed under seal on June 26, 2017, ECF No. 221), (ii) ██████████████████████ ████████████████████████████████████████ ████████, and (iii) ████████████████████████ ████████████ (*Id.* ¶¶ 8-9.) ████████████████████ ████████████████████████████████ (*Id.* ¶¶ 7-10.)

As a result, the reimbursement rate paid to Opt-Ins is neither stagnant nor consistent across each of the 743 corporate stores. Rather, the data demonstrates that PJI's reimbursement rate varies significantly over time, by store location, and within a store location. (Saad Report ¶¶ 97-100.) It also shows corporate stores ██████████████████████████ ████████████████████████████████ (Rich Butler Decl. ¶ 9.) Based on Plaintiffs' assumption that delivery drivers on average drove ████████████, this range

---

[3] For additional evidence of variation of the number of deliveries made per hour between delivery drivers within a particular store, *see* Exhibits 26 through 30 of the Saad Report Appendix. (Saad Report ¶ 93, Appendix Ex. 35-39.)

equates to fluctuations ██████████████████████████████ (Ex. 4, Conlon Report p. 18, n. 12.)

In fact, the variability in PJI's reimbursement can be analyzed only when reduced to averages.[5] For instance, the *average* per mile reimbursement rate across states and store locations varies significantly, ███████████████████████████████████████████ ███████████████████████████████ Dr. Saad explained, because the per-mile reimbursement rate is a function of miles driven, the reimbursement amount per delivery, and the number of miles driven per delivery, the per-mile reimbursement rate is sensitive to geographic differences that affect the miles driven per delivery. (Saad Report ¶ 98.) ██████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████

PJI's reimbursement rate was materially different even within a given store location. For example, ██████████████████████████████████████████████████████████ █████████████████████ (Saad Report, Appendix, Ex. 45.) Exhibits 45 to 49 in the Appendix to the Saad Report present scatterplots of the average per-mile reimbursement rate by driver at the top five store locations, by number of shifts. (Saad Report ¶ 99.)

## B.    PJI's Hourly Rates Vary Significantly Across And Within Corporate Stores

PJI operates corporate and joint-venture stores across 17 different states. To comply with the various state and municipality minimum wage requirements, PJI does not pay its delivery drivers a uniform hourly rate. (Butler Decl. ¶¶ 5-6.) Instead, the hourly rates paid to delivery drivers, vary from state to state, store to store, within a store depending on driver seniority, and

---

[4] ███████████████████████████████████████████████████████████████
████████.

[5] PJI does not concede that Plaintiffs can rely on assumptions, composite experiences, and averages to prove their FLSA claim on a collective-wide basis.

even for the same driver over time. (*Id.* ¶ 7.) In fact, the data produced demonstrates that ███

██████████████████████████████████████████████████████████████████████████

████████████████████████████████ (Saad Report ¶ 52, Exhibit 6.)

The Named Plaintiffs' individual experiences demonstrate these differences. For instance,

Named Plaintiff Sultan ("Sultan")'s average hourly rate was ████████████████████████████

████████████ rate paid to Plaintiff Richard Sobol ("Sobol"). (Saad Report ¶ 57.)

### C.    Delivery Drivers Varied To The Extent They Used Their Vehicles For Personal Use And Non-Papa John's Employment

The use of Opt-Ins' vehicles for personal uses and other employment varied tremendously.

Opt-Ins testified that they made extensive use of their vehicles for personal matters when not using

them to make deliveries for PJI. For example, Opt-Ins used their cars for personal errands, such as

shopping, dropping kids off at school, commuting to and from work or school, and a myriad of

other activities. (Ex. 9, Opt-In Testimony Chart.) In fact, many Opt-Ins testified that they used

their vehicle a significant percentage of the time for personal uses rather than for making deliveries,

sometimes even to a much greater extent. (*Id.*) Other Opt-Ins testified that they lent their cars or

shared them with others, who also used those vehicles for personal or work reasons unrelated to

the Opt-Ins' work at PJI. This was in addition to the time that Opt-Ins used those cars for personal

use. (*Id.*) One Opt-In even testified that he shared his car with his wife, who was also using that

car to make deliveries for PJI during the same time period as the Opt-In. (*Id.*)

### D.    Named Plaintiffs Sultan And Sobol Had Unique Employment Conditions

Plaintiff Sultan worked at PJI stores located in Alexandria, and Dumfries Virginia . (Sultan

Tr. 45:17-46:7.) During that time, Sultan drove two different vehicles to make deliveries for PJI,

a 2010 Nissan Versa and a 2015 Toyota Camry. (*Id.* p. 2-3.) Sultan testified that he used his vehicle

for PJI about 75% of the time. (Ex. 8, Sultan Tr. 73:23-74:5.) He also testified that while using his

vehicle for employment with PJI, he also used his vehicle for employment with Uber and Lyft. (*Id.* 33:8-25; 34:1.) Sultan admitted that PJI should not have to pay for his car insurance for the portion of time he was using his car to also drive for Uber and Lyft. (*Id.* 122:25-123:8).

Plaintiff Sobol, by contrast, worked at a store in Louisville, Kentucky. (Ex. 7, Sobol Tr. 35:10-13; 51-52). During that time, Sobol drove a 2004 Chrysler Sebring and a 2001 Ford Escape. (Sobol Tr. 118:16-19.) Sobol testified that he used the same vehicle for PJI deliveries that he used for personal matters about 10% of the time, and agreed that PJI should not have to reimburse him for vehicle expenses for his personal use of his vehicle. (Sobol Tr. 133:10-25-134:8.)

## III.   ARGUMENT

### A.   Plaintiffs Have The Burden Of Proving That They Are Similarly-Situated On The Controlling Issue Of Whether They Suffered A Kickback

The FLSA was expressly amended in 1947 to limit actions "to employees who assert[ ] claims in their own right" and to "free[ ] employers of the burden of representative actions." Portal to-Portal Act, Pub. L. No. 80-49, § 5(a), 61 Stat. 84, 87 (1947). While collective actions are permitted, judicial efficiency "can only be achieved to the extent that named plaintiffs and opt-in plaintiffs" are "similarly situated." *Scott*, 954 F.3d at 516; s*ee also Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170, 173 (1989) (allowing plaintiffs to proceed collectively should promote the "efficient resolution in one proceeding" of employees' claims"); *Hernandez v. United Auto Credit Corp.*, No. 08-CV-03404, 2010 WL 1337702, *5 (N.D. Cal. Apr. 2, 2010) ("[W]here there appears to be substantially different employment experiences among the various [Opt-Ins], the procedural advantages of a collective action cannot be realized.").

Such similarity does not mean "any similarity," *Scott*, 954 F.3d at 516 n.4, nor those that are "superficial." *Vecchio v. Quest Diagnostics Inc.*, No. 16 Civ. 5165, 2020 WL 5604080, *14 (S.D.N.Y. Sept. 18, 2020). Rather "the [similarly-situated] standard is met" only "when there is

similarity with respect to 'an issue of law or fact material to the disposition of [plaintiffs'] FLSA claim.'" *Scott,* 954 F.3d at 516 n.4; *Vecchio,* 2020 WL 5604080, at *13 (applying *Scott* to decertify a collective because experiences "varied widely in how long it took to perform . . . pre-appointment work, post-appointment work, and to travel" and thus "[i]t would be impossible for the Court or a jury to decide in one fell swoop" the claims of "the entire collective" action membership).

At the decertification stage, Plaintiffs must meet a more "stringent standard" of proof to establish that the full record shows they and the Opt-Ins are "in fact" similarly-situated and that the case can be fairly and efficiently tried on a collective-wide basis. *Myers v. Hertz Cor*p., 624 F.3d 537, 548, 555 (2d Cir. 2010) ("[T]he regulations make clear that these questions should be resolved by examining the employees' actual job characteristics."); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). A mere allegation of a common decision, policy, or plan is not sufficient to meet this standard. *See Thind v. Healthfirst Mgmt Servs*., LLC, No. 14 Civ. 9539, 2016 WL 7187627,*3 (S.D.N.Y. Dec. 9, 2016) (decertifying collective action where employees' actual job experiences contradicted plaintiffs' assertion of a common, uniform policy). Instead, Plaintiffs must show that they and the Opt-Ins were in fact "common victims of a *FLSA violation* pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation." *Scott*, 954 F.3d at 516. To determine whether plaintiffs have met their burden, courts in the Second Circuit consider: (1) the "disparate factual and employment settings of the individual plaintiffs;" (2) "defenses available to defendants which appear to be individual to each plaintiff;" and (3) "fairness and procedural considerations." *Dieffenbauch v. Rhinehart R.R. Constr., Inc*., No. 8:17-CV-1180, 2021 WL 365850, at *2 (N.D.N.Y. Feb. 3, 2021). Plaintiffs cannot meet their burden on this record.

**B.      Plaintiffs Have Failed To Demonstrate That They And Opt-Ins Are Similarly-Situated On The Controlling Issue Of Whether They Suffered A Kickback**

**1.      *No Common <u>Unlawful</u> Company Policy Or Practice Exists***

It is undisputed that PJI reimbursed delivery drivers on a per-delivery basis. But per the Court's March 1, 2018 ruling denying Plaintiffs' second Motion for Conditional Certification, a "per delivery" reimbursement policy does not violate the FLSA. (Ex. 2, Mar. 1, 2018 Hrg. Tr. 15:6-10.) The Court stated that a violation arises only if the employer sets a "per-delivery reimbursement rate that is too low to compensate for the costs associated with making the delivery" such that the result is a FLSA violation. (*Id.*) In fact, an employer may even *refuse* to reimburse an employee for expenses that are primarily for the benefit of the employer "if the employee nevertheless received the required minimum wage in cash free and clear." 29 C.F.R. § 531.6(b). It is "only to the extent that any such deductions reduce the wages of the employee in any such workweek below the minimum wage required by the Act [that] they are illegal." *Id.*; *see also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (explaining an employer only "must reimburse the Farmworkers up to the point that their wages satisfy the FLSA minimum wage."); *Martinez-Trumm v. Citywide Home Loans*, No. 2:18-CV-103, 2018 WL 3037395, *3 (D. Utah June 19, 2018) (dismissing claim premised solely on the failure to reimburse for business-related expenses without any allegation that the employee's pay fell below the minimum wage).

Plaintiffs' claims are brought under 29 C.F.R. § 531.35 (the "free and clear/kickback" regulation for minimum wage compliance), which states "the wage requirements of the [FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." (ECF No. 321 at 14-15.) A kickback occurs when the cost of tools that "are specifically required for the performance of the employer's particular work . . . cuts into the minimum or overtime wages

required to be paid him under the Act." *Id*. Under the regulation, the question is whether "cost of such tools" cut into Plaintiffs' minimum wage in a given workweek. *Id*.; *Wass v. NPC Int'l, Inc.*, 688 F. Supp. 2d 1282, 1288 (D. Kan. 2010) (explaining no minimum wage violation results by "merely by failing to reimburse plaintiffs for expenses; rather such failure must be in an amount great enough to bring plaintiffs' wages for a particular time period below the legal minimum.").

Plaintiffs cannot merely rest on PJI's per-delivery reimbursement rate as evidence that they are similarly-situated because that fact is not material to the disposition of their claims. *See Julian v. MetLife, Inc.*, No. 17 Civ. 957, 2021 WL 3887763, at *3 (S.D.N.Y. Aug. 31, 2021) ("while Plaintiffs may still share various factual similarities, those facts are not 'material to the disposition of their FLSA claims' . . . they therefore are not 'similarly situated'") (citing *Scott*, 954 F.3d at 516); *Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) ("[M]ere classification of a group of employees . . . is not by itself sufficient . . . evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated.'").

Plaintiffs cannot do so because the evidence demonstrates that, while delivery drivers were reimbursed on a per-delivery basis, they were not reimbursed at a uniform rate, but instead, their per-mile or per-delivery reimbursement rates varied across time, states, locations, and even amongst drivers at the same location. (*See supra* at 6-7 (Delivery drivers were reimbursed anyhere from ███████████████████████████████████████████████████████ ████████████████████████████████████████████

These drastic fluctuations are material to Plaintiffs' claims and impact the kickback calculation in a way that precludes determining *liability* and/or *damages* on a collective-wide basis. A reimbursement methodology that substantially varies among almost 10,000 different delivery drivers is not "common." *See Sullivan v. PJ United, Inc.*, No. 7:13-CV-01275, 2018 WL

10345326, at *1 (N.D. Ala. June 22, 2018) (decertifying collective action where some Opt-Ins were reimbursed for vehicle expenses at a rate higher than the minimum reimbursement rate set by defendants); *Southern California Pizza Wage and Hour Cases*, No. JCCP 4725, 2016 WL 3513505, *4 (Cal. Super. June 24, 2016) ("SoCal Pizza") ("evidence shows that the per delivery rate varies with each store, depends on various factors particular to the store location, and changes on either a quarterly or monthly basis"). To put a finer point on it, a delivery driver who is reimbursed ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████ because the key inquiry is whether the driver's total reimbursements cause the drivers wages to fall below minimum wage. By the same token, even two delivery drivers working at the same store are not similarly-situated ████████████████████████████████████████████████████████████ ████████████████████████ (*See supra* at 7.)

### 2.    *Plaintiffs And The Opt-Ins Lack Material Similarity*

Plaintiffs and the Opt-Ins' depositions, as well as PJI's extensive data produced, reveal no common proof that would allow these kickback violations to be tried on a collective-wide basis. *Scott*, 954 F.3d at 516; *Vecchio,* 2020 WL 5604080, at *12 (decertifying collective action, holding "varying testimony across the deposed opt-in plaintiffs illustrates that no fact-finder could make a blanket finding" as to all members of the collective action). Plaintiffs cannot demonstrate, as they must, that they and the Opt-Ins "are similar in 'relevant respects,' *i.e.*, with respect to the factors relevant to this Court's determination of whether they" suffered a kickback violation. *Hernandez v. Fresh Diet, Inc*., No. 12-CV-4339, 2014 WL 5039431, at *4 (S.D.N.Y. Sept. 29, 2014).

When confronted with nearly identical circumstances to those here, the court in *Sullivan*, 2018 WL 10345326, at *1, decertified a collective action that consisted of delivery drivers who worked for a Papa John's franchisee. The court found that opt-in plaintiffs were not similarly-

13

situated because (1) Opt-in Plaintiffs worked in different states; (2) Opt-in Plaintiffs worked in rural, semi-urban, and urban areas, and at different periods of time in which the Defendants' alleged failure to pay the federal minimum wage occurred; (3) Opt-in Plaintiffs received a different hourly wage; (4) some franchisee owners reimbursed Opt-in Plaintiffs for vehicle expenses at a rate higher than the minimum reimbursement rate set by Defendants; (5) the differing costs incurred by Opt-in Plaintiffs during their delivery such as insurance, registration, vehicle maintenance, and vehicle repair; and that (6) Opt-in Plaintiffs drove different types of vehicles while making deliveries on behalf of the Defendants. *Id.* The court found decertification of the FLSA collective action was necessary because the "procedural burden of litigating the individual costs incurred by each Opt-in Plaintiff would outweigh any benefit to the class-action-nature of the litigation." *Id.*[6]

Likewise, in *SoCal Pizza*, the court twice denied class certification of plaintiffs' claim that defendant under-reimbursed their vehicle costs with per-delivery reimbursement, concluding that plaintiffs' claim was not susceptible to class-wide resolution. 2021 WL 2549103, at *3. The court found that the per delivery rate varies with each store, depends on various factors particular to the store location, and changes on either a quarterly or monthly basis." *Id.* As a result, the court held that even though "Defendant has a general policy of paying drivers a set amount for each delivery does not mean Defendant's policy is uniform as to all stores and all putative class members." *Id.* Ultimately, the court noted that defendant "would be entitled to show that [its per-delivery reimbursements] were more than the class members' actual expenses," which the court noted would "require myriad answers to individualized questions for each class member." *Id.*

---

[6] *See also Criddell v. Premier Healthcare Servs.*, LLC, No. 16-CV-5842, 2017 WL 2079653, at *4 (C.D. Cal. Feb. 9, 2017) (denying class certification of vehicle reimbursement claims); *Bradford v. Team Pizza, Inc.*, No. 1:20-CV-00060, 2020 WL 5987840, at *2 (S.D. Ohio Oct. 9, 2020) (denying conditional certification of nationwide collective action of delivery drivers and limiting collective action to location where plaintiff worked).

In rejecting plaintiffs' second attempt to certify a collective action, the court held:

"Plaintiffs still must establish that class members' actual expenses were indeed less than the lump sums paid. Proof would hinge on numerous individualized inquiries, such as the age and condition of each class member's car; his or her gasoline, maintenance, and insurance costs (and the portion of each properly attributed to work-related driving); the number of miles he or she drove; and the number of deliveries he or she made, including whether multiple deliveries were made to the same location."

*Id.* at *3. In denying class certification, the court rejected plaintiffs' contention that "any uncertainty in the mileage incurred by class members or the amount of their actual expenses simply goes to damages," thus echoing this Court's conditional certification assessment that a FLSA violation arises *only if* the employer sets a "per-delivery reimbursement rate that is too low to compensate for the costs associated with making the delivery." *See supra* at 3. Specifically, the court noted this is a question of liability, not damages, explaining that "liability is established only if the amounts paid by Defendant were less than the actual expenses incurred by class members. Plaintiffs cannot rely on estimates to prove their case." *Id.* at *4.

Here, the same variability and individualized issues across the membership of the collective action result in lack of material similarity and render the action unsuitable for adjudication on a collective-wide basis. Whether a given Opt-In suffered a kickback violation and/or received a reimbursement amount that reasonably approximated their individual vehicle costs turns on material and individual factors that are not uniform by store location, much less across all 749 stores. Plaintiffs and the Opt-Ins cannot show that they are similarly situated with respect to the "material" factors relevant to resolving their claims. *See Scott*, 954 F.3d at 51. For example:

- ***Plaintiffs Lack Similarity With Respect To Reimbursement Rates.*** Plaintiffs' core contention is that PJI's reimbursement rate resulted in a kickback violation. ███████ ████████████████████████, the evidence shows that PJI's reimbursement rate varied extensively driver to driver, state to state, within a store, and over time. (*See supra* at 6-7.) In fact, at one store location, a delivery driver's average reimbursement rate was ████████ the amount of another delivery driver's rate. (*Id.*) Hence, the Opt-Ins are not similarly-situated with respect to their reimbursement rates, which is "material to the disposition of

their FLSA claims." *Scott*, 954 F.3d at 517; *SoCal Pizza*, 2016 WL 3513505, at *4 (denying class certification because "the per delivery rate varies with each store, depends on various factors particular to the store location, and changes on either a quarterly or monthly basis").

- ***Plaintiffs Lack Similarity With Respect To Hourly Rates.*** While Plaintiffs claim they were all paid at or near minimum wage, *see* Compl. ¶ 66, the evidence demonstrates hourly rates varied significantly across stores and even within stores. (*See supra* at 6.) A delivery driver's hourly rate is material to his or her FLSA claim because it may or may not be high enough to absorb their vehicle costs, thus negating any kickback that would otherwise drop their hourly rate below the minimum. *See Wass*, 688 F. Supp. 2d at 1288 (under-reimbursement "must be in an amount great enough to bring plaintiffs' wages for a particular time period below the legal minimum"). For example, delivery driver "A" earning ███ per hour is not similarly-situated to delivery driver "B" earning ███ – almost double delivery driver "A". (*See supra* at 8.) Practically speaking, if all else were equal, delivery driver "B" would need to incur vehicle costs ███████ that of "A" in order for their claims to be on par with one another. Consequently, the Opt-Ins are not similar in regards to this "material" fact, and thus are not similarly-situated for purposes of § 216(b). *Scott*, 954 F.3d at 517; *Sullivan*, 2018 WL 10345326, at *1 (decertifying collective action because, among other reasons, Opt-Ins "received a different hourly wage").

- ***Plaintiffs Lack Similarity Regarding Miles Per Delivery And Deliveries Per Hour.*** The number of miles driven per delivery varied widely by state, store location, driver to driver, and even across drivers within the same stores. (*See supra* at 5.) Also, the number of deliveries per hour differ per Opt-In. (*Id.*) These variations impact costs, and are "material" to Plaintiffs' alleged minimum wage violation because drivers were reimbursed on a per-delivery basis, which means the shorter the delivery distance per delivery, the greater the reimbursement rate, and the greater number of deliveries per hour, the higher the reimbursement rate, and thus the effective hourly rate. *See Scott* 954 F.3d at 517.

- ***Plaintiffs Lack Similarity With Respect To Geographical Locations.*** Delivery drivers are not similarly-situated with respect to their work environment, but rather worked across geographically diverse locations. This is a material factor relevant to resolving their claims, *see Scott* 954 F.3d at 517, because store location impacts a delivery driver's unique vehicle costs on a per mileage basis since different locations required longer delivery distances, had different fuel costs, and impacted depreciation and other vehicle maintenance costs differently. (Saad Report ¶ 77.) Opt-Ins did not all work at a single location, where gas prices, driving conditions, and maintenance costs are uniform, but worked across 17 different states. (*See supra* at 7; Saad Report. ¶ 89.)

- ***Plaintiffs Lack Similarity With Respect To Vehicle Costs***. Although Conlon assumes that ████████████████████████████████████[7] the evidence reveals extensive variability of vehicle costs across the collective action members. Several non-uniform factors impact a given delivery

---

[7] Conlon assumes that each driver incurred vehicle costs of ████████████████ ████████████████████ (Conlon Report p. 47.)

driver's vehicle costs, including the vehicle driven, its trim, year, mileage, fuel costs, depreciation, insurance, and the number of miles driven per delivery. (*See supra* at 4.) In fact, Conlon admitted in testimony that annual vehicle costs differ from driver to driver and even for the same driver within a given week, and that fuel prices and driving distances varied. (Ex. 6, Conlon Dep. 42:16-25.) Conlon also admits that it is possible PJI's per delivery reimbursement methodology could have *over*-reimbursed delivery drivers for their vehicle expenses, depending on their individual vehicle costs. (*Id.* 106:3-25.)[8] Thus, Plaintiffs and the Opt-Ins "do not share a similar issue of fact material to the disposition of their FLSA claims." *See Pino v. Harris Water Main & Sewer Contractors Inc.*, No. 17-CV-5910, 2020 WL 5708889, *3 (E.D.N.Y. Sept. 23, 2020) (citing *Scott*, at 516.)

- ***Plaintiffs Lack Similarity With Respect To Personal Use.*** Deposition testimony from Opt-Ins demonstrates that Opt-Ins varied greatly in terms of using their delivery vehicle for personal use. For instance, some Opt-Ins only used their vehicle to make deliveries. While others varied in the frequency in which they used their vehicle for personal use, ranging anywhere from 20% to 75% personal use, sharing their vehicles with their spouses, and even using their vehicle for other jobs (*e.g.*, Uber, Lyft, Domino's, Jimmy John's, etc.), as much as 75% of the time. (Saad Report n. 27.) The variation in personal use is "material" to Plaintiffs' claims because PJI is not required to reimburse drivers for vehicle costs attributable to their personal use of the vehicle. *See* FLSA 2020-12 ("when the employee's vehicle is not solely a tool of the trade, employers would be required to reimburse only the variable expenses attributable to the employee's use of the vehicle for the employer . . . .")[9] Hence, the Opt-Ins are not similarly-situated with regard to this "material" fact, which drives the determination of what a particular Opt-In's vehicle costs are and, in turn, what reimbursement amount reasonably approximates those costs. *See Scott*, 954 F.3d at 517; *Vecchio,* 2020 WL 5604080, at *13 (finding opt-in testimony demonstrated "wide variation in the amount of time they spent on various tasks" and therefore opt-ins were not "similarly-situated for purposes of certification").

In sum, Plaintiffs cannot meet the standard articulated in *Scott*, 954 F.3d at 517 because they and 9,700 or so Opt-Ins do not share facts "material to the disposition of their FLSA claims." *Id*. For the same reasons, Plaintiffs also cannot satisfy the first prong of the *ad hoc* test – "disparate factual and employment settings." *See Buehlman v. Ide Pontiac, In*c., 345 F. Supp. 3d 305, 314 (W.D.N.Y. 2018) (decertifying where the "employment settings varied in material ways").

---

[8] In this respect, those individuals would have no injury-in-fact for purposes of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021), and cannot be similarly situated as a matter of law.

[9] 29 C.F.R. § 778.217(d) (employer need not reimburse expenses "normally incurred" for employee's own benefit); *SoCal Pizza*, 2021 WL 2549103, at *3 (denying class certification because of the individualized issue of apportioning insurance costs to "work-related driving"). Thus, any dispute Plaintiffs manufacture concerning *how* PJI chooses to reimburse delivery drivers is a red herring, as there is no requirement to reimburse expenses. And, while PJI anticipates Plaintiffs may argue their damages averages mirror PJI's reimbursement rate, this is a false equivalency. PJI's sophisticated reimbursement methodology is based on three sets of data that vary by market, not simply bald averages.

### C.    Plaintiffs And The Opt-Ins Lack Common Evidence That Would Allow A Trier Of Fact To Decide Liability For The Collective Action As A Whole

Plaintiffs lack common evidence that would allow a trier of fact to conclude that all Opt-Ins were under-reimbursed for vehicle expenses to the extent that they suffered a kickback violation (let alone their alleged damages, if any). Courts have decertified collective actions when, as here, a plaintiff's claim turns on evidence that is not common to the collective action. *See Julian*, 2021 WL 3887763, at *3 (decertifying collective action where plaintiffs' claims depended on "evidence that is not common to the collective" ); *Vecchio*, 2020 WL 5604080, at *13 (decertifying a collective action where "it would be impossible for the Court or a jury to decide in one fell swoop the proper hours calculation for the entire collective"); *McEarchen v. Urb. Outfitters, Inc.*, No. 13-CV-3569, 2017 WL 3912345, *2 (E.D.N.Y. Sept. 6, 2017) (decertifying FLSA collective action because variations among the named plaintiffs and opt-in plaintiffs resulted in a lack of "'representative' proof"); *Brown*, 2018 WL 3105068, at *6 ("'When representative or common proof cannot be used . . .collective treatment for a merits determination is not warranted.").

Here, because Plaintiffs and the Opt-Ins do not share similar issues of fact material to the disposition of their FLSA claim, they also lack common evidence to answer the key question of whether each Opt-In's reimbursements cause his wages to fall below the minimum wage, or that PJI's reimbursement rate failed to reasonably approximate each Opt-In's vehicle expenses.

### 1.    *Plaintiffs Lack Common Evidence Of A "Minimum" Amount For Vehicle Expenses*

Plaintiffs' purported common evidence is, in fact, not "common" and fails to meet the admissibility requirements established by the U.S. Supreme Court in *Tyson Foods, Inc.*, 577 U.S. at 458. Plaintiffs' theory of liability assumes that vehicle expenses for each of the 9,700 or so delivery drivers were exactly the *same*, regardless of the vehicle he drove, the model, trim, or year of that vehicle, the geographical gas prices in the area where the driver worked, and the insurance

costs associated with the region where he worked. Plaintiffs' theory also assumes that every delivery driver was paid the exact same reimbursement rate and drove the exact same mileage when making a delivery. In other words, Plaintiffs have created a composite vehicle and a fictitious plaintiff and then assume that the vehicle costs of this hypothetical plaintiff, using this hypothetical vehicle is the same for the *entire membership of the collective action.*

This is the exact type of representative evidence that courts have prohibited. Indeed, in *Tyson Foods, Inc.*, 577 U.S. at, 458, the Supreme Court made clear that representative evidence is only proper if the "the sample at issue could have been used to establish liability in an individual action."[10] Here, it is self-evident that it is not. Plaintiffs' purported "common evidence" fails the test articulated in *Tyson Foods, Inc.*, because no Named Plaintiff or Opt-In would be able to rely on the hypothetical vehicle costs of a vehicle they never drove to establish his or her own individual claim. Confronted with similar so-called representative evidence and long before *Tyson*, the Fourth Circuit likewise rejected an expert's model that was based on a "fictional franchise operation." In *Broussard v. Meineke Disc. Muffler Shops, In*c., 155 F.3d 331, 343 (4th Cir. 1998), plaintiffs' expert based his testimony on an "abstract analysis of 'averages,'" and "admitted that he had 'not attempted to calculate the damages that any individual franchisee has suffered in this case,' focusing instead on the fictional 'typical franchisee operation.'" *Id*; *c.f.* Conlon Dep. 101:6-11 (Conlon admitted that he never compared Plaintiffs' or any Opt-In's estimated vehicle costs to his calculated rates). As a result, the Fourth Circuit concluded that "plaintiffs attempted to substitute this 'hypothetical or speculative" evidence, divorced from any actual proof of damages."

---

[10] There, the Supreme Court deemed the representative evidence at issue permissible because it was needed to fill an "evidentiary gap" created by the "employer's failure to keep adequate records," despite its statutory obligation to do so. *Id*. at 1047. In *Tyson Foods, Inc.*, the Supreme Court distinguished the representative evidence at issue in *Wal-Mart Stores, Inc. v. Dukes* because the employees there could not "have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against." *Id.*

Importantly, the Court opined "that this shortcut was necessary in order for this suit to proceed as a class action should have been a caution signal to the district court that class-wide proof" was unavailable. *Id.*

Similarly, in *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011), the Third Circuit affirmed a denial of certification of a toxic tort class. There, it rejected plaintiff's representative evidence because the "proof would show only the amount that hypothetical residents of the village would have been exposed to under a uniform set of assumptions without accounting for differences in exposure year-by-year or based upon an individual's characteristics." *Id.* The Court concluded plaintiff could not rely on "hypothetical, composite persons in order to gain class certification." *Id*; *see also Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (rejecting plaintiff's use of "hypothetical composite plaintiff" to obtain class certification); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010) (reversing certification because plaintiffs "may not lawfully "amalgamate" their disparate claims in the name of convenience"); *Reed v. Advoc. Health Care,* 268 F.R.D. 573 (N.D. Ill. 2009) (noting even if "average wage was reduced by the alleged conspiracy, that would not mean that all members of the proposed class suffered a reduced wage.").

Likewise, in *In Re Graphics Processing Units Antitrust Litigation,* 253 F.R.D. 478, 493-97 (N.D. Cal. 2008), the court found that by resorting to averaging in his analysis of the prices of graphics cards, plaintiffs' expert "evaded the very burden that he was supposed to shoulder," *id.* at 493, and it accordingly held that plaintiffs did not provide a viable method of demonstrating class-wide injury with common proof. The court explained that averaging "by definition glides over what may be important differences" and "can hide substantial variation across individual cases." 253 F.R.D. at 494 (citation omitted).

Plaintiffs' purported common proof or "representative evidence" runs afoul of *Tyson* and suffers from the same flaws evidenced in these decisions. Conlon's model piles on assumption after assumption and stacks averages upon averages to create an amalgamation – the "perfect hypothetical plaintiff.[11] For example Conlon assumes:

Faulty Assumption 1: Of the more than ███ different vehicles utilized by delivery drivers, Conlon selected 7 specific vehicles,[12] which he used to calculate an *average* measure of cost per mile driven for all collective action members. (Conlon Report, at 31.) In other words, Conlon assumed that each and every Opt-In drove the *same composite* vehicle.

Faulty Assumption 2: Although the data shows that vehicle age varied anywhere between 1 year to 30 years, Conlon assumed that every collective action member drove a vehicle that ████████████████████ (Saad Report, at n. 71.)

Faulty Assumption 3: Although the data shows that PJI's reimbursement rates varied significantly from driver to driver and over time, *see supra* at 6, Conlon assumed that PJI ████████████████████████████████████ ██████████████████

Faulty Assumption 4: In arriving at his reimbursement rate of ███, Conlon assumed that every Opt-In drove on average ███ miles per delivery, (Conlon Report, at 18), despite the record evidence demonstrating that delivery distances varied driver to driver, including state by state, store to store, and even within a particular store. (*See supra* at 6.)

Faulty Assumption 5: Although there is considerable data variation in the percentage of driving that takes place in rural versus city areas, Conlon assumed that each and every Opt-In drove in city conditions (using 100 percent city driving fuel economy) and never drove on highways when making deliveries. (Conlon Report, at 24.) In fact, Conlon admitted that he never analyzed the extent to which delivery drivers drove in rural versus urban areas, despite acknowledging that city driving results in higher vehicle costs attributable to stop and go driving, increased fuel and maintenance costs. (Conlon Dep. 50:14-25.)

Faulty Assumption 6: Although discovery and testimony reveals that delivery drivers varied to the extent they used their vehicle for other employment and personal matters, Conlon assumed that each Opt-in drove ████████████████████ ████████████████████████ (Conlon Report, at 32.)[13]

---

[11] Plaintiffs cannot base their similarly-situated argument on a flawed expert analysis that does not meet the admissibility requirement under *Daubert*. Per the Court's oral ruling at the January 28, 2022 conference, the parties will brief their respective *Daubert* motions after the Court resolves the instant motion that is *sub judice*.

[12] ████████████████████████████████████████████████████████ ████████████████████████████████████

[13] Admitting he made absolutely no effort to determine how many miles drivers drove per year for business purposes, (Conlon Dep 98:17-21.), Conlon assumed that every driver drove 15,000 miles per year *because that is the default*

By crafting these faulty assumptions and "averages," Conlon constructs a purely hypothetical vehicle cost figure that is not indicative of the estimated <u>minimum</u> vehicle costs of Plaintiffs or any particular Opt-In. This is improper under *Tyson* because no plaintiff could rely on such information to prove his FLSA claim. For example, Sultan worked in Alexandria, Virginia, and drove a 2010 Nissan Versa – a sub-compact car, which he also used 25% of the time for personal use including driving for Uber and Lyft. (*See supra* at 8.) In contrast, Plaintiffs' purported representative evidence assumes that *every delivery* driver drove the same composite vehicle (not one being a Nissan Versa) that was 10.69 years old, and includes only national average gas and insurance costs as part of the vehicle cost calculation. (*See supra* at 4.) Plaintiffs' representative evidence also assumes that delivery drivers drove their vehicles *exclusively for PJI*. (*Id.*)

If Sultan filed an identical individual action for under-reimbursement, he could not rely on the estimated vehicle costs of a hypothetical vehicle he never drove, with an age different form his actual vehicle, or the gas prices of geographical regions that he never encountered. Similarly, he could not rely on an average of national insurance costs, when his own insurance costs were known to him, or can be estimated based on the zip code in which he lived. Nor would he permitted to rely on vehicle costs based on the assumption that he used his vehicle solely for work with PJI.

Tellingly, the same Edmunds TCO data relied upon by Conlon to piece together his composite vehicle is also available for determining the estimated vehicle costs of Plaintiff Sultan's Nissan Versa, had he wanted to actually estimate his vehicle costs (instead of a fictitious person's costs). Likewise, gas prices in Alexandria, Virginia, where Sultan worked, are similarly available had Conlon wanted to use them, as are Sultan's insurance costs. But Conlon never considered analyzing the Named Plaintiffs, comparing an individual Opt-in's estimated vehicle costs to the

---

*mileage assumed in Edmunds TOC data*. (*Id.* at 98.) Yet according to an internal PJI estimate, delivery drivers drove ████████████████████████████████████████████████ (*Id.* at. 104:18-25:105:1-15.)

reimbursement rates that he came up with. (Conlon Dep. 101:6-11.) In sum, neither Plaintiffs nor Conlon ever attempted to *estimate* their vehicle costs based on the vehicles they actually drove, the hours they worked, the miles per delivery they drove, the gas prices in the geographic regions they worked, or any other variable applicable to them.

*Tyson* controls here. It precludes Plaintiffs from relying on their purported common evidence to establish liability for the collective action. As the Supreme Court recognized in *Tyson*, in *Wal-Mart* no plaintiff "could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers." *See Tyson*, 577 U.S. at 458. The same is true here; no Opt-In could prevail in an individual suit by relying on the vehicle costs associated with a vehicle *he did not drive or under driving conditions he did not encounter*. Rather, a plaintiff would have to prove that the *actual* reimbursement that *he* was paid was not a reasonable approximation of *his* vehicle costs based on the vehicle that *he* drove, under *his personal driving* circumstances, *the* gas prices and insurance premiums that *he* paid, and prove it caused a kickback based on the hourly rate that *he* earned.

An average is made up of numbers that are higher and lower than the average. The collective action members are real people, not "average" people, and their vehicle costs vary from the average, hypothetical vehicle for all of the reasons individuals vary from averages. Plaintiffs' "composite plaintiff" only tells one what a hypothetical, fictitious delivery driver may have incurred in vehicle costs. It tells one nothing about the common minimum vehicle costs for each collective action member. *Gates,* F.3d at 265 (denying class certification where plaintiffs' common evidence merely "showed average daily exposure, not minimum exposure") (emphasis added).

### 2.    *The IRS Rate Is Not The "Minimum" Amount Of Vehicle Expenses*

For the same reasons, Plaintiffs may not evade the material disparities among the collective action members by assuming their vehicle costs were at least equal to the IRS Rate.[14] Like Conlon's composite vehicle and fictitious plaintiff, the IRS Rate has no connection to the real-world actual vehicle costs for any particular collective action member, and is an average rate. Indeed, as courts have recognized, the IRS Rate is a national average itself, and thus has the potential to under-reimburse or over-reimburse employees depending on whether they work in regions with above or below average vehicle-related costs. *Kennedy v. Mountainside Pizza, Inc.*, No. 19-CV-01199, 2020 WL 5076756, *5 (D. Colo. Aug. 26, 2020). Indeed, the IRS Rate "does not account for geographic variances; 'as such, it is not specific to individual drivers or locations.'" *Id.*; *Sullivan v. PJ United, Inc.*, 362 F. Supp. 3d 1139, 1154 (N.D. Ala. 2018), *opinion vacated in part on reconsideration* (Aug. 7, 2018) ("The IRS rate is arbitrary and has no logical tie to the ultimate question in a minimum wage case — whether Sullivan was paid the federal minimum wage taking into account reimbursements he received for vehicle expenses he incurred.").

### D.    **Fairness, Procedural Considerations, And Individual Defenses Require Decertification**

The Court should also grant decertification because PJI has individualized defenses as to particular Opt-Ins, and fairness and procedural considerations require decertification. Courts have decertified conditionally certified collective actions when, as here, plaintiffs' evidence "is not

---

[14] The annual IRS "Standard Mileage Rates" publication sets forth the "standard mileage rates for … computing the deductible costs of operating an automobile for business, charitable, medical or moving expense purposes." *See, e.g.*, 2021 Standard Mileage Rates, available at https://www.irs.gov/pub/irs-drop/n-21-02.pdf (last accessed on Feb. 25, 2021). According to the IRS, the IRS rate is "the maximum standard automobile cost that may be used in computing the allowance under a fixed and variable rate (FAVR) plan." *Id*. Because the IRS rate is the maximum allowance for vehicle expenses, the IRS rate over-compensates most, if not all, of the vehicle expenses throughout the United States. The IRS Rate is not directly relevant to determining the "actual cost of driving for an employer." (Saad Report, at 9 (explaining the IRS Rate is a "maximum total costs 'safe harbor' amount for reimbursements under the tax regulations and overstates vehicle costs because it represents a total cost of vehicle ownership).

representative and cannot fairly be extrapolated to the" opt-in population and resolving the "many fact-specific issues . . . would essentially require . . . mini-trials of each individual plaintiff." *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 469 (S.D.N.Y. 2011) (decertifying collective action where "the defenses available to" defendant were "individual to each plaintiff").

Here, Conlon admitted that it is possible that PJI's per delivery reimbursement methodology could *over*-reimburse delivery drivers for their vehicle expenses, depending on their individual vehicle costs. (Conlon Dep. 106:3-25.) Hence, a collective action deprives PJI of the opportunity to put on a defense demonstrating that the "actual" reimbursement rate paid to a particular Opt-In (as opposed to an average) was a reasonable approximation of that Opt-In's vehicle expenses, based on an estimation of the vehicle expense of that Opt-In derived from the vehicle actually driven in circumstances actually encountered. *See Hernandez*, 2014 WL 5039431, at *6 (decertifying collective action where "proceeding as a collective action would . . . prejudice [D]efendants' ability to present their defenses"). Determinations of whether PJI's reimbursement rates reasonably approximated a given Opt-In's vehicle expenses, much less caused a minimum wage violation, "would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Zivali,* 784 F. Supp. 2d at 468; *Abe v. Virginia Dep't of Env't Quality*, No. 3:20-CV-270, 2021 WL 1845324, at *4 (E.D. Va. Apr. 6, 2021) (applying *Scott v. Chipolte* and finding that because defendant could assert a unique defense, "plaintiffs no longer 'share legal or factual similarities material to the disposition of their claim'").

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the conditionally certified collective action cannot stand. Plaintiff and the approximately 9,700 or so Opt-Ins do not share facts material to the disposition of their FLSA claims. Proceeding as a collective action here would create a result antithetical to collective action treatment and deprive PJI of its right to put it on an adequate defense.

25

**Dated: March 7, 2022**

Respectfully submitted,

PAPA JOHN'S INTERNATIONAL, INC.


By:  */s/ Gerald L. Maatman, Jr.*

Gerald L. Maatman, Jr.


Gerald L. Maatman, Jr.
Kristen Argentine
Matthew J. Gagnon
Michael DeMarino
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL  60606
(312) 460-5000


Lisa Savadjian
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York  10018-1595
(212) 218-5500

*Counsel for Defendant*
*Papa John's International, Inc.*

26

80324994v.1